

| | | |
|---|---|---|
| SVEA HOVRÄTT<br>Avdelning 02<br>Rotel 020106 | **DOM**<br>2016-12-09<br>Stockholm | Mål nr<br>T 2675-14 |

Sid 1 (74)

**KÄRANDE**
Republiken Kazakstan
Ministry of Justice
Orynbor Street 8, House of Ministries, 13 Entrance
010000, Astana, Left Bank, Kazakhstan

SVEA HOVRÄTT 20.17-02-03
Domen/Beslutet vann
laga kraft den 2016-12-09

I tjänsten

Ombud:
1. Advokaten Pontus Ewerlöf
MAQS Advokatbyrå AB
Box 7009, 103 86 Stockholm

2 och 3. Advokaten Alexander Foerster och jur. kand. Ludwig Metz
Mannheimer Swartling Advokatbyrå AB
Box 1711, 111 87 Stockholm

4. Advokaten Karl Guterstam
Frank Advokatbyrå
Box 7099, 103 87 Stockholm

Att denna fotografiska kopia är
likalydande med fotograferade
handlingen betygar i tjänsten

**SVARANDE**
1. Ascom Group S.A.
75 A. Mateevici Street
Chisinau, MD-2009, Moldavien

2. Anatolie Stati
20 Dragomirna Street
Chisinau, MD-2008, Moldavien

3. Gabriel Stati
1A Ghioceilor Street
Chisinau, MD-2008, Moldavien

4. Terra Raf Trans Traiding Ltd.
Don House, Suite 31
30-38 Main Street, Gibraltar

Ombud för 1–4: Advokaterna Bo G H Nilsson, Therese Isaksson och Ginta Ahrel
Advokatfirman Lindahl KB
Box 1065, 101 39 Stockholm

**SAKEN**
Skiljedoms ogiltighet m.m. avseende skiljedom meddelad i Stockholm den
19 december 2013 med rättelse den 17 januari 2014

Dok.Id 1302455

| Postadress | Besöksadress | Telefon | Telefax | Expeditionstid |
|---|---|---|---|---|
| Box 2290<br>103 17 Stockholm | Birger Jarls Torg 16 | 08-561 670 00<br>08-561 675 00<br>**E-post**: svea.avd2@dom.se<br>www.svea.se | 08-561 675 09 | måndag – fredag<br>09:00-15:00 |

SVEA HOVRÄTT       **DOM**       Sid 2
Avdelning 02                                                 T 2675-14

### DOMSLUT

1. Hovrätten lämnar Republiken Kazakstans talan utan bifall.

2. Republiken Kazakstan ska ersätta Ascom Group S.A. för rättegångskostnader med 4 614 358 SEK och 377 400,65 USD, varav 3 969 852 SEK avser ombudsarvode, jämte ränta på de två förstnämnda beloppen enligt 6 § räntelagen (1975:635) från dagen för hovrättens dom till dess betalning sker.

3. Republiken Kazakstan ska ersätta Anatolie Stati för rättegångskostnader med 4 114 357 SEK och 377 400,65 USD, varav 3 969 852 SEK avser ombudsarvode, jämte ränta på de två förstnämnda beloppen enligt 6 § räntelagen från dagen för hovrättens dom till dess betalning sker.

4. Republiken Kazakstan ska ersätta Gabriel Stati för rättegångskostnader med 4 114 357 SEK och 377 400,65 USD, varav 3 969 852 SEK avser ombudsarvode, jämte ränta på de två förstnämnda beloppen enligt 6 § räntelagen från dagen för hovrättens dom till dess betalning sker.

5. Republiken Kazakstan ska ersätta Terra Raf Trans Traiding Ltd. för rättegångs-kostnader med 4 114 357 SEK och 377 400,65 USD, varav 3 969 852 SEK avser ombudsarvode, jämte ränta på de två förstnämnda beloppen enligt 6 § räntelagen från dagen för hovrättens dom till dess betalning sker.

SVEA HOVRÄTT        **DOM**      Sid 3

Avdelning 02                              T 2675-14

## Innehållsförteckning

1. BAKGRUND .................................................................................................... 5

2. YRKANDEN..................................................................................................... 6

3. ÅBEROPADE RÄTTSLIGA GRUNDER OCH OMSTÄNDIGHETER I SAK .. 8

   3.1 Kazakstan ................................................................................................... 8

     3.1.1 Rättsliga grunder för talan............................................................... 8

     3.1.2 Omständigheter i sak....................................................................... 8

       3.1.2.1 Ogiltighet på grund av det bedrägliga upplägget, falsk bevisning, vilseledande information m.m............................................................... 8

       3.1.2.2 Upphävande på grund av att skiljedomen inte omfattas av ett giltigt skiljeavtal ................................................................................. 14

       3.1.2.3 Ogiltighet alternativt upphävande på grund av utnämningen av skiljenämnden ........................................................................... 15

       3.1.2.4 Upphävande på grund av uppdragsöverskridande alternativt handläggningsfel (felaktig bevisvärdering m.m.) ............................................ 17

       3.1.2.5 Övriga uppdragsöverskridanden alternativt handläggningsfel.............. 20

   3.2 Investerarna.............................................................................................. 22

     3.2.1 Rättsliga grunder för bestridandet.................................................... 22

     3.2.2 Omständigheter i sak....................................................................... 22

       3.2.2.1 Ogiltighet på grund av det påstått bedrägliga upplägget, falsk bevisning, vilseledande information m.m.................................................. 22

       3.2.2.2 Skiljedomen omfattas av ett giltigt skiljeavtal ...................................... 28

       3.2.2.3 Utnämningen av skiljenämnden ........................................................... 30

       3.2.2.4 Uppdragsöverskridanden alternativt handläggningsfel (påstått felaktig bevisvärdering m.m.) ............................................................. 32

       3.2.2.5 Övriga uppdragsöverskridanden alternativt handläggningsfel.............. 35

4. UTREDNINGEN............................................................................................. 37

5. DOMSKÄL...................................................................................................... 37

   5.1 Dispositionen av hovrättens domskäl....................................................... 37

   5.2 Rättsliga utgångspunkter för hovrättens prövning ................................... 38

     5.2.1 Ordre public som grund för ogiltighet ............................................. 38

     5.2.2 Uppdragsöverskridande och handläggningsfel som grund för upphävande 40

   5.3 Frågan om skiljedomens ogiltighet alternativt upphävande......................... 42

     5.3.1 Ogiltighet på grund av det bedrägliga upplägget, falsk bevisning, vilseledande information m.m.................................................................. 42

SVEA HOVRÄTT        **DOM**        Sid 4

Avdelning 02                                              T 2675-14

5.3.2 Upphävande på grund av att skiljedomen inte omfattas av ett giltigt skiljeavtal ................................................................................................ 44

5.3.3 Ogiltighet alternativt upphävande på grund av utnämningen av skiljemännen .......................................................................................................... 51

5.3.4 Upphävande på grund av uppdragsöverskridande alternativt handläggningsfel ........................................................................................... 57

   5.3.4.1 Taras Khalelovs vittnesutlåtande och vittnesmål ............................... 57

   5.3.4.2 Kazakstans sakkunnig- och vittnesbevisning ..................................... 59

   5.3.4.3 Beaktande av invändningar avseende avdrag på skadeståndet m.m. ..... 61

   5.3.4.4 Övriga påstådda uppdragsöverskridanden och handläggningsfel ........ 62

5.3.5 Hovrättens sammanfattande slutsatser och sammantagna bedömning av Kazakstans talan ......................................................................................... 66

**5.4 Rättegångskostnader** ................................................................................ **67**

5.4.1 Ersättningsskyldig part ............................................................................. 67

5.4.2 Investerarnas kostnadsyrkande .................................................................. 67

5.4.3 Ersättning för parts eget arbete .................................................................. 68

5.4.4 Ersättning för King & Spaldings biträde .................................................... 68

5.4.5 Ersättning för King & Spaldings utlägg ..................................................... 69

5.4.6 Investerarnas ersättningsyrkande i övrigt .................................................. 70

5.4.7 Sammanfattande bedömning ...................................................................... 70

**5.5 Överklagande** ........................................................................................... **71**

SVEA HOVRÄTT        **DOM**       Sid 5
Avdelning 02                 T 2675-14

## 1. BAKGRUND

Republiken Kazakstan (Kazakstan) har naturtillgångar i form av olja och naturgas och
har önskat att utländska investerare ska bistå landet i utvinning av dessa tillgångar. För
detta syfte har Kazakstan ratificerat det internationella avtalet Energy Charter Treaty
(ECT). Mellan åren 1999 och 2003 förvärvade Anatolie Stati och hans son Gabriel
Stati via bolagen Ascom Group S.A. (Ascom) och Terra Raf Trans Traiding Ltd (Terra
Raf) samtliga aktier i två kazakstanska bolag, Kazpolmunay LLP (KPM) och
Tolkynneftegaz LLP (TNG). KPM ägde utvinningsrättigheter till oljefältet Borankol,
på vilket den s.k. LPG-anläggningen skulle uppföras av TNG. TNG ägde motsvarande
rättigheter till naturgasfältet Tolkyn. TNG hade också prospekteringsrättigheter enligt
ett avtal benämnt "Avtal 302". Anatolie Stati, Gabriel Stati, Ascom och Terra Raf
benämns nedan Investerarna.

Sedan Kazakstan år 2010 sagt upp avtalen om utvinningsrättigheter påkallade
Investerarna skiljeförfarande och gjorde gällande att Kazakstan brutit mot sina skyldig-
heter enligt ECT genom överträdelser av investerarskyddsreglerna. Investerarna yrkade
i skiljeförfarandet skadestånd om drygt 3 miljarder USD. Skiljeförfarandet ägde rum
vid Stockholms handelskammare (SCC) och dom meddelades den 19 december 2013 i
SCC:s mål nr V (116/2010), med rättelse den 17 januari 2014. Skiljenämnden bestod
av professor Karl-Heinz Böckstiegel (ordförande), advokaten David Haigh och
professor Sergei Lebedev. Under skiljeförfarandet anlitade vardera parten ekonomiska
och geologiska experter för värdering av aktuella anläggningar.

Skiljenämnden ogillade vissa behörighetsinvändningar som framställts av Kazakstan
och fann att Kazakstan brutit mot sina förpliktelser om "fair and equitable treatment"
enligt art. 10 (1) ECT. Av denna artikel framgår att gjorda investeringar ska behandlas
skäligt och rättvist. Vidare fann skiljenämnden att de åtgärder som Kazakstan vidtagit
hade orsakat skada och att Kazakstan var skadeståndsskyldigt. Skiljenämnden fann
också att Investerarna var berättigade till ett skadestånd om 508 130 000 USD jämte
ränta från den 30 april 2009 enligt en räntesats motsvarande den genomsnittliga räntan
på sexmånaders amerikanska statsskuldväxlar. Från skadeståndsbeloppet avdrogs ett
belopp avseende skulder uppgående till 10 444 899 USD som skiljenämnden ansåg att

SVEA HOVRÄTT      **DOM**      Sid 6

Avdelning 02            T 2675-14

Investerarna inte längre svarade för. Det belopp som Kazakstan enligt skiljedomen
förpliktades att betala till Investerarna uppgick således till 497 685 101 USD. Kost-
naderna för skiljeförfarandet delades mellan parterna på så sätt att Kazakstan fick bära
tre fjärdedelar och Investerarna en fjärdedel. Kazakstan förpliktigades att ersätta
Investerarna för deras rättegångskostnader med 8 975 496,40 USD, vilket motsvarade
hälften av Investerarnas rättegångskostnader.

Två av skiljemännen var skiljaktiga. Sergei Lebedev var skiljaktig i fråga om skilje-
nämndens behörighet och David Haigh i fråga om skadeståndets storlek.

# 2. YRKANDEN

**Kazakstan** har yrkat att hovrätten i första hand ska förklara skiljedomen ogiltig i
dess helhet eller i vart fall i de delar domen avser LPG-anläggningen, dvs. med ett
belopp om 199 miljoner USD jämte ränta enligt skiljedomen samt en motsva-
rande reduktion av tillerkänd rättegångskostnad med 1 757 546 USD.

**Kazakstan** har yrkat att hovrätten i andra hand ska upphäva skiljedomen i dess
helhet eller delvis.

För det fall hovrätten finner att skiljedomen ska ogiltigförklaras eller upphävas delvis
har Kazakstan yrkat att enligt skiljedomen utdömda belopp ska reduceras med
1. 199 miljoner USD jämte ränta enligt skiljedomen samt en motsvarande reduk-
   tion av tillerkänd rättegångskostnad med 1 757 546 USD om hovrätten finner
   att Skiljenämnden har underlåtit att beakta avgörande vittnesbevisning be-
   träffande värdet på LPG-anläggningen, och/eller
2. 277,8 miljoner USD jämte ränta enligt skiljedomen samt en motsvarande
   reduktion av tillerkänd rättegångskostnad med 2 453 499 USD om hovrätten
   finner att Skiljenämnden har förlitat sig på Investerarnas geologiska experter
   utan att ange skäl härför och därvid helt underlåtit att beakta Kazakstans
   geologiska experter, och/eller
3. 215,3 miljoner USD jämte ränta enligt skiljedomen samt en motsvarande
   reduktion av tillerkänd rättegångskostnad med 1 901 506 USD om hovrätten

SVEA HOVRÄTT        **DOM**        Sid 7
Avdelning 02        T 2675-14

finner att Skiljenämnden har överskridit sitt uppdrag och begått ett handlägg-
ningsfel genom att inte fatta beslut om Kazakstans invändningar om att alla
intäkter som tillfallit Investerarna mellan värderingstidpunkten och dagen för
uppsägning av avtalet skulle avräknas från ett eventuellt skadestånd, och/eller

4. 99,5 miljoner USD jämte ränta enligt skiljedomen samt en motsvarande
   reduktion av tillerkänd rättegångskostnad med 878 773 USD om hovrätten
   finner att Skiljenämnden har överskridit sitt uppdrag och begått ett handlägg-
   ningsfel genom att inte ta hänsyn till och fatta beslut om Kazakstans invänd-
   ning om att en skiljedom för LPG-anläggningen endast kan omfatta hälften av
   det antagna värdet, och/eller

5. 277,8 miljoner USD jämte ränta enligt skiljedomen samt en motsvarande
   reduktion av tillerkänd rättegångskostnad med 2 453 499 USD om hovrätten
   finner att Skiljenämnden har överskridit sitt uppdrag och begått handlägg-
   ningsfel genom att beträffande värderingen av Tolkyn och Borankol felaktigt
   antagit att Kazakstan vitsordat ett visst värderingsresultat, då Kazakstan i själva
   verket klart och tydligt angett att värderingsresultatet var felaktigt och över-
   drivet.

**Investerarna** har motsatt sig bifall till Kazakstans talan i någon del. För det fall
hovrätten skulle finna att skiljenämnden överskred sitt uppdrag eller begick något
handläggningsfel har Investerarna begärt att hovrätten ska vilandeförklara målet och
bereda skiljenämnden tillfälle att vidta rättelse.

**Kazakstan** har motsatt sig att skiljenämnden ska få tillfälle att vidta rättelse.

**Parterna** har yrkat ersättning för sina rättegångskostnader.

SVEA HOVRÄTT **DOM** Sid 8
Avdelning 02 T 2675-14

# 3. ÅBEROPADE RÄTTSLIGA GRUNDER OCH OMSTÄNDIGHETER I SAK

## 3.1 Kazakstan

### 3.1.1 Rättsliga grunder för talan

1.  Skiljedomen och det sätt på vilket skiljedomen har tillkommit är uppenbart oförenlig med grunderna för rättsordningen i Sverige, dvs. strider mot s.k. ordre public och är därför helt eller delvis ogiltig enligt 33 § första stycket 2 lagen (1999:116) om skiljeförfarande (LSF).

2.  Skiljedomen ska upphävas helt eftersom
    a)  den inte omfattas av ett giltigt skiljeavtal mellan parterna (34 § första stycket 1 LSF),
    b)  skiljenämnden har utsetts i strid med skiljedomsreglerna för Stockholms Handelskammares Skiljedomsinstitut, SCC-reglerna, och med likabehandlingsprincipen (34 § första stycket 4 LSF) samt
    c)  tillsättandet av skiljenämnden utgör ett handläggningsfel som sannolikt har inverkat på utgången (34 § första stycket 6 LSF).

3.  Skiljedomen ska upphävas helt eller delvis eftersom skiljenämnden har överskridit sitt uppdrag och/eller begått handläggningsfel som vart och ett, eller i vart fall i kombination, har inverkat på målets utgång (34 § första stycket 2 och 6 LSF).

Mot bakgrund av att skiljemannen Sergei Lebedev har gått ur tiden i april 2016 saknas förutsättningar för skiljenämnden att vidta rättelse.

### 3.1.2 Omständigheter i sak

*3.1.2.1 Ogiltighet på grund av det bedrägliga upplägget, falsk bevisning, vilseledande information m.m.*

Skiljedomen och det sätt på vilket skiljedomen tillkommit är uppenbart oförenlig med grunderna för rättsordningen i Sverige, dvs. strider mot ordre public. Det är vidare

oförenligt med grunderna för rättsordningen att upprätthålla skiljedomar som är baserade på omfattande bedrägliga upplägg och korruption eller att tillåta process-bedrägeri i form av falsk bevisning.

För det första har uppförandet av LPG-anläggningen omgärdats av ett omfattande och avancerat bedrägligt upplägg, som utgör korruption, från Investerarnas sida. Upplägget har gått ut på att, genom skenavtal och skentransaktioner, skapa ett väsentligt fingerat värde i LPG-anläggningen. För det andra har Investerarna ägnat sig åt processbedrägeri genom att medvetet presentera falsk bevisning i form av vittnesattester, vittnes-förhör och expertutlåtanden avseende det bedrägliga upplägget och därmed LPG-anläggningens värde, vilken bevisning vilseledd Kazakstan, SCC och skiljenämnden. Investerarna har vidare medvetet undanhållit information avseende investeringen i och värderingen av LPG-anläggningen för att dölja det bedrägliga upplägget för Kazakstan, SCC och skiljenämnden. För det tredje har Investerarnas bedrägliga upplägg och vilseledande påverkat utgången i målet då det legat till grund för KazMunaiGas National Companys (KMG) indikativa bud och därmed skiljenämndens beräkning av skadeståndet. Vidare har den falska bevisningen påverkat skiljenämndens generella värdering av vittnesförhör, vittnesattester, expertrapporter och Investerarnas talan i stort, vilket både påverkat ansvarsfrågan och bedömningen av skadeståndets storlek.

Dessa omständigheter utgör var för sig och sammantaget att skiljedomen strider mot grunderna för rättsordningen i Sverige.

Det bedrägliga och vilseledande upplägget

Investerarna vilseledde medvetet skiljenämnden, SCC och Kazakstan beträffande sina investeringskostnader i LPG-anläggningen. Den påstådda investeringskostnaden om 245 miljoner USD utgjordes till stor del av fingerade kostnader. Det vilseledande upplägget innefattade följande.

De fingerade investeringskostnaderna hade sin grund i ett avtal (Perkwood-avtalet) mellan TNG och bolaget Perkwood Investment Limited (Perkwood). Trots att Perkwood enligt Perkwood-avtalet skulle ha agerat huvudleverantör av byggnads-

SVEA HOVRÄTT                    **DOM**                Sid 10
Avdelning 02                                          T 2675-14

material och utrustning samt projektledare i projektet med uppförandet av LPG-
anläggningen har Perkwood inte levererat några varor eller utfört några tjänster.
Avtalet mellan Perkwood och TNG var i stället ett skenarrangemang. I skiljeför-
farandet underlät Investerarna att upplysa skiljenämnden och Kazakstan om Perkwood-
avtalet och om Perkwoods roll i projektet med uppförandet av LPG-anläggningen.
Investerarna underlät vidare att informera revisorerna som granskade de av
Investerarna upprättade årsredovisningarna om Perkwoods verkliga funktion och i
synnerhet att Perkwood var ett TNG och Investerarna närstående bolag.

Genom det vilseledande upplägget skapade Investerarna en bild av att stora belopp
hade investerats eller skulle investeras i LPG-anläggningen, vilket möjliggjorde för
Investerarna att yrka ett högre skadestånd än de annars hade varit berättigade till. De
fingerade investeringskostnaderna omfattade följande delar:

i.   *Fingerade inköpskostnader*

     Enligt Perkwood-avtalets Annex 2 skulle TNG betala cirka 93 miljoner USD
     till Perkwood för utrustning som var identisk med den som redan levererats av
     ett annat företag, Tractebel Gas Engineering GmbH (TGE). TGE var den
     verkliga huvudleverantören av komponenterna och utrustningen till LPG-
     anläggningen och hade levererat till ett pris vilket uppgick omräknat till 34,5
     miljoner USD. Dessutom omfattade vissa tillägg till Perkwood-avtalet (Annex
     14 och 16) föremål som ingick även i Annex 2 och som dessutom levererats
     tidigare.

ii.  *Fingerade komponentkostnader*

     TNG bokförde ett belopp om 72 miljoner USD avseende komponenter och
     utrustning som påståtts ha levererats men ännu inte installerats i LPG-
     anläggningen. I realiteten har denna utrustning aldrig existerat.

iii. *Fingerade räntekostnader*

     Den påstådda räntekostnaden om 60 miljoner USD, avseende lån som upptagits
     för att finansiera uppförandet av LPG-anläggningen, är beräknad på de
     fingerade investeringskostnaderna och därmed fiktiv i samma utsträckning som
     kostnaden för komponenter och utrustning.

SVEA HOVRÄTT        **DOM**        Sid 11

Avdelning 02                                     T 2675-14

*iv.*    *Fingerad management fee*

Den påstådda investeringskostnaden innefattar s.k. "management fee" om cirka 44 miljoner USD, vilken betalats till Perkwood utan någon avtalsrättslig grund och utan motprestation i form av lämnade tjänster.

Vidare betalade TNG cirka 37 miljoner USD i förskott till Perkwood för byggnads-material och utrustning som inte behövdes och som aldrig levererats, "Förskott på icke-levererade komponenter". Trots den uteblivna leveransen har beloppet inte återbetalats till TNG.

Det vilseledande upplägget har medfört att stora penningströmmar kunnat slussas ut från Kazakstan, vilket strider mot det grundläggande syftet med ECT, som är att skydda "good faith"-investeringar i värdlandet. Därefter riktade Investerarna ett krav mot staten Kazakstan, inledde ett skiljeförfarande och åberopade investerarskydd enligt ECT trots att sådant investerarskydd saknades på grund av ovan nämnda omständigheter.

<u>Investerarna har presenterat falsk bevisning, lämnat vilseledande information och undanhållit relevant information i skiljeförfarandet</u>

Det bedrägliga upplägget var avsett att vilseleda skiljenämnden och Kazakstan för att på så vis erhålla ett väsentligt högre skadestånd genom skiljedomen än vad som annars varit möjligt. För att åstadkomma detta åberopade Investerarna falsk bevisning i form av vittnesattester, vittnesförhör och expertrapporter samt lämnade vilseledande information i inlagor och under huvudförhandlingen i skiljeförfarandet enligt följande: "statement of claim" den 18 maj 2011, "claimant's reply memorial on jurisdiction and liability" den 28 maj 2012, "claimant's reply memorial on quantum" den 7 maj 2012, "Stati's first post hearing brief" den 8 april 2013, "Stati's second post hearing brief" den 3 juni 2013, "transcript from hearing on jurisdiction and the merits" den 1 oktober 2012, "transcript from hearing on quantum" den 28 januari 2013, Arthur Lungus första vittnesattest den 17 maj 2011, Anatolie Statis andra vittnesattest den 7 maj 2012 och Catalin Broscarus vittnesattest den 11 april 2011.

SVEA HOVRÄTT                    **DOM**                    Sid 12
Avdelning 02                                              T 2675-14

Investerarna vilseledde även skiljenämnden och Kazakstan genom att undanhålla information som kunnat avslöja det bedrägliga upplägget. Bland annat vilseledde Investerarna medvetet skiljenämnden och Kazakstan om vilka parter som varit delaktiga i investeringen i projektet med LPG-anläggningen, och följaktligen hur stor del av den totala investeringskostnaden som belöpt på Investerarna. Vilseledandet bestod i att Investerarna i skiljeförfarandet gjorde gällande att de ensamma hade stått för hela investeringskostnaden trots att denna i själva verket hade delats med Vitol, vilket Investerarna anförde i ett parallellet skiljeförfarande mellan Vitol och Montvale Invest Ltd. (Montvale), det s.k. Montvale-målet.

Investerarna vilseledde också skiljenämnden och Kazakstan beträffande berättigade parter i anslutning till projektet med LPG-anläggningen. Vilseledandet bestod i att Investerarna underlät att upplysa Kazakstan och skiljenämnden om att Terra Raf hade överlåtit samtliga rättigheter och skyldigheter hänförliga till LPG-anläggningen till det närstående bolaget Montvale, vilket Investerarna anförde i det parallella Montvale-målet. Denna uppgift skulle ha haft betydelse för skiljenämndens bedömning av Terra Rafs status som investerare under ECT och också för Terra Rafs rätt till skadestånd i skiljeförfarandet.

Investerarna undanhöll information om Perkwood, Perkwood-avtalet och Perkwoods roll i uppförandet av LPG-anläggningen. Investerarna har aldrig under skiljeförfarandet presenterat något dokument som klarlagt Perkwoods roll i projektet. Varken Kazakstan eller skiljenämnden har haft kännedom om det bedrägliga upplägget eller den falska bevisningen före det att skiljedomen meddelades.

Det var mot bakgrund av detta processbedrägeri som Investerarna framställde sitt yrkande i skiljeförfarandet och skiljedomen meddelades.

Värderingen av LPG-anläggningen

Skiljenämnden tog del av den falska bevisningen och den vilseledande informationen som hänvisas till ovan och detta påverkade sannolikt skiljenämndens bevisvärdering generellt och slutsatser avseende såväl jurisdiktion som ansvarsfrågan. Avseende

SVEA HOVRÄTT              **DOM**                    Sid 13
Avdelning 02                                         T 2675-14

bedömningen av skadeståndets storlek valde dock skiljenämnden att inte förlita sig på
de expertrapporter som Investerarna åberopade i målet och vilka baserades på finge-
rade investeringskostnader. I stället tog skiljenämnden avstamp i KMG:s indikativa
bud, vilket även det baserades på Investerarnas vilseledande information om LPG-
anläggningens värde.

I skiljeförfarandet åberopade Investerarna ett s.k. indikativt bud på LPG-anläggningen
om 199 miljoner USD som lämnats av KMG som en alternativ grund för sitt skade-
ståndsyrkande i ECT-målet, punkten 1707 i skiljedomen. Felaktig och vilseledande
information från Investerarna till bolagets revisorer KPMG Audit LLC (KPMG), den
ryska investmentbanken Renaissance Capital och KMG låg till grund för det indikativa
budet.

Det indikativa budet grundade sig på investeringskostnaden för uppförandet av LPG-
anläggningen. KMG tog investeringskostnaden från "Information Memorandum" som
på uppdrag av Investerarna upprättats av Renaissance Capital. "Information Memo-
randum" byggde i sin tur på finansiell information om Investerarnas kazakstanska
tillgångar, vilka var upptagna i de konsoliderade årsredovisningarna för Tristan Oil
Ltd. (Tristan Oil), KPM och TNG. Dessa årsredovisningar hade upprättats av respek-
tive bolagsledning, i vilka Anatolie Stati ingick, och hade granskats av KPMG. Den
information avseende de belopp som investerats i LPG-anläggningen och som var del
av årsredovisningarna var felaktig och vilseledande på grund av de ovan beskrivna
fingerade kostnaderna. Investerarna underlät också att informera KPMG om att
Perkwood var en närstående part, vilket Investerarna hade en skyldighet att göra enligt
redovisningsstandarden International Financial Reporting Standards och "Information
Memorandum".

Med hänsyn till den värderingsmetod som angetts i det indikativa budet skulle KMG
ha värderat LPG-anläggningen till ett väsentligt lägre belopp om TNG:s verkliga
investeringskostnader för LPG-anläggningen hade återspeglats i de dokument som låg
till grund för KMG:s indikativa bud. Skiljenämndens bedömning av LPG-anlägg-
ningens värde och följaktligen det skadestånd som tilldömdes Investerarna grundade

SVEA HOVRÄTT       **DOM**       Sid 14

Avdelning 02              T 2675-14

sig på det indikativa budet, varför Investerarnas bedrägliga och vilseledande upplägg direkt har inverkat på utgången av målet, se punkten 1747 i skiljedomen.

*3.1.2.2 Upphävande på grund av att skiljedomen inte omfattas av ett giltigt skiljeavtal*

Skiljedomen omfattas inte av ett giltigt skiljeavtal mellan parterna eftersom Investerarna gav in sin påkallelseskrift endast fem dagar efter det att KPM:s och TNG:s avtal om utvinningsrättigheter sagts upp, och därigenom bröt mot den tvingande föreskriften om tre månaders förstegsförhandling i art. 26 (2) ECT. Kazakstans anbud att ingå skiljeavtal under ECT innefattade ett villkor om tre månaders förstegsförhandling enligt art. 26 (2) ECT. Påkallande av skiljeförfarande betraktas därmed som en oren accept av Kazakstans anbud. Förstegsförhandlingar har inte förts av Investerarna.

Det bestrids att kravet på förstegsförhandling har avhjälpts genom att förhandlingar genomförts efter det att skiljeförfarande hade inletts. Kravet enligt art. 26 ECT utgör en tvingande formföreskrift och är en förutsättning för att skiljeavtalet uppkom.

Det bestrids att Kazakstan avstod från sin invändning om bristande jurisdiktion i samband med att skiljenämnden vilandeförklarade målet i avvaktan på att parterna skulle försöka göra upp målet i godo.

Vidare bestrids att de brev som Investerarna skickat till Kazakstan kunde uppfattas som begäran om förstegsförhandlingar enligt ECT. Breven innehöll inte några krav hänförliga till ECT eller önskemål om förhandling för att uppnå en "amicable settlement". Vidare omfattade de inte Anatolie Stati och Gabriel Stati utan hänvisade endast till Terra Raf och Ascom. Det bestrids att det vid diskussionerna som hållits, bl.a. den 19 mars 2009 vid ett möte där Kazakstan deltog, gjordes någon hänvisning till ECT.

Det bestrids att bedömningen huruvida en förstegsförhandling på förhand är utsiktslös eller inte saknar betydelse för skyldigheten att delta i sådan förhandling. Vidare bestrids att en förstegsförhandling i detta fall skulle ha varit utsiktslös.

SVEA HOVRÄTT        **DOM**        Sid 15

Avdelning 02                          T 2675-14

Skiljenämnden avgjorde inte frågan om dess behörighet på ett korrekt sätt senast i samband med skiljedomen. Skiljenämnden skulle ha prövat om i ECT angivna processförutsättningar var uppfyllda och om det förelåg ett giltigt skiljeavtal i förhållande till var och en av Investerarna. (Se punkterna 828–830 i skiljedomen.)

### 3.1.2.3 Ogiltighet alternativt upphävande på grund av utnämningen av skiljenämnden

Kazakstan fick aldrig tillfälle att utse någon skiljeman. I Kazakstans ställe utsåg SCC skiljemannen professor Sergei Lebedev. Förfarandet innebar en kränkning av Kazakstans grundläggande processuella rättigheter och SCC-reglerna. Att Kazakstan fråntogs rätten att utse sin egen skiljeman innebär att det sätt på vilket skiljedomen har tillkommit är uppenbart oförenligt med grunderna för rättsordningen i Sverige. Alternativt är detta en brist i utseendet av skiljenämnden. I vart fall har det förekommit fel i SCC:s handläggning som inverkat på utgången i målet.

Det bestrids att det klart framgår av SCC-reglerna att Kazakstan skulle utse en skiljeman i sin svarsskrift. Enligt SCC-reglerna ska svaranden *om tillämpligt* inkomma med information om den skiljeman som har utsetts. Kazakstan har antagit att SCC ska, liksom är fallet för andra frekvent anlitade skiljedomsinstitut, först fatta beslut om antalet skiljemän.

Föreläggandena från SCC saknade uppgift om att Kazakstan skulle ha utsett en skiljeman i sitt svar på påkallelseskriften. Föreläggandena från SCC saknade vidare uppgift om att SCC skulle komma att utse skiljeman i Kazakstans ställe om Kazakstan inte självt utsåg en skiljeman. SCC gav inte heller Kazakstan tillfälle att yttra sig över Investerarnas begäran om att en skiljeman skulle utses för Kazakstans räkning. SCC bröt därmed mot den i LSF förankrade likabehandlingsprincipen.

SCC agerade också i strid mot principen om ett rättvist förfarande och principen om parternas likabehandling genom att bestämma för korta tidsfrister. Tidsfristen för Kazakstan att inkomma med svarsskrift ska, i enlighet med SCC-reglerna, tidigast

**DOM**

Sid 16
T 2675-14

räknas från den 11 augusti 2010 då Kazakstan tog del av föreläggandet. Det innebär att Kazakstan beviljades en tidsfrist om 15 dagar. De tidsfrister som bestämdes var alltför korta med hänsyn till att tvisten var komplex, att Kazakstan var en suverän stat, att skiljeförfarandet påkallats i strid mot föreskriven förhandlingsfrist, att befordran av handlingarna tog tid, att SCC:s förelägganden var otydliga, att Kazakstan inte med lätthet kunde förstå engelska, att Kazakstan måste ha rimlig tid på sig att anlita ett ombud, samt att utseendet av en skiljeman kräver noggrant övervägande och kommunikation.

SCC gav inte Kazakstan rätt att höras i samband med utnämnandet av en skiljeman i dess ställe. Kazakstan borde i vart fall fått tillfälle att yttra sig över Investerarnas begäran om att en skiljeman skulle utses för Kazakstans räkning.

Det bestrids att Kazakstan har avstått från sin rätt att utse skiljeman eller att föra talan om detta i hovrätten. Kazakstan har uppfyllt kraven på "reklamation" enligt 34 § andra stycket LSF och 31 § i SCC-reglerna. Kazakstan har inte vid något tillfälle bekräftat att skiljenämnden skulle ha varit konstituerad på ett riktigt sätt och alltså avstått från sin invändning härom. Uttalandet under förhandlingen den 8 oktober 2012, vilken hölls ca två år efter det att skiljenämnden konstituerats, åsyftade bara invändningar mot skilje-nämndens agerande under förhandlingen och inte hinder mot skiljeförfarandet i dess helhet.

SCC underlät att rätta sitt misstag genom att ge Kazakstan en möjlighet att utse en ny skiljeman.

SCC har inte följt sin tidigare praxis beträffande utseende av skiljeman.

Sergei Lebedev intog en mycket passiv roll under skiljeförfarandet och kunde inte säkerställa att Kazakstans talan uppfattades på ett korrekt sätt av skiljenämnden.

SVEA HOVRÄTT         **DOM**         Sid 17

Avdelning 02                       T 2675-14

*3.1.2.4 Upphävande på grund av uppdragsöverskridande alternativt handläggningsfel (felaktig bevisvärdering m.m.)*

<u>Taras Khalelovs vittnesutlåtande och vittnesmål</u>

Skiljenämnden grundade sitt beslut att tillerkänna Investerarna skadestånd för LPG-anläggningen enbart på påståendet att Kazakstan hade arbetat för att färdigställa LPG-anläggningen sedan Investerarna lämnat landet. Påståendet grundade sig på två internetlänkar som fanns i en fotnot i en expertrapport, den s.k. FTI-rapporten, upprättad av Investerarnas experter, se punkten 1745 i skiljedomen. Internetlänkarna gavs inte in som bevisning och översattes inte, vilket stod i strid med punkten 7 i "Procedural Order No. 1", se punkten 20 i skiljedomen. Investerarna frånföll vidare påståendet i efterföljande inlagor. Skiljenämnden underlät att beakta avgörande muntlig bevisning i form av Taras Khalelovs vittnesutlåtande och vittnesmål vilken motbevisade detta påstående.

Detta har inverkat på målets utgång vad avser LPG-anläggningens värde med ett belopp om 199 miljoner USD motsvarande skiljenämndens uppskattning.

<u>Kazakstans sakkunnig- och vittnesbevisning</u>

Skiljenämnden underlät att beakta

    i.    ingivna sakkunnigutlåtanden från professor Anatoly Didenko och Kadirbek Latifov och vittnesbevisning från Salamat Baymaganbetov avseende klassificeringen av pipelines,

    ii.    sakkunnigutlåtande från professor Kulyash Ilyassova avseende lagligheten i avståendet från förköpsrätten,

    iii.    sakkunnigutlåtande från professor Tomas Balco och vittnesbevisning från Nurlan Rahimgaliev avseende lagligheten i kvarskattebedömningen,

    iv.    väsentliga delar av utlåtandet från Deloitte GmbH (Deloitte) avseende kausalitet, och

    v.    väsentliga delar av Kazakstans geologiska experters, Gaffney Cline & Associates, rapport.

SVEA HOVRÄTT                    **DOM**                    Sid 18
Avdelning 02                                              T 2675-14

Skiljenämnden, som grundade sin skiljedom på ett stort antal omständigheter som
sammantaget ansågs utgöra en samordnad trakasserikampanj ("string of measurement
of coordinated harassment"), hade inte kunnat komma fram till de bedömningar som
gjorts om den beaktat bevisning som åberopats av Kazakstan.

i.   Skiljenämnden underlät att beakta innehållet i kazakstansk rätt angående
     klassificeringen av pipelines, punkten 1090 i skiljedomen, trots att parterna var
     eniga om att kazakstansk rätt härvid skulle tillämpas. I skiljeförfarandet
     åberopade Kazakstan sakkunnigutlåtanden från professorerna Anatoly Didenko
     och Kadirbek Latifov samt skriftligt vittnesutlåtande från Salamat
     Baymaganbetov, vilka samtliga gav stöd åt Kazakstans inställning avseende
     klassificeringen av pipelines. Skiljenämnden underlät emellertid att ens nämna
     att dessa utlåtanden hade getts in, jfr punkterna 82, 174, 1088, 1090 i skilje-
     domen.

ii.  Skiljenämnden avgjorde en fråga om kazakstansk civilrätt utan att beakta det av
     Kazakstan åberopade sakkunnigutlåtandet från Kulyash Ilyassova, se punkterna
     1093, 1095 och 1417 i skiljedomen. Den aktuella frågan gällde Kazakstans
     förköpsrätt till aktierna i TNG vid Terra Rafs förvärv år 2005. I stället för att
     tillämpa kazakstansk civilrätt konstaterade skiljenämnden att Kazakstans åter-
     kallande av bemyndigandet av denna överlåtelse utgjorde en del av den sam-
     ordnade trakasserikampanjen.

iii. Skiljenämnden avgjorde en fråga om kazakstansk skatterätt utan att beakta av
     Kazakstan åberopade sakkunnigutlåtanden från Tomas Balco och vittnes-
     utlåtande från Nurlan Rahimgaliev, vilka gav stöd åt Kazakstans inställning
     avseende restskattefrågan, se punkterna 1541 och 1798 – 1800 i skiljedomen.
     Tomas Balco och Nurlan Rahimgaliev nämns inte ens i domskälen i skilje-
     domen. I stället för att tillämpa kazakstansk skatterätt konstaterade skiljenämn-
     den att Kazakstans åläggande av restskatt för KPM och TNG "were created by
     Respondent's conduct which this Tribunal found above to be a breach of the

SVEA HOVRÄTT                **DOM**                      Sid 19
Avdelning 02                                            T 2675-14

ECT", alltså en del av den samordnade trakasserikampanjen, se punkterna 1541
och 1798–1800 i skiljedomen.

iv.    Skiljenämnden har avgjort frågan om orsakssamband mellan den påstådda
       trakasserikampanjen och den av Investerarna påstådda skadan utan att beakta
       Kazakstans ekonomiska expert Deloitte. I skiljeförfarandet åberopade
       Kazakstan sakkunnigutlåtanden från Deloitte som visade att Investerarnas
       bolag befann sig i ekonomiskt trångmål, helt oberoende av Kazakstans
       åtgärder, och att orsakssamband därför saknades. Skiljenämnden fann att,
       eftersom Deloitte inte gjort en direkt bedömning av KPM:s och TNG:s för-
       mågor att betala sina skulder enligt obligationslånet från Tristan Oil, vilket
       uppenbart är fel, så accepterade skiljenämnden slutsatsen från Investerarnas
       expert FTI Consulting (FTI) att bolagens finansiella ställning var god före
       oktober 2008, se punkten 1456 i skiljedomen.

v.     Skiljenämnden beaktade i skadeståndsbedömningen enbart Investerarnas
       geologiska experter (Ryder Scott) och bortsåg från Kazakstans geologiska
       experter (Gaffney Cline & Associates) utan att ange något skäl för detta. Trots
       att frågan om den geologiska bedömningen av tillgångarna i Tolkyn- och
       Borankolfälten var mycket omfattande och komplicerade samt att respektive
       expert hade gett in fyra sakkunnigutlåtanden vardera, fastställde skiljenämnden
       i en enda mening att Investerarnas expert Ryder Scott var övertygande i sin
       metodologi och slutsats ("considers that the Ryder Scott reports on reserv
       estimates are convincing in their approach and results"), se punkten 1625 i
       skiljedomen.

Ej beaktat invändningar avseende avdrag på skadeståndet

Skiljenämnden beaktade inte Kazakstans invändningar om att vissa avdrag skulle göras
från ett eventuellt tilldömt skadestånd. Skiljenämndens domskäl är i denna del så
minimala att det kan likställas med att domskäl saknas, se punkterna 1535–1542 i
skiljedomen. I skiljeförfarandet invände Kazakstan *dels* att alla intäkter som tillfallit
Investerarna efter värderingstidpunkten skulle avräknas, se skiljedomen punkterna

SVEA HOVRÄTT           **DOM**           Sid 20
Avdelning 02                              T 2675-14

1486 och 1487, *dels* att eventuellt skadestånd för LPG-anläggningen endast kunde uppgå till hälften av värdet på grund av att Vitol hade finansierat hälften av LPG-anläggningen och att Vitol också hade rätt till hälften av den framtida avkastningen av LPG-anläggningen, allt enligt ett avtal mellan Investerarna med Vitol (JOA-avtalet), se punkterna 1738–1741 i skiljedomen. För den del som finansierats av Vitol kunde Investerarna inte erhålla skadestånd av Kazakstan. Invändningarna kan likställas med genkäromål eller kvittningsinvändningar. Skiljenämnden fullgjorde således inte sitt uppdrag att pröva tvisten i dess helhet. Underlåtenheten att beakta invändningarna inverkade på målets utgång. På grund av detta uppdragsöverskridande alternativt handläggningsfel ska skiljedomen upphävas med i vart fall ett belopp om 314,8 miljoner USD. Beloppet motsvarar de intäkter som tillfallit Investerarna efter värderingstidpunkten, 215,3 miljoner USD, och hälften av det antagna värdet för LPG-anläggningen, 99,5 miljoner USD.

*3.1.2.5 Övriga uppdragsöverskridanden alternativt handläggningsfel*

Skiljenämnden överskred sitt uppdrag och begick handläggningsfel genom att vid flera tillfällen gå utöver parternas åberopanden samt genom att underlåta att beakta parternas åberopanden och tillämplig lag, enligt vad som anges nedan.

      KazAzot

i.   I frågan om Kazakstans ansvar, orsakssambandet mellan Kazakstans handlande och skadan, skadebeloppet samt om bolaget KazAzots roll, grundade skilje-nämnden sina slutsatser på den omständigheten att KMG och Timur Kulibayev hade påverkat KazAzot, vilket dock inte hade åberopats av någon av parterna, se punkten 1418 i skiljedomen. Investerarna hade åberopat KazAzots roll endast för prissättningen av gas. Skiljenämnden underlät också att tillämpa tillämplig lagstiftning i frågan om att tillskriva kazakstanska staten KazAzots beslut att inte underteckna det s.k. trepartsavtalet (sedvanlig internationell rätt om statligt ansvar inklusive "Articles on Responsibility of States for Inter-nationally Wrongful Acts" som är upprättade av International Law

SVEA HOVRÄTT                    **DOM**                    Sid 21
Avdelning 02                                              T 2675-14

Commission [ILC Draft Articles][1]). (Se punkterna 1094 och 1418 i skilje-
domen.)

Interfax

ii.    Skiljenämnden grundade sin slutsats om att en pressrelease från Interfax, som
       enligt skiljenämnden utgjorde en del av den samordnade trakasserikampanjen,
       hade orsakats av Kazakstans agerande redan i oktober och november 2008,
       trots att detta inte anförts av någon av parterna och framhöll felaktigt att denna
       omständighet var ostridig, se punkten 994 i skiljedomen.

Finanspolisen

iii.   Beträffande den kazakstanska finanspolisens agerande förlitade skiljenämnden
       sig på påståendet att finanspolisen hade rapporterat till Kazakstans vice
       premiärminister att den funnit att KPM och TNG drev huvudrörledningar
       ("trunk pipelines") trots att detta inte hade åberopats av någon av parterna.
       Skiljenämnden fann dessutom felaktigt att Kazakstan skulle ha medgivit att så
       varit fallet, se punkten 990 i skiljedomen.

Tristanobligationerna

iv.    I frågan om det från företagsvärdet för KPM och TNG skulle göras avdrag för
       de s.k. Tristanobligationerna underlät skiljenämnden att beakta parternas
       rättsliga argument, se punkterna 1768–1771 i skiljedomen. Skiljenämnden
       grundade också sitt beslut på ett påstått medgivande från Kazakstan som aldrig
       lämnats. Om det funnits ett sådant medgivande hade Kazakstan återkallat detta.
       Värdet på Tristanobligationerna uppgick till i vart fall ett belopp om
       497 685 101 USD den 30 april 2009. (Se punkterna 1536–1537 i skiljedomen.)

Värderingsmetod

v.     I frågan om värderingen av Tolkyn- och Borankolfälten antog skiljenämnden
       felaktigt att Kazakstan medgett en viss värderingsmetod, se punkten 1625 i

---

[1] ICL Draft Articles är en kombination av kodifiering och fortlöpande utveckling av internationell rätt.
Förenta nationernas (FN) generalförsamling antog resolutionen 56/83 den 12 december 2001 genom
vilken ICL Draft Articles anförtroddes regeringar utan förpliktelser.

SVEA HOVRÄTT         **DOM**         Sid 22

Avdelning 02                                                 T 2675-14

skiljedomen. På grund av detta ska skiljedomen upphävas med i vart fall ett belopp om 277, 8 miljoner USD.

På grund av vart och ett av uppdragsöverskridandena alternativt handläggningsfelen ska skiljedomen upphävas. I vart fall utgör bristerna sammantaget skäl för upphävande av skiljedomen.

### 3.2 Investerarna

#### 3.2.1 Rättsliga grunder för bestridandet

Skiljedomen och det sätt på vilket skiljedomen har tillkommit är inte uppenbart oförenlig med rättsordningen i Sverige.

Skiljedomen omfattas av ett giltigt skiljeavtal mellan parterna.

Skiljenämnden har inte utsetts i strid med parternas avtal eller likabehandlings-principen.

SCC:s tillsättande av skiljenämnden har inte utgjort ett handläggningsfel som inverkat på utgången.

Nämnden har varken överskridit sitt uppdrag eller begått handläggningsfel som inverkat på utgången.

Skiljenämnden är beslutsför även med två skiljemän.

#### 3.2.2 Omständigheter i sak

*3.2.2.1 Ogiltighet på grund av det påstått bedrägliga upplägget, falsk bevisning, vilseledande information m.m.*

Skiljedomen eller det sätt på vilket skiljedomen tillkommit är inte uppenbart oförenlig med grunderna för den svenska rättsordningen. Skiljedomen ska därför inte förklaras ogiltig.

FILED: NEW YORK COUNTY CLERK 06/15/2017 06:41 PM
NYSCEF DOC. NO. Case 1:17-cv-05742-RA    Document 1-25    Filed 07/28/17    Page 22 of 40

INDEX NO. 653297/2017

RECEIVED NYSCEF: 06/15/2017

SVEA HOVRÄTT
Avdelning 02

**DOM**

Sid 23
T 2675-14

Det bestrids att skiljedomen är baserad på ett bedrägligt upplägg, korruption eller falsk bevisning.

Allt sedan Investerarna förvärvade KPM och TNG investerade de hundratals miljoner USD för utveckling av olje- och gasfälten samt uppförande av LPG-anläggningen. Dessa kostnader är ingalunda fiktiva eller fingerade.

Uppförandet av LPG-anläggningen har inte skett genom ett bedrägligt upplägg, korruption, skenavtal eller skentransaktioner. Investerarna presenterade inte falsk bevisning (vittnesattester, vittnesförhör och expertutlåtanden) och vilseledde inte heller Kazakstan, SCC eller skiljenämnden eller undanhöll information avseende investeringen i och värderingen av LPG-anläggningen. KMG grundade sitt indikativa bud även på egna antaganden och beräkningar. Det finns inget adekvat orsakssamband mellan de påstått vilseledande handlingarna och skiljenämndens dom såvitt gäller LPG-anläggningens värde.

Skiljedomen grundar sig inte på falsk bevisning eller osanna utsagor. Den information i "Information Memorandum" och årsredovisningar som påstås vara falsk eller vilseledande har inte skapats med skiljeförfarandet i åtanke, utan för ett annat syfte, och dessutom långt före inledandet av ECT-målet. Även om Kazakstans anklagelser skulle vara till någon del befogade, vilket bestrids, tjänade dessa handlingar inte som något direkt underlag för KMG:s indikativa bud eller skiljenämndens dom såvitt gäller LPG-anläggningens värde.

Även om oriktig dokumentation eller osanna uppgifter på något vis skulle ha legat till grund för skiljedomen i denna del vore detta inte tillräckligt för att ogiltigförklara skiljedomen helt eller delvis.

Det bedrägliga och vilseledande upplägget är uppdiktat

Investerarna vilseledde inte skiljenämnden, SCC eller Kazakstan beträffande sina investeringskostnader i LPG-anläggningen. Investeringskostnaden i LPG-anläggningen

SVEA HOVRÄTT
Avdelning 02

**DOM**

Sid 24
T 2675-14

är inte fingerad. Den bestod inte enbart av kostnader för utrustning utan även av kostnader för byggmaterial och arbeten för anläggningens uppförande. Vid expropriationstillfället var anläggningen i det närmaste färdigställd.

Perkwood-avtalet innebar inte något skenarrangemang. Perkwoods roll var att sköta upphandlingen och leveransen av utrustning för byggnation av LPG-anläggningen. Perkwood har importerat utrustning till ett värde om cirka 138 miljoner USD till TNG i Kazakstan och omkring 24,7 miljoner USD har betalats till de kazakstansk myndigheterna genom tullavgifter och skatter. Dessutom utredde de kazakstanska tullmyndigheterna TNG i oktober 2008 utan att finna att bolaget överträtt några lagar eller bestämmelser i sina mellanhavanden med Perkwood eller annars. Det har alltså inte varit fråga om något vilseledande upplägg eller skenavtal mellan TNG och Perkwood. Vid granskning av de upprättade årsredovisningarna hade TNG:s revisorer, KPMG, full tillgång till alla redovisningshandlingar. KPMG kände till Perkwoods funktion. Under skiljeförfarandet lade Investerarna fram ett antal handlingar där Perkwoods roll i projektet med uppförandet av LPG-anläggningen redovisades.

Investerarna har investerat betydande belopp i LPG-anläggningen vilket Kazakstan var medvetet om.

Det bestrids att Investerarna redovisat fingerade inköpskostnader. Perkwood-avtalet var mer omfattande än kontraktet mellan TGE och Azalia Ltd. (Azalia)/Ascom, och innehöll en stor mängd utrustning och material som inte fanns med i TGE-avtalet. Leveransvillkoren var också annorlunda. TGE sålde vissa delar av utrustningen till LPG-anläggningen till Azalia, men varken TGE eller Azalia var ansvarigt för leveransen av utrustningen till Kazakstan. Det var Perkwood som sålde utrustning till TNG och levererade denna till Kazakstan. Den utrustning som framgår av Annex 2, 14 och 16 till Perkwood-avtalet kunde därför inte ha levererats av TGE tidigare. Annex 14 omfattade inte samma utrustning som Annex 2 utan avsåg reservdelar som beställdes för att säkra den kommande driften. I vart fall reglerades senare det erlagda förskottet för utrustningen enligt Annex 14 om cirka 37 miljoner USD mellan Perkwood och TNG.

SVEA HOVRÄTT                    **DOM**                    Sid 25
Avdelning 02                                             T 2675-14

Det bestrids att Investerarna redovisat fingerade komponentkostnader. Perkwood har
levererat utrustning och material till ett värde motsvarande det belopp om 72 miljoner
USD som bokförts av TNG såsom levererat men ännu inte installerat i LPG-
anläggningen. Samma belopp för denna utrustning har redovisats i en rapport från en
oplanerad inspektion av TNG som genomfördes mellan den 25 januari och den
5 februari 2010 av Kazakstans Ministerium för Energi- och Naturresurser, se punkten
1072 i skiljedomen.

Det bestrids att Investerarna redovisat fingerade räntekostnader. Ränteutgifter om
60 miljoner USD som upptagits för att finansiera uppförandet av LPG-anläggningen
har redovisats i TNG:s bokföring och motsvarar den faktiska kostnaden.

Det bestrids att Investerarna redovisat fingerad "management fee". Den avtalsrättsliga
grunden för betalningen av "management fee" finns i § 10.1 i Perkwood-avtalet.

Det bestrids att Investerarna redovisat förskott på icke-levererade komponenter.
Perkwood accepterade att återbetala förskottet till TNG. TNG överlät sedermera sin
fordran mot Perkwood avseende återbetalning av förskott om cirka 37 miljoner USD
till Tristan Oil den 9 februari 2010. Parterna skrev under ett avtal varigenom Tristan
Oil underrättade Perkwood om överlåtelsen och samtidigt avskrev motsvarande del i
TNG:s utestående lån.

Påståendet om att det inte föreligger någon "good faith"-investering i Kazakstan
bestrids. Detta påstående prövades och underkändes av skiljenämnden, se punkterna
812–813 i skiljedomen.

Investerarna presenterade inte falsk bevisning, lämnade inte vilseledande information
eller undanhöll inte relevant information i skiljeförfarandet

Det bestrids att de angivna dokumenten utvisar att Investerarna lämnade falsk eller
vilseledande information i skiljeförfarandet.

SVEA HOVRÄTT                    **DOM**                    Sid 26
Avdelning 02                                              T 2675-14

Det bestrids att Investerarna undanhöll "information som kunnat avslöja det bedrägliga upplägget". Investerarna vilseledde inte skiljenämnden eller Kazakstan om vilka parter som varit delaktiga i investeringen i projektet. Vitol har aldrig haft en ägarandel i LPG-anläggningen. Avsikten var att Vitol skulle förskottera hälften av finansieringen för dess uppförande. Investerarna gjorde inte gällande att de ensamma hade stått för hela investeringskostnaden. (Se punkterna 1702–1703 och 1740 i skiljedomen.)

Frågan om Ascoms tvist med Vitol i det s.k. JOA-målet hade betydelse när Investerarnas skadeståndsanspråk avseende LPG-anläggningen prövades av skiljenämnden. Skiljenämnden konstaterade att det saknade betydelse för den fråga som skiljenämnden hade att bedöma, nämligen vad som enligt internationell rätt utgjorde skäligt marknadsvärde för LPG-anläggningen, och huruvida Vitol hade medverkat tillsammans med Investerarna i de investeringar som gjordes i LPG-anläggningen. (Se punkterna 1539 och 1542 i skiljedomen.)

Investerarna vilseledde inte skiljenämnden eller Kazakstan beträffande berättigade parter i anslutning till projektet med LPG-anläggningen. Det påstods aldrig i Montvale-målet att Terra Raf hade överfört samtliga sina rättigheter och skyldigheter avseende LPG-anläggningen till det närstående bolaget Montvale. Det som hände var att Terra Raf överlät sina samtliga rättigheter och skyldigheter under JOA-avtalet, avseende den gemensamma finansieringen av LPG-anläggningen med Vitol, till Montvale genom ett "Novation Agreement" där även Vitol var part. Terra Raf:s status som TNG:s ensamma aktieägare förändrades aldrig. Följaktligen saknade denna uppgift någon som helst betydelse för bedömningen av Terra Raf:s status som investerare under ECT eller rätt till skadestånd. Information om "Novation Agreement" fanns återgiven i Squire Sanders "Due Diligence"-rapport som Kazakstan lämnade in i skiljeförfarandet och åberopade vid ett flertal tillfällen, se punkterna 1177, 1197, 1489 och 1793 i skiljedomen. Det hade under alla förhållanden ingen betydelse för utgången.

Det bestrids att Investerarna gjorde sig skyldiga till processbedrägeri genom att undanhålla information om Perkwood, Perkwood-avtalet och Perkwoods roll i uppförandet av LPG-anläggningen.

SVEA HOVRÄTT         **DOM**        Sid 27

Avdelning 02                                          T 2675-14

### Värderingen av LPG-anläggningen

Investerarna lämnade inte vilseledande information avseende investeringskostnader till sina revisorer eller någon annan. Uppgifterna om investeringskostnader för LPG-anläggningen påverkade inte bedömningen av skadeståndets storlek.

Av KMG:s indikativa bud och interna beslutsunderlag, som Kazakstan lämnade in i skiljeförfarandet, framgår att bolaget grundade sitt indikativa bud *dels* på "Information Memorandum", *dels* på egna antaganden och beräkningar.

Investerarna åberopade inte det indikativa budet som en alternativ grund för sitt skadeståndsyrkande i skiljeförfarandet. Information om KMG, jämte sju andra bud-givares, indikativa bud lämnades som stöd för Investerarnas beräkningar avseende värdet av de exproprierade tillgångarna eftersom Kazakstan ifrågasatte Investerarnas värderingsmetoder. I skiljeförfarandet intog Kazakstan ståndpunkten att investerings-kostnaden var irrelevant eftersom diskonterad kassaflödesmetod eller nuvärdes-beräkning ("Discounted Cash Flow") skulle tillämpas vid marknadsvärdering ("Fair Market Value") samt vidare att investeringskostnaderna i själva verket var mycket högre och att Investerarna hade försökt gömma dem, se punkterna 1724 och 1718 i skiljedomen.

Skiljenämnden grundade sin bedömning av värdet av LPG-anläggningen väsentligen på det indikativa bud om 199 miljoner USD som lämnats av KMG. Det indikativa budet var preliminärt och grundades på ett antal osäkra antaganden. KMG beaktade inte endast "Information Memorandum" utan även annan allmänt tillgänglig information och gjorde egna antaganden och beräkningar. Budet har inte heller grundat sig endast på TNG:s investeringskostnader i LPG-anläggningen utan har beräknats som ett aritmetiskt medeltal mellan "the matrix of the comparative methods value and cost method value". Medeltalet landade på 199 miljoner USD eftersom investerings-kostnaden var 193 miljoner USD och beloppet enligt den jämförande värderings-metoden uppgick till 205 miljoner USD.

SVEA HOVRÄTT           **DOM**           Sid 28
Avdelning 02                             T 2675-14

Det bestrids att uppgifter om Investerarnas kazakstanska tillgångar, vilka var intagna i de konsoliderade årsredovisningarna för Tristan Oil, KPM och TNG, var felaktiga eller vilseledande.

KPMG kände till Perkwoods funktion.

Det bestrids att Anatolie Stati ingick i ledningen för KPM och TNG.

KMG:s vittne, Medet Suleimenov, uppgav i förhör att det indikativa budet var baserat på begränsad information och att det var strategiska överväganden som bestämde budets storlek, se punkten 1736 i skiljedomen. Det är därför omöjligt att säga på vilket sätt, om något, ändringar i investeringskostnaden skulle ha påverkat budets storlek.

### 3.2.2.2 Skiljedomen omfattas av ett giltigt skiljeavtal

Kazakstan och samtliga av Investerarna har träffat skiljeavtal på grundval av Kazakstans i ECT intagna stående anbud om skiljeförfarande enligt SCC-reglerna för investeringstvister och Investerarnas accept genom påkallelse av skiljeförfarande under åberopande av detta anbud.

Iakttagandet av föreskriften om förstegsförhandling är inte ett villkor för slutande av skiljeavtal. Av art. 26 (3) (a) ECT följer att Kazakstan har lämnat ett villkorslöst samtycke till skiljeförfarande. Genom Investerarnas påkallande av skiljeförfarande uppstod ett bindande skiljeavtal, varigenom skiljenämnden blev behörig.

Bestämmelserna i art. 26 ECT utgör inte tvingande formföreskrifter. Underlåtenhet att iaktta förstegsförhandling är inte ett rättegångshinder.

Under alla förhållanden vilandeförklarades skiljeförfarandet under tre månader på begäran av Kazakstan för att möjliggöra förhandlingar jämlikt art. 26 (2) ECT. Eventuell brist före skiljeförfarandet har därför läkts och Kazakstan har förlorat rätten till jurisdiktionsinvändning.

SVEA HOVRÄTT                    **DOM**                    Sid 29

Avdelning 02                                              T 2675-14

Investerarna accepterade Kazakstans begäran om vilandeförklaring på villkor att
Kazakstan avstod från att framställa någon invändning på den grunden att fristen inte
uppfyllts, vilket Kazakstan genom sitt dåvarande ombud accepterade. Kazakstan
fortsatte sedan att delta i processen utan att informera Investerarna om att invänd-
ningen vidhölls. I vart fall hade Investerarna anledning att tro att Kazakstan avstod från
sin invändning, vilket Kazakstan måste ha varit medvetet om. Parternas överens-
kommelse var bindande för Kazakstan och Kazakstan var även på grund härav
skiljeavtalsbunden gentemot Investerarna, i vart fall efter tremånadersfristens utgång.

Investerarna uppfyllde kraven på förstegsförhandling enligt art. 26 (2) ECT innan
skiljeförfarandet inleddes. Det enda krav som uppställs avseende inledande av
förstegsförhandling är en begäran om uppgörelse i godo av någon av de investerare
som berörs, vilken inte behöver vara skriftlig. Det finns alltså inget krav på att samtliga
investerare ska skriva under samtliga brev eller delta i förstegsförhandling. Vidare var
Anatolie Stati under den aktuella tiden behörig att företräda Gabriel Stati. Det är
tillräckligt att hänvisning sker till en traktats föremål så att den stat mot vilken krav
riktas informeras om att det föreligger eller kan komma att föreligga en tvist rörande
detta föremål. Av Investerarnas brev till Kazakstan framgår tydligt att Investerarna
vänder sig mot Kazakstans behandling av KPM och TNG, dvs. Investerarnas
investeringar i Kazakstans territorium. Under åren 2008–2010 påtalade Investerarna
flera gånger de tvistiga förhållandena för Kazakstan och försökte få till stånd en dialog.
Investerarna gav också både muntliga och skriftliga förslag till en uppgörelse av
tvisten samt angav att de avsåg att hänskjuta tvisten till internationellt skiljeförfarande
enligt SCC-reglerna om inte en lösning kunde nås. Under denna tid var grundorsaken
till tvisten densamma. Förstegsförhandling skedde mer än ett år innan tvisten hänsköts
till skiljeförfarande vilket är tillfyllest. Att orden "i godo" eller liknande inte användes
saknar betydelse.

Något krav på att delta i förstegsförhandling under tre månader finns inte om sådan
framstår som utsiktslös, vilket framgår av art. 26 (1) ECT. Kazakstan underlät att
besvara de flesta av Investerarnas framställningar och visade inget intresse att för-
handla. Kazakstans agerande före inledandet av skiljeförfarandet visar att det inte var
möjligt att nå en förlikning av tvisten.

SVEA HOVRÄTT             **DOM**                    Sid 30
Avdelning 02                                        T 2675-14

Skiljenämnden avgjorde frågan om sin behörighet på ett korrekt sätt och i förhållande till var och en av Investerarna.

### 3.2.2.3 Utnämningen av skiljenämnden

SCC bröt inte mot parternas skiljeavtal, av vilket SCC-reglerna utgör en del, eller grundläggande principer och rättigheter vid utseendet av skiljenämnden. Kazakstan har inte fråntagits rätten att utse sin egen skiljeman, utan antingen på grund av sin egen underlåtenhet försuttit sin möjlighet att göra detta eller medvetet valt att inte delta vid utseendet av skiljenämnden. Det bestrids vidare att det förekommit en brist i utseendet av skiljenämnden samt att det förekommit ett handläggningsfel hänförligt till SCC:s utseende av skiljenämnden som inverkat på utgången av målet.

Att svaranden ska utse en skiljeman i sitt svar på påkallelseskriften följer av skilje-avtalet. SCC:s regler är klara i detta hänseende. Eftersom parterna inte avtalat om annat skulle skiljenämnden bestå av tre skiljemän och vardera parten få möjlighet att utse en skiljeman, om inte SCC beslutade om annat. SCC har inte beslutat om något annat. Att skiljeförfarandet skulle avgöras av tre skiljemän framgick inte enbart av SCC-reglerna, utan även av SCC:s brev och påkallelseskriften.

SCC:s förelägganden var tydliga. Till föreläggandet att inkomma med svarsskrift bifogades bl.a. påkallelseskriften och en kopia av SCC-reglerna, av vilka framgår att Kazakstan i sin svarsskrift behövde ange vilken skiljeman Kazakstan hade utsett. Investerarna yrkade redan i påkallelseskriften att SCC, för det fall Kazakstan underlät att utse en skiljeman, skulle utse en skiljeman i Kazakstans ställe. Från delfåendet av påkallelseskriften till dess att Sergei Lebedev tillfrågades hade Kazakstan haft 40 dagar på sig att ge in svarsskrift eller begära anstånd. När svarsfristen hade löpt ut fick Kazakstan en påminnelse och ytterligare 14 dagar på sig att följa föreläggandet, samt upplysning om att Kazakstans uteblivna svar inte hindrade skiljeförfarandet från att fortskrida. SCC-reglerna föreskriver inte att SCC:s föreläggande måste innehålla en uttrycklig anmodan att utse skiljeman. Kazakstan anmodades därtill att yttra sig över

SVEA HOVRÄTT        **DOM**        Sid 31
Avdelning 02                               T 2675-14

Investerarnas förslag att de partsutsedda skiljemännen skulle utse skiljenämndens ordförande. SCC bröt inte mot likabehandlingsprincipen.

Svar och utseende av skiljeman ska ske inom den tid som SCC beslutar. SCC:s agerande i detta avseende var i enlighet med skiljeavtalet, SCC:s praxis och grundläggande principer och rättigheter. Kazakstan hade kompetenta och erfarna medarbetare med erforderliga språkkunskaper. Det finns även en rysk översättning av SCC-reglerna på SCC:s hemsida. Dessutom har Kazakstan varit part i ett stort antal skiljeförfaranden vid SCC före det här aktuella ECT-målet och var väl förtroget med tillämpliga regler och praxis. Det saknas grund för att Kazakstan borde ha behandlats mer förmånligt i egenskap av stat eller på grund av att det var fråga om en komplex investeringstvist. Varken sättet för befordran av handlingarna, Kazakstans egen byråkrati, dess påstådda bristande engelskakunskaper eller dess behov av ombud motiverade utsättande av en längre tidsfrist. Kazakstan begärde inte anstånd och deltog över huvud taget inte i förfarandet förrän mer än en månad efter det att SCC utsett skiljeman för Kazakstans räkning.

Kazakstan underlät att utse en skiljeman inom den tid som SCC beslutade. SCC utsåg därför en skiljeman för Kazakstans räkning, utan hörande av någondera parten. I den uppkomna situationen medger inte skiljeavtalet Kazakstan någon rätt att höras.

Kazakstan underlät i tid invända mot utseendet av skiljenämnden och har därför försuttit sin rätt att göra gällande det eventuella felet. Kazakstan bekräftade efter utseendet av Sergei Lebedev och Karl-Heinz Böckstiegel inför skiljenämnden under förhandlingen i jurisdiktionsfrågan den 8 oktober 2012, att det inte fanns några invändningar mot förfarandet som det dittills genomförts. Kazakstan har förlorat sin rätt att göra gällande det påstådda felet.

Det bestrids att SCC borde ha gett Kazakstan möjlighet att utse en ny skiljeman när Kazakstan till slut deltog i skiljeförfarandet.

SCC begick inte något misstag utan agerade i enlighet med SCC-reglerna och följde sin praxis beträffande utseende av skiljeman.

SVEA HOVRÄTT        **DOM**        Sid 32

Avdelning 02                                       T 2675-14

Det bestrids att Sergei Lebedev skulle ha intagit en passiv roll eller att en partsutsedd skiljeman har till uppgift att säkerställa att partens talan uppfattas på ett korrekt sätt av skiljenämnden.

### 3.2.2.4 Uppdragsöverskridanden alternativt handläggningsfel (påstått felaktig bevisvärdering m.m.)

Taras Khalelovs vittnesutlåtande och vittnesmål

Fråga var om LPG-anläggningen skulle värderas som en "going concern" vilket Investerarna hävdade, eller till ett skrotvärde vilket Kazakstan hävdade. Skiljenämnden beaktade inte omständigheter eller bevis som inte hade åberopats av Investerarna.

Investerarna återkallade aldrig påståendet att Kazakstan ämnade slutföra konstruktionen och påbörja driften av LPG-anläggningen. Detta förändras inte av att Investerarna inte senare upprepade påståendet. Investerarna angav dessutom i sina "Post-Hearing Briefs" att de vidhöll allt som tidigare anförts i målet.

Bevisningen i form av information från allmänt tillgängliga webbsidor för Mangystauregionen och den kazakiska ambassaden i Israel fördes in i målet på ett korrekt sätt genom Investerarnas expertbevisning från FTI och som bilagor till Investerarnas inlaga av den 7 maj 2012. Investerarna åberopade även annan bevisning i form av Victor Romanosovs vittnesutlåtande.

Skiljenämnden beaktade all skriftlig och muntlig bevisning som hade åberopats av parterna, inklusive Taras Khalelovs vittnesutlåtande och vittnesmål. Även om skiljenämnden skulle ha begått ett handläggningsfel genom att inte beakta denna bevisning så har detta fel i vart fall inte inverkat på målets utgång. Bevisningen var inte tillräcklig för att motbevisa de omständigheter på vilka skiljenämnden baserade sina slutsatser om värdet på LPG-anläggningen.

SVEA HOVRÄTT                    **DOM**                    Sid 33
Avdelning 02                                              T 2675-14

Skiljenämnden överskred följaktligen inte sitt uppdrag eller begick inte något hand-
läggningsfel som sannolikt påverkat utgången i målet.

Kazakstans sakkunnig- och vittnesbevisning

Skiljenämnden beaktade all bevisning, inklusive bevisning avseende:

— klassificeringen av pipelines,

— förköpsrätten,

— kvarskattebedömningen,

— kausalitet, och

— geologiska frågor.

Kazakstans påståenden i denna del är grundlösa och utgör varken var för sig eller
tillsammans uppdragsöverskridanden eller handläggningsfel som sannolikt inverkat på
utgången i målet.

Skiljenämnden beaktade Kazakstans bevisning om innehållet i kazakstansk rätt
angående klassificeringen av pipelines. Frågan om rättvis och skälig behandling
innefattade frågor rörande klassificeringen av pipelines enligt kazakstansk lag. Redan
Kazakstans godtyckliga hantering av klassificeringsfrågan stred mot skyldigheten att
iaktta rättvis och skälig behandling och kazakstansk rätt hade begränsad betydelse för
bedömningen avseende klassificeringen.

Skiljenämnden redovisade i kronologiskt ordning parternas huvudskrifter utan att
räkna upp sakkunnigutlåtanden eller vittnesutlåtanden. Kazakstans påståenden
avseende Anatoly Didenko, Kadirbek Latifov och Salamat Baymaganbetov är
felaktiga. Anatoly Didenkos utlåtande nämns i skiljedomen, se punkten 193 i
skiljedomen. Kadirbek Latifovs utlåtande gavs in som vittnesutlåtande (inte
sakkunnigutlåtande) till Kazakstans andra skrift. Kazakstan redovisade inte heller
några kostnader för Kadirbek Latifovs utlåtande, jfr punkten 1872 i skiljedomen.
Skiljenämnden noterade att Salamat Baymaganbetov hördes den 8 oktober 2012, se
punkten 117 i skiljedomen.

SVEA HOVRÄTT          **DOM**          Sid 34
Avdelning 02                          T 2675-14

Kazakstans påstående om att skiljenämnden avgjorde en fråga om kazaskansk civilrätt utan att beakta det av Kazakstan åberopade sakkunnigutlåtandet från Kulyash Ilyassova saknar grund. Kulyash Ilyassovas synpunkter avseende Kazakstans förköpsrätt till aktierna i TNG som överläts från Gheso till Terra Raf har redovisats i skiljedomen, se punkterna 787 och 993 i skiljedomen.

Skiljenämnden har korrekt avgjort frågan om kazaskansk skatterätt hänförlig till restskattefrågan och med beaktande av allt som Kazakstan anfört inklusive sakkunnigbevisning genom Tomas Balco och vittnet Nurlan Rahimgaliev. Både Tomas Balco och Nurlan Rahimgaliev omnämns på ett flertal platser i skiljedomen under både Investerarnas och Kazakstans inställning.

Skiljenämnden avgjorde korrekt frågan om orsakssamband – inklusive frågan om mellankommande orsak och den ekonomiska strukturen på KPM och TNG - med beaktande av allt som Kazakstan anfört inklusive experterna från Deloitte, se punkterna 1456 och 1503 i skiljedomen.

Skiljenämnden beaktade korrekt all geologisk expertis inklusive Gaffney Cline & Associates och skiljedomen saknar inte domskäl såvitt gäller betydelsen av de geologiska frågorna för skadeberäkningen.

Invändningar avseende avdrag på skadeståndet

Skiljenämnden beaktade Kazakstans invändningar om att vissa avdrag skulle göras från eventuellt skadestånd, både vad gäller intäkter som tillfallit Investerarna efter värderingstidpunkten (215,3 miljoner USD) och om att skadeståndet för LPG-anläggningen högst kunde uppgå till hälften av värdet på grund av Investerarnas avtal med Vitol (99,5 miljoner USD). Kazakstans invändningar avsåg frågan om skadeståndets storlek och utgjorde inte ett genkäromål eller en kvittningsinvändning. Skiljenämnden redovisade i domskälen fullgott sina bedömningar och fann korrekt att några avdrag inte skulle göras, se punkterna 1530, 1531 och 1539 i skiljedomen.

SVEA HOVRÄTT        **DOM**        Sid 35

Avdelning 02                              T 2675-14

Vinster, som Kazakstan hänvisade till och som hade delats ut, hade tjänats in före såväl den värderingspunkt som skiljenämnden stannade för som den som Investerarna åberopade. Sådana vinster skulle inte dras av från skadeståndet, vilket skulle motsvara nuvärdet på vinster som KPM och TNG förväntades generera i framtiden. (Jfr punkterna 1473–1477 i skiljedomen.)

Vitol ägde inte någon del av LPG-anläggningen och Vitols avtal med Investerarna om finansieringen av LPG-anläggningen, JOA-avtalet, motiverade inte något avdrag från skadeståndet. Skiljenämnden överskred inte sitt uppdrag och begick inte något hand-läggningsfel som sannolikt påverkat utgången i målet, se punkten 1539 i skiljedomen.

### 3.2.2.5 Övriga uppdragsöverskridanden alternativt handläggningsfel

Skiljenämnden dömde inte över omständigheter som inte åberopats och underlät inte att beakta något som den borde ha beaktat. De omständigheter som Kazakstan gör gällande att skiljenämnden dömde över utan erforderligt åberopande är bevisfakta. Skiljenämnden får ex officio beakta bevisfakta på grundval av det föreliggande processmaterialet. Skiljenämnden beaktade tillämplig lag och internationella rätts-principer korrekt.

### KazAzot

Skiljenämnden grundade sina överväganden i fråga om KazAzot på omständigheter som åberopats av parterna. Investerarna åberopade att Timur Kulibayev, svärson till Kazakstans president, kontrollerade KazAzot och att internationella rättsprinciper om statligt ansvar är tillämpliga på KazAzots beslut att inte underteckna det s.k. treparts-avtalet. (Se punkterna 639, 674 och 1094 i skiljedomen.) Även om parterna hanterade KazAzot som en fråga om både ansvar i och för sig och skadeståndets storlek, stod det skiljenämnden fritt att bedöma det som en ansvarsfråga. Skiljenämnden tillämpade internationell lag korrekt och underlät inte att beakta något.

### Interfax

Skiljenämndens bedömning i frågan om Kazakstans ansvar för pressreleasen från Interfax var en rättslig bedömning som låg inom ramen för skiljenämndens behörighet.

FILED: NEW YORK COUNTY CLERK 06/15/2017 06:41 PM
NYSCEF DOC. NO. Case 1:17-cv-05742-RA   Document 1-25   Filed 07/28/17   Page 36 of 40

INDEX NO. 653297/2017
NYSCEF: 06/15/2017

SVEA HOVRÄTT
Avdelning 02

**DOM**

Sid 36
T 2675-14

Skiljenämnden dömde inte över en icke åberopad omständighet. Investerarna hade
åberopat att pressmeddelandet från Interfax orsakades av statlig inblandning och var en
del av en större kampanj riktad mot KPM och TNG. (Se punkterna 348, 1122, 1335
och 1339 i skiljedomen.)

Finanspolisens klassificering av rörledningar

I frågan om den kazakstanska finanspolisens beslut om klassificeringen av rörled-
ningar grundade skiljenämnden sitt beslut på omständigheter som åberopats av
Investerarna. Investerarna hade åberopat att finanspolisen den 10 december 2008
meddelade vice premiärminstern att den hade beslutat att KPM:s och TNG:s rör-
ledningar var huvudrörledningar och inte fältrörledningar, se punkten 343 i skilje-
domen. I en skrivelse medgav Kazakstan att ett brev från finanspolisen till den
biträdande premiärministern angav att finanspolisen hade beslutat att de aktuella
ledningarna var huvudrörledningar. Skiljenämnden har haft rätt att beakta medgivandet
som bevisfaktum, se punkten 990 i skiljedomen.

Tristanobligationerna

I frågan om Tristanobligationerna och företagsvärdet av KPM och TNG grundade
skiljenämnden sitt beslut på omständigheter som åberopats av parterna. Investerarna
hade åberopat att de hade fortsatt ansvar för Tristanobligationerna och att de från
utdömt skadestånd skulle tvingas avstå skulden enligt Tristanobligationerna, se
punkterna 1752–1758 i skiljedomen. Kazakstan medgav att "enterprise value" var en
korrekt värderingsmetod, om Investerarna var ersättningsskyldiga mot obligations-
innehavarna. Eftersom skiljenämnden konstaterade att så var fallet, var det korrekt att
parterna var överens om vilken värderingsmetod som skulle tillämpas, se punkterna
1769–1771 i skiljedomen. Kazakstan hade rätt att ompröva sitt medgivande, men
skiljenämnden var ändå fri att beakta vilken bevisbetydelse det tidigare medgivandet
kunde ha.

Värderingsmetod

I frågan om skadeståndet hänförligt till Tolkyn- och Borankolfälten grundade skilje-
nämnden sitt beslut om skadeståndets storlek på en alternativ beräkning som
Kazakstan introducerat och beskrivit som lämplig, se punkten 1625 i skiljedomen.

SVEA HOVRÄTT
Avdelning 02

**DOM**

Sid 37
T 2675-14

Skiljenämnden grundade inte sin bedömning på ett formellt medgivande av Kazakstan utan gjorde en bevisvärdering, vilket är en materiell fråga.

Skiljenämnden överskred följaktligen inte sitt uppdrag eller begick inte något fel som sannolikt påverkat utgången i målet.

## 4. UTREDNINGEN

Parterna har åberopat förhållandevis omfattande bevisning, såväl muntlig som skriftlig. Vad gäller muntlig bevisning har på begäran av Kazakstan hörts diplomerade ingenjören Ernst Kallweit, projektledaren Franjo Zaja, auktoriserade revisorn Thomas Gruhn, professorn Thomas Grant och advokaten Dr Horacio A. Grigera Naón. På begäran av Investerarna har hörts advokaterna Kenneth R. Fleuriet, Johan Gernandt och Gary B. Born.

## 5. DOMSKÄL

### 5.1 Dispositionen av hovrättens domskäl

Målet gäller ogiltighet och klander av en skiljedom genom vilken skiljenämnden prövat ersättningsanspråk som Investerarna riktat mot Kazakstan med anledning av investeringar som Investerarna gjort inom Kazakstans territorium. Kazakstans talan vilar på den grunden att skiljedomen är ogiltig eftersom domen i sig eller det sätt på vilket den tillkommit är uppenbart oförenlig med grunderna för rättsordningen i Sverige (ordre public). Kazakstan har också åberopat att skiljedomen ska upphävas på grund av att den inte omfattas av något giltigt skiljeavtal mellan parterna och då en av skiljemännen utsetts på felaktigt sätt. Därutöver har Kazakstan gjort gällande att domen i vart fall ska upphävas på grund av att skiljemännen i flera avseenden överskridit sitt uppdrag och att det förekommit ett flertal handläggningsfel, som inverkat på utgången i målet.

Hovrätten kommer inledningsvis att redogöra för de generella, rättsliga utgångspunkter som hovrätten har för prövningen av de grunder för ogiltighet respektive upphävande

SVEA HOVRÄTT                **DOM**              Sid 38
Avdelning 02                                    T 2675-14

av skiljedomen som Kazakstan har åberopat. Förutsättningar för ett giltigt skiljeavtal i relation till art. 26 ECT kommer hovrätten dock att behandla samlat i avsnitt 5.3.2.

Efter redogörelsen för de rättsliga utgångspunkterna för prövningen kommer hovrätten att ta ställning till Kazakstans talan utifrån de omständigheter i sak som Kazakstan har åberopat. Hovrätten kommer att göra prövningen i den ordning som följer av den disposition som Kazakstan har valt för att presentera sina grunder för talan och som framgår av redovisningen av Kazakstans talan ovan i avsnitt 3.1.

Avslutningsvis kommer hovrätten också att redovisa sina sammanfattande slutsatser av ställningstagandena och sin sammantagna bedömning av de grunder som Kazakstan har åberopat till stöd för att skiljedomen ska förklaras ogiltig alternativt upphävas.

Sist i domskälen kommer hovrätten att redovisa sin bedömning i frågan om rättegångs-kostnader.

### 5.2 Rättsliga utgångspunkter för hovrättens prövning

#### 5.2.1 Ordre public som grund för ogiltighet

Enligt 33 § första stycket 2 LSF är en skiljedom ogiltig om skiljedomen eller det sätt på vilket skiljedomen tillkommit är uppenbart oförenligt med grunderna för rättsord-ningen i Sverige.

Svensk rätt intar en restriktiv inställning till möjligheten att få en skiljedom ogiltig-förklarad med stöd av nämnda bestämmelse. Av förarbetena till bestämmelsen framgår att den är avsedd att omfatta endast höggradigt stötande fall och att den på grund av sitt snäva tillämpningsområde ytterst sällan blir aktuell att tillämpa samt att den omfattar fall då grundläggande rättsprinciper av materiell eller processuell art har åsidosatts (se prop. 1998/99:35 s. 142 och 234). I sammanhanget kan också nämnas att Skiljedoms-institutet vid SCC i sin handbok ger uttryck för att begreppet ordre public ska tolkas mycket snävt och tillämpas då det är fråga om synnerligen stötande fall där elementära principer har ignorerats (se Öhrström, Stockholms Handelskammares Skiljedoms-institut – En handbok och regelkommentar för skiljeförfaranden, 2009, s. 80). Vidare

SVEA HOVRÄTT    **DOM**    Sid 39
Avdelning 02    T 2675-14

följer av Högsta domstolens avgörande i NJA 2015 s. 433 att om parternas utredning
ger stöd för att en skiljedom skulle vara uppenbart stridande mot grunderna för
rättsordningen bör domstolen självmant uppmärksamma parterna på detta och ge dem
möjlighet att utveckla sina ståndpunkter i den frågan.

I förarbetena till lagen om skiljeförfarande nämns följande som exempel på när en
skiljedom anses vara uppenbart oförenlig mot grunderna för rättsordningen i Sverige
(a. prop., s.141 f.). Så anses vara fallet när skiljenämnden har prövat en fråga som en
allmän domstol inte skulle befatta sig med såsom anspråk som grundas på spel eller
kriminella handlingar (t.ex. förpliktande att betala en avtalad muta). Andra fall som
anges är att någon genom skiljedomen har förpliktats till en prestation som är för-
bjuden enligt lag eller att skiljedomen har en sådan karaktär av straff att den inte kan
anses godtagbar. Vidare nämns som exempel att skiljenämnden har avgjort en tvist
utan att ta hänsyn till en rättsregel som är tvingande till förmån för tredje man eller ett
allmänt intresse (a.s.).

Bestämmelsen i 33 § första stycket 2 LSF om ordre public tar också sikte på grund-
läggande rättsprinciper av procedurmässig art genom hänvisningen till det sätt på
vilket skiljedomen tillkommit. Som exempel på en sådan situation när detta kan
aktualiseras anges i förarbetena att skiljedomen har tillkommit efter brott, t.ex. efter
hot mot eller bestickning av en skiljeman (a. prop., s. 142).

Även skiljedomar som grundas på falsk bevisning torde kunna omfattas av ordre
public-begreppet (se Skiljedomsutredningens betänkande SOU 1994:81, s. 182).
Skiljedomsutredningen övervägde införandet av en uttrycklig lagbestämmelse om att
en skiljedom skulle kunna upphävas på talan av en part om en handling som åberopats
till bevis varit förfalskad eller förvanskad eller om någon annan än en part eller en
ställföreträdare för en part avgett en medvetet osann utsaga och handlingen eller
utsagan kunde antas ha inverkat på målets utgång (se a.a., avsnitt 6.5). Att göra
resningsbestämmelserna fullt ut tillämpliga på skiljedomar ansåg dock utredningen
komma alltför mycket i konflikt med syftet att ett skiljeförfarande utan tidsutdräkt ska
leda till ett definitivt avgörande. Utredningen lämnade därför ett förslag som endast i
viss utsträckning var i linje med rättegångsbalkens bestämmelser om resning (se a.a.,

s. 182). Regeringen valde dock att inte genomföra skiljedomsutredningens förslag i denna del och motiverade sitt ställningstagande att inte införa en möjlighet att få en skiljedom upphävd om falsk bevisning eller osanna utsagor inverkat på utgången, främst med intresset av att regelverket i största möjliga utsträckning skulle tillgodose parternas krav på en snabb och effektiv handläggning och att garantera en skiljedoms slutgiltighet (se a. prop., s. 150 ff.). I detta syfte ansågs det särskilt angeläget att undvika regler som genom sin konstruktion inbjuder till en klandertalan och under lång tid skapar osäkerhet om skiljedomens giltighet (a.s.). Regeringen hänvisade emellertid också till utredningens slutsats att situationen när falsk bevisning hade åberopats torde innefattas i det ordre public-begrepp som UNCITRAL Model Law on International Commercial Arbitration (modellagen) och 1958 års New York-konvention om erkännande och verkställighet av utländska skiljedomar använde (a.s.). I litteraturen har antagits att en skiljedom i vissa undantagsfall skulle kunna anses ogiltig på grund av ordre public i den nu beskrivna situationen (se Heuman, a.a., s. 600 f.). Som skäl härför har anförts bl.a. strävanden att harmonisera svensk rätt med utländsk praxis. Det har dock också samtidigt framhållits att ordre public-bestämmelsen inte får tillämpas på ett sådant sätt att det öppnas en tidsobegränsad möjlighet att få skiljedomen ogiltigförklarad på denna grund (se Heuman a.a., s. 600).

### 5.2.2 Uppdragsöverskridande och handläggningsfel som grund för upphävande

En skiljedom kan också enligt 34 § första stycket 2, 4 respektive 6 LSF upphävas efter klander om skiljemännen har överskridit sitt uppdrag, om en skiljeman utsetts i strid med parternas överenskommelse eller LSF eller om det annars utan parternas vållande har förekommit något fel i handläggningen som sannolikt har inverkat på utgången. Skiljenämndens uppdrag styrs av skiljeavtalet, eventuella partsöverenskommelser om förfarandet och parternas talan i skiljeförfarandet. Det kan ibland vara svårt att avgöra vad som ligger i begreppet uppdrag och om vissa processuella fel ska bedömas enligt bestämmelsen i punkten 2 eller om de ska bedömas enligt generalklausulen i punkten 6 som tar sikte på andra handläggningsfel (se Heuman, a.a., s. 605 f., och Lindskog, Skiljeförfarande. En kommentar, Zeteo, maj 2016, kommentaren till 34 §, avsnitt 4.2.3).