# EXHIBIT 1



Neutral Citation Number: [2017] EWHC  (1348)

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Case No: CL-2014-000070

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 06/06/2017

Before :

**MR JUSTICE KNOWLES CBE**
- - - - - - - - - - - - - - - - - - - -
**Between :**

(1) ANATOLIE STATI
(2) GABRIEL STATI
(3) ASCOM GROUP S.A.
(4) TERRA RAF TRANS TRAIDING LTD

**Claimants**

- and –

**THE REPUBLIC OF KAZAKHSTAN**

**Defendant**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Thomas Sprange QC and Ruth Byrne** (instructed by **King & Spalding**) for the **Claimants**
**Ali Malek QC, Christopher Harris and Paul Choon Kiat Wee** (instructed by **Herbert Smith**
**Freehills**) for the Defendant

Hearing dates: 6-7 February 2017
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MR JUSTICE KNOWLES

## Knowles J:

### Introduction

1. On 19 December 2013 in arbitral proceedings seated in Sweden ("the Arbitration"), the Defendant ("the State") was ordered to pay damages in excess of US$500 million to the Claimants ("the Award").

2. The Arbitration was instituted pursuant to the Energy Charter Treaty ("the ECT"). The arbitral tribunal ("the Tribunal") comprised Professor Karl-Heinz Bockstiegel, Mr David R Haigh QC and Professor Sergei Lebedev.

3. The Award is within the New York Convention (the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards 1958). The Claimants sought permission to enforce the Award in this jurisdiction and on 28 February 2014 permission was initially granted, on the Claimants' 'without notice' application. On 30 September 2014 the Claimants also commenced proceedings in the United States District Court for the District of Columbia ("the US Court") to enforce the Award in the United States.

4. Meanwhile in the country of the seat, the State applied to the Svea Court of Appeal ("the Swedish Court"), to set aside the Award.

5. On 7 April 2015 the State issued an application ("the English Application") to set aside the permission that had been granted to enforce the Award in this jurisdiction. At that time, the State took three points. First that there was no valid arbitration agreement. Second that the Tribunal was invalidly constituted. Third that there had been a number of serious procedural errors which had the effect of preventing the State from presenting its case to the Tribunal.

6. Shortly after the English Application was issued, the State was successful in an application in the United States for judicial assistance ("the US Disclosure Proceedings"), an application that had been contested by the Claimants but resulted in a subpoena against a third party compelling the production of documents. It is the State's case that the documents produced revealed fraud by the Claimants. On 27 or 28 August 2015 the State applied to amend the English Application to add the contention that enforcement of the Award would contravene English public policy by reason of fraud by the Claimants.

7. On 3 September 2015 Popplewell J stayed the English Application pending the determination of the proceedings before the Swedish Court to set aside the Award. The grounds before the Swedish Court were amended to add the contention that the Award should be declared invalid on the basis that it would contravene Swedish public policy by reason of fraud by the Claimants.

8. In due course on 9 December 2016 the Swedish Court decided the amended application before it and dismissed that application. Meanwhile on 11 May 2016 the US Court had refused a motion by the State to amend to add the alleged fraud to its grounds.

9.   The State accepts that the decision of the Swedish Court precludes it from pursuing the three points it originally took in the English Application. The Claimants' position is that there is no sufficient basis for the State to pursue the allegation of fraud that remains. Moreover, argue the Claimants, the decisions of the Swedish Court and of the US Court preclude the State from pursuing the contention that enforcement would contravene English public policy by reason of that alleged fraud.

10.  On this hearing the Claimants request that I dismiss the English Application. The State requests that I allow the English Application (duly amended) to proceed to a trial.


## Approach

11.  The following principles from the authorities cited by the parties sufficiently summarise the approach to be taken:

(1) "Recognition or enforcement of a New York Convention award shall not be refused except in the following cases …if it would be contrary to public policy to recognise or enforce the award": section 103(1) and (3) Arbitration Act 1996.

(2) "[T]he public policy exception in section 103(3) is confined to the public policy of England (as the country in which enforcement is sought) in maintaining the fair and orderly administration of justice: Mustill & Boyd, at pp. 91-92."; IPCO (Nigeria), Ltd v Nigerian National Petroleum Corporation [2005] EWHC 726 (Comm); [2005] 2 Lloyd's Rep 326 at [13] per Gross J.

(3) When addressing the question whether an award has been obtained by fraud or the award or the way in which it was procured is contrary to public policy the Court will normally look to see whether "some form of reprehensible or unconscionable conduct has contributed in a substantial way to the obtaining of the award": see Double K Oil Products 1996 Limited v Neste Oil OYJ [2009] EWHC 3380 (Comm); [2010] 1 Lloyd's Rep 141 at [33] per Blair J; and see Gater Assets Ltd v Nak Naftogaz Ukrainiy [2008] 1 CLC 141 at [41] per Tomlinson J ("That means conduct which we would be comfortable in describing as fraud, conduct dishonestly intended to mislead").

(4) It may be sufficient to show that a party "had deliberately and dishonestly failed to disclose [material] in the arbitration and made submissions or called evidence which deliberately and dishonestly continued that concealment and misled the tribunal" and that the material would have had "an important influence on or would probably have affected the result of the arbitration": Chantiers de l'Atlantique SA v Gaztransport & Technigaz SAS [2011] EWHC 3383 (Comm) at [58] and [311] per Flaux J.

(5) "[C]onsiderations of public policy, if relied upon to resist enforcement of an award, should be approached with extreme caution": IPCO (Nigeria), above, at [13].

(6) "[T]here can be no realistic doubt that s. 103 of the [Arbitration] Act embodies a pre-disposition to favour enforcement of New York Convention Awards, reflecting the underlying purpose of the New York Convention itself": IPCO (Nigeria), above, at [11].

(7) For the English Court to permit a party to pursue to a trial of the issues an allegation that a New York Convention award was obtained by fraud, normally two conditions will require to be fulfilled: Westacre Investments Inc v Jugoimport-SPDR Holding Co Ltd [2000] QB 288 (CA) at 309F per Waller LJ (dissenting in the result).

(8) The first condition is "that the evidence to establish the fraud was not available to the party alleging the fraud at the time of the hearing before the arbitrators": Westacre, above, at 309F, but noting the qualification at G-H.

(9) The second condition is that "there is a prima facie case of fraud which is sufficient to overcome the extreme caution of the court when invited to set aside an award on the grounds of public policy": IPCO (Nigeria) Limited v Nigerian National Petroleum Corporation [2015] EWCA Civ 1144; [2016] 1 Lloyd's Rep 5 at [191] per Christopher Clarke LJ.

(10) And "where perjury is the fraud alleged, i.e., where the very issue before the arbitrators was whether the witness or witnesses were lying, the evidence must be so strong that it would reasonably be expected to be decisive at a hearing, and if unanswered must have that result.": Westacre, above, at 309G.

12. I add that as a Judge of this Court, I should accord the greatest respect to the Swedish Court, as to the US Court. I do so willingly in both cases. If anything, the importance of mutual respect between courts that have responsibilities in relation to commercial arbitration that is of international reach – whether responsibilities in relation to oversight or enforcement - is increasing all the time as commerce becomes more globalised and interconnected.

**The LPG Plant**

13. The business subject matter of the Arbitration concerned the exploration and extraction of hydrocarbons.

14. The damages awarded included damages for the value of a liquefied petroleum gas plant ("the LPG Plant"). Tolkynneftegaz LLP ("TNG") was the owner of the equity interest in the LPG Plant. By 2002 the Claimants had acquired the whole of TNG.

15. On the question of the level of damages, the Claimants argued in the arbitration that the LPG Plant should be valued as a going concern. The State argued that the LPG Plant should be valued as scrap because, they contended, the project behind it had failed.

16. Before the Tribunal, the Claimants claimed to have invested more than US$245 million in the development and construction of the LPG Plant. This was the evidence

of the first Claimant himself, and of Mr Artur Lungu called by the Claimants, each by witness statement and in oral evidence before the Tribunal. It carried through into expert reports and into statements from arbitration counsel. The figure was not broken down, but did appear in audited or reviewed financial statements of TNG.

17.     The Claimants also relied in the Arbitration on a number of indicative bids for the acquisition of the LPG Plant, within a bidding process in 2008 known as Project Zenith. One of the indicative bids had been submitted by a subsidiary of KazMunaiGas ("KMG"), an oil and gas company controlled by the State, in September 2008. For the LPG Plant the bid estimated a value of US$199 million ("the KMG Indicative Bid").

18.     As shown below, the Tribunal decided to base its assessment of the valuation of the LPG Plant on the KMG Indicative Bid, awarding damages of US$ 199 million in respect of the LPG Plant.


**The Award**

19.     The essential parts of the Award are as follows:

> "1743. First, in addition to an application of the Tribunal's considerations in the chapter on causation above in this Award, the Tribunal has no doubt that [the State's] actions found above to be in breach of the ECT, in particular were a cause for the delay and then discontinuance of Claimants' completion of the LPG Plant.
>
> ...
>
> 1745. The Tribunal is not persuaded by [the State's] and their experts' conclusion that the LPG is a failed project and must be considered to have a negative value and no damages at all can be claimed by Claimants. If that were so, [the State] would not have been ready to invest further expenses in the completion of the Plant, after [the State] had taken control of the Plant. However, there were obviously plans to complete it. Publicly available information indicates that [the State] was in fact preparing to open the LPG Plant in 2012. In a document entitled "List of Investment projects of the Mangistauskoi Region, which are being supervised in 2011", there is a specific reference to the LPG Plant under "Regional Projects". The project is identified as having a cost of USD 315 million (47 billion Tenge) and it was expected to start up in the first half of 2012 with a capacity of 7 mcm of gas per day (2nd FTI Report para 7.7 and fns. 138 and 139). [The State's] argument that it cannot be identified with this document is not persuasive. The LPG Plant was also listed on website of [the State's] Embassy in Israel under the caption "Large Investment Projects in Kazakhstan through 2012" with the same project costs (FTI 2nd Report para 7.7 and fn 140).
>
> 1746. Regarding the value of damages caused by [the State's] action, the Tribunal has taken note of the various extensive arguments submitted by the Parties relying on their respective experts' reports. However, the Tribunal considers that it does not have to evaluate these reports and the very different results they reach. In the

view of the Tribunal, the relatively best source for the valuation in the period of the valuation date accepted by the Tribunal are the contemporaneous bids that were made for the LPG Plant by third parties after Claimants' efforts to sell the LPG Plant, both before and after October 14, 2008. Prospective purchasers bid on the Plant, not as scrap but obviously as prospectively operational. This is reflected in the undisputed indicative offers made by interested buyers in 2008, which valued the LPG Plant at USD 150 million on average. In this context, the Tribunal is not persuaded by [the State's] argument that these offers did not reflect the anticipated price bidders were ready to pay, but were only strategic offers to gain access to the data room. In this context, the Tribunal attributes a limited evidentiary value to the testimony of [the State's] witnesses from KNOC and Total E&P, since these foreign companies remain active investors in [the State] and, thus, for understandable reasons, have an interest to maintain a good relationship with the government of that country.

1747. On the other hand, the Tribunal considers it to be of particular relevance that an offer was made for the LPG Plant by state-owned KMG at that time for USD 199 million. The Tribunal considers that to be the relatively best source of information for the valuation of the LPG Plant among the various sources of information submitted by the Parties regarding the valuation for the LPG Plant during the relevant period of the valuation date accepted by the Tribunal …

1748. Therefore, this is the amount of damages the Tribunal accepts in this context."

20.  Thus in the Tribunal's view, (a) the LPG Plant project had not failed, (b) prospective purchasers bid on the LPG Plant as prospectively operational, and (c) "the relatively best source for the valuation" were contemporaneous bids by third parties, and within those, the KMG Indicative Bid specifically.

**The Alleged Fraud**

21.  Perkwood Investment Limited ("Perkwood") features in the Award. At paragraph 1450 it is described as a "third company", alleged by the State to have been involved in returning advances paid on cancellation by the Claimants of "delivery for equipment to the LPG Plant".

22.  The same paragraph of the Award also makes it very clear that the State felt able to allege before the Tribunal that the Claimants had "likely siphoned off … monies", had "likely pocketed" money, and "would … divert cash … such as by paying … double the market price". At the same time the State was also clear that it was "impossible to see" "[l]ikely … other transactions".

23.  Later (Award paragraph 1712) the Award summarises the State's case that the Claimants had not proved that US$ 245 million had been spent on the LPG Plant.

24.  The facts to which I now turn are derived from the evidence of Ms Patricia Nacimiento, and in particular from her Fourth and Fifth Witness Statements dated 27 August 2015 and 13 January 2017 and the documents referred to in those statements.

The evidence concerns the make-up of the US$ 245 million said by the Claimants to have been spent on the LPG Plant.

25. There has been no oral testimony, including cross examination, at this stage. Ms Nacimiento is a partner formerly of Norton Rose Fulbright LLP and now of Herbert Smith Freehills Germany LLP. She was involved as counsel in the Arbitration and since. I proceed on the basis that Ms Nacimiento has taken every care in the written evidence she gives, under a statement of truth. She is to be taken to know that this Court will have high expectations in these respects, especially in a case of this nature involving very serious allegations.

26. Ms Nacimiento states that in the proceedings before the Swedish Court the Claimants conceded that Perkwood and the Claimants were related. The State has, since the Award, also discovered that in a separate arbitration (known as the JOA Arbitration) and two months before the Award in this Arbitration, evidence of Mr Lungu filed on behalf of the third Claimant in these proceedings had stated that Perkwood was related to the Claimants. That was not the Claimants' position in the Arbitration.

27. Documents that the State has obtained through the US Disclosure Proceedings include a contract between Perkwood and TNG dated 17 February 2006 ("the Perkwood Contract"). This shows TNG agreeing to buy equipment from Perkwood relating to the construction of the LPG Plant for US$115 million (a figure later increased).

28. It is the State's case that at least a large proportion of this equipment had already been purchased, at a far lower cost. The State points to Perkwood selling equipment for US$93 million to TNG that had already been supplied through an arm's length contract at EUR 28.4 million or EUR31 million, and then Perkwood in 2008 charging TNG a further US$31 million for the same equipment. Thus equipment worth no more than EUR 31 million was ascribed a cost of US$ 124 million.

29. In the Arbitration, the Tribunal had upheld a request that the Claimants disclose "in so far as in the Claimants' possession, custody or control", "documents specifying the cost of construction and assembly operations, start-up and adjustment works in respect of basic facilities of [the LPG Plant]". Despite this ruling from the Tribunal the Perkwood Contract was not disclosed in the Arbitration by the Claimants.

30. TNG also paid US$44 million to Perkwood as a "management fee". In the case of this fee there is no contemporaneous record of what management was undertaken. It transpires that Perkwood, incorporated in 2005, from 2006 to 2009 filed accounts that showed it was dormant. In 2011 it was struck off the register of companies and dissolved. The truth is, say the Claimants, that a cost of US$44 million was ascribed in return for nothing.

31. The documents obtained in the United States Disclosure Proceedings also indicate that US$ 72 million of the figure of US$ 245 million (the total that the Claimants had said was spent on the LPG Plant) was ascribed to equipment delivered but not yet incorporated into the LPG Plant. The State contends that there was nowhere at the LPG Plant where equipment of this value could have been stored. It was common ground that the LPG Plant was almost complete.

32.   Interest on construction costs, in a sum of US$60 million, also formed part of the alleged costs of the LPG Plant. The State makes the point that where costs themselves had not in truth been incurred, interest could not have been incurred.

33.   Ms Nacimiento states in her Fifth Witness Statement that in the proceedings before the Swedish Court the Claimants were required for the first time to respond to a number of the State's allegations. In this regard she brings out the following points in her account of the proceedings before the Swedish Court:

   a.   The Claimants sought to justify the price charged under the Perkwood Contract in part on the basis of transportation costs but did not submit any evidence in support of the alleged transportation cost.

   b.   The Claimants initially contended that the further US$ 31 million charged under the Perkwood Contract referred not to the same equipment but to spare parts. On the final day of the hearing the Claimants changed their position and submitted that new equipment that would be used to increase the capacity of the LPG Plant was involved, but did not submit any evidence in support of this.

   c.   The Claimants did not submit any corroborating evidence to support the proposition that management services were actually performed by or on behalf of Perkwood.

   d.   The Claimants did not offer any explanation for what equipment had been purchased for US$ 72 million, where it was stored or how it related to the state of completion of the LPG Plant

34.   In these circumstances the State alleges that the claim by the Claimants in the Arbitration that costs incurred on the LPG Plant were US$ 245 million was dishonest. The Claimants concealed, says the State, the true position from the auditors of TNG, the relevant bidder (KMG) and the Tribunal, as well as the State. The conduct affected in turn the accounts of TNG, the KMG Indicative Bid, and the Award.

35.   Mr Thomas Sprange QC (appearing with Ms Ruth Byrne for the Claimants) submits that "all that is before the Court ... is evidence that a related entity charged a large management fee by way of mark-up and acquired plant and equipment on behalf of the Joint Venture that constructed the plant." I recognise that is a submission made in summary form but nonetheless I do not, with respect, consider that way of describing things is complete.

36.   A great deal of what Ms Nacimiento says is not (at least yet) answered in detailed evidence by the Claimants. This is a course open to the Claimants at this stage in these proceedings. I am moreover very conscious that Ms Nacimiento's Fifth Witness Statement was served relatively close to the hearing before me, limiting the time available to the Claimants to respond.

37.   Mr Sprange QC submits that there is no prima facie evidence of fraud, either on the Tribunal or at all. As to fraud on the Tribunal, he supports the conclusions of the Swedish Court and the US Court and I deal with those separately. As to fraud "at all", there is in my judgment sufficient prima facie evidence summarised in the paragraphs above.

## Effect of the alleged fraud

38. If the Claimants did dishonestly state the costs so that they did not represent true costs and for work actually done, it will be necessary to establish whether the KMG Indicative Bid was in the sum of US$199 million as a result.

39. Mr Sprange QC submits that there is no evidence from KMG as to the circumstances surrounding the KMG Indicative Bid, "or that the alleged false representations even formed part of its considerations"; that there is no "probative evidence ... as to KMG's rationale for [the KMG Indicative Bid]". I do not find it possible to accept these submissions.

40. The KMG Indicative Bid itself included these passages:

> "The primary rationale behind our interest ... is the strategy to continue increasing our reserves of hydrocarbon resources and building oil production through acquisitions of oil and gas producing assets in accordance with our Corporate Development Strategy.
>
> ...
>
> The Indicative Offer herein relates to the proposed acquisition of 100% of the share capital of [Kazpolmunay LLP ("KPM") and TNG, collectively, "the Company")].
>
> ...
>
> On the basis of the information contained in the Information Memorandum and publicly available information, subject to the conditions and assumptions set out elsewhere in this Indicative Offer and contingent upon further due diligence at Phase II of the sale process, we value the Company at US$754 million on a debt free and cash free basis (the "Enterprise Value") for expected completion of the Proposed Transaction in January 2009.
>
> ...
>
> We estimate the value of the Borankol field at US$100 million, the value of the Tolkyn field at US$455 million, and the value of the LPG plant at US$199 million.
>
> ...
>
> In formulating our Indicative Offer, we have relied upon the information contained in the Information Memorandum and certain other publicly available information. Our valuation depends upon this information and assumptions being substantiated in the next round through due diligence materials and meetings.
>
> Due to lack of sensitive input data, we used comparative (transaction and trading multiples) method for valuation of Borankol and Tolkyn fields, whereas the LPG [P]lant was valued using the combination of comparative and cost methods.

...

The value of the LPG [P]lant was calculated as an arithmetical average between the matrix of comparative method value and cost method value. EV/EBITDA multiple of 5.5x was used as a base for comparative method valuation. Historical costs of US$193 million were used as a base for cost method valuation.

*Inter alia,* our estimates of the Company's value and the present Indicative Offer are based on the following key assumptions:

...

Historical production, revenues, costs and CAPEX were as reported in the Information Memorandum;

...

[KMG's subsidiary] and its advisors are prepared to begin reviewing the electronic data room and the vendor due diligence reports immediately, and would anticipate, at the very least, performing the following additional due diligence ..."

41.    The following is clear:

(1) The KMG Indicative Bid was based on the information contained in the Information Memorandum and publicly available information.

(2) It was contingent upon further due diligence to be carried out at Phase II of the sale process. The value of the LPG Plant at US$199 million depended (as did other values) upon this information, and assumptions, being substantiated in the next round through due diligence materials and meetings.

(3) The LPG Plant was valued using a combination of comparative and cost methods. The value of the LPG Plant was calculated as an arithmetical average, one part of which was the cost method.

(4) Historical costs of US$193 million were used as a base for cost method valuation.

42.    The Information Memorandum, prepared in August 2008, was expressly based on the information found in audited (and unaudited) financial statements of KPM and TNG which in turn showed construction costs for the LPG Plant at the levels asserted by the Claimants.

43.    If construction costs were not US$245 million because that figure was fraudulently inflated by the Claimants to the extent alleged by the State, then, because the KMG Indicative Bid valued the LPG Plant using a calculation that brought costs of US$193 million into an arithmetical average there is the clearest argument that the KMG Indicative Bid would have been lower. (An "LPG Plan Assessment" by KMG shows the US$199 million KMG Indicative Bid to have been the midway point between US$193 million "adopted balance sheet value of outstanding construction" and a value of US$205 million based on assumed sales.)

44.     The KMG Indicative Bid was contingent on further due diligence at Phase II of the sale process. The Award records (at paragraph 365) that in January 2009 that phase began and KMG's subsidiary, with other potential bidders, was given access to the data room. I have not been taken to any evidence that suggests that this brought to the attention of the subsidiary the points about costs on which the State centres its challenge.

45.     The Claimants invited the Tribunal to have regard to the KMG Indicative Bid. At paragraph 1696 of the Award the Tribunal quoted from the Claimants' written argument which had been in these terms:

> "Indeed the offer made for the LPG plant by [KMG] at that time was US$199 million. While Claimants did not accept these offers because at the time they deemed them too low and did not feel that they would lead to a sale, the Tribunal should note that State-owned [KMG] itself offered almost US$200 million for the Plant, more than six times the highest value assigned to the LPG Plant by Deloitte of US$32 million. Little more is needed to demonstrate that Deloitte's salvage value assumptions and calculations are worthless."

I draw particular attention to the Claimants' phrase, addressed to and recorded by the Tribunal, that "little more is needed".

46.     At paragraph 1707 of the Award the Tribunal summarised a further part of the Claimants' argument, in which again the Claimants asked the Tribunal to rely on the KMG Indicative Bid, on this occasion to reject an argument by the State that a cost basis was not a correct valuation method.

47.     If the KMG Indicative Bid was in fact the result of the Claimants' dishonest misrepresentation then it seems to me, at this stage of scrutiny on the English Application, there is the necessary strength of prima facie case that the Tribunal would no longer (to use its words) consider it as taking a place of "particular relevance" within "the relatively best source of information for the valuation of the LPG Plant"; still less being the one offer from which they took the damages figure. The Tribunal showed its interest in "undisputed indicative offers made by interested buyers in 2008". It looked at them critically, so as to assess whether these were "strategic offers to gain access to the data room", concluding that they were not.

48.     Mr Sprange QC submits that "[I]t is absurd to suggest that the alleged fraud was a fraud on the Tribunal ..., or would have made a difference to the Tribunal". I do not find it possible to accept that submission. In my judgment there is the necessary strength of prima facie case that the alleged fraud would have made a difference to the Tribunal. And that, in asking the Tribunal to rely on the KMG Indicative Bid in circumstances (concealed from the Tribunal, as from the bidder) of the alleged fraud, there was a fraud on the Tribunal.

49.     Mr Sprange QC takes an additional point. He argues that the alleged fraud in relation to costs could not have foreseen the KMG Indicative Bid, and the effect of the KMG Indicative Bid on the Arbitration. I think this misunderstands the State's case. The original motives for the fraud are not all known but three are summarised by Ms Nacimiento: defrauding investors, extraction of funds from the State without paying taxes, and defrauding a joint venture partner. The conduct itself, and the concealment

of what had been done, had later consequences including for the audited or reviewed financial statements and the KMG Indicative Bid, and in turn the Award.

## The decision of the US Court

50.    As mentioned above, on 11 May 2016 the US Court refused a motion by the State to amend to add the alleged fraud to its grounds for opposing enforcement.

51.    Mr Sprange QC draws particular attention to the following passage in the ruling of the US Court:

> "[I]t would not be in interest of justice to broaden the scope of this proceeding to consider whether [the Claimants] did or did not mislead the foreign arbitration panel when it presented evidence related to the value of the plant in question. The Court has not come to any conclusions about the legitimacy of the evidence presented to the arbitrators on this issue. But it has reviewed [the Award], and it is clear that the arbitrators did not rely upon the allegedly fraudulent evidence in reaching their decision, so [the State's] proposed submissions would not be germane to the petition to confirm [the Award] … Under those circumstances, and given the fact that the issue has already been presented to the Swedish authorities, it will not be in the interest of justice to conduct a mini-trial on the issue of fraud here when the arbitrators themselves expressly disavowed any reliance on the allegedly fraudulent material."

52.    In my respectful view the statement of the US Court that on a review of the Award "it is clear that the arbitrators did not rely upon the allegedly fraudulent evidence in reaching their decision" must be read narrowly so as to refer simply to the Claimants' evidence of the costs incurred on the LPG Plant. The statement that "the arbitrators themselves expressly disavowed any reliance on the allegedly fraudulent material" must in my respectful view be read in the same narrow way.

53.    In the result, the decision of the US Court does not conclude the question of the consequences of the Tribunal's reliance on the KMG Indicative Bid. That includes the question whether the Tribunal was misled because the KMG Indicative Bid was based on the allegedly fraudulent material and the Claimants knew that when they presented, not the fraudulent material, but the KMG Indicative Bid.

54.    I should add that, on the evidence of Mr Matthew Kirtland, lead counsel for the State before the US Court, by witness statement dated 3 February 2017, the State filed a motion for reconsideration by the US Court. That motion was fully briefed by 3 June 2016, but has not been decided. Instead what happened is that the US Court ordered a stay pending the decision of the Swedish Court. A joint status report was filed with the US Court after the decision of the Swedish Court. On the information made available to me the proceedings before the US Court remain stayed.

55.    I add that, before the US Court in its motion for reconsideration, the State advances the submission that in order to invoke the public policy defence under Article V(2)(b) of the New York Convention the alleged fraud need not be relied upon by the arbitral tribunal.

## The decision of the Swedish Court

56.    Each party offered its own translation of the decision of the Swedish Court but for present purposes I find no material difference between the two translations offered. I take the translation offered by the State, as that was referred to most often.

57.    I have felt able to examine the decision of the Swedish Court by reference to its terms (albeit in translation). I nonetheless record my gratitude for the expert assistance given by Dr Patrik Scholdstrom, Director for the Stockholm Centre for Commercial Law) in his expert report dated 13 January 2017.

58.    A great deal of evidence and material concerning the alleged fraud (including that summarised above) was before the Swedish Court. Mr Sprange QC says the Claimants' case that the Award was obtained by fraud, was "fully ventilated". In the event with limited exceptions the Swedish Court did not form a view on the evidence and material.

59.    In the passage quoted below from the decision of the Swedish Court (in translation), I add my own paragraph lettering for ease of reference:

> "5.3 The issue of the invalidity or setting aside of [the Award]
>
> 5.3.1 Invalidity based on the fraudulent scheme, false evidence, misleading information etc.
>
> A. [The State] has argued that [the Award], and the manner in which it arose, violates public policy, and invoked the detailed circumstances set forth in section 3.1.2.1.
>
> The Court of Appeal makes the following assessment.
>
> B. In the arbitration at hand [the Claimants] claimed that [the State] had breached its obligations under the ECT by violating the investor protection provisions in the ECT and that [the State] was thus liable to pay damages to [the Claimants], inter alia with respect to what was referred to as the LPG [P]lant. It is undisputed in the case that the plant exists and, based on the evidence presented here, it is also clear that investments were made in it. [The Award] states that [the State] contested [the Claimants'] claim, and consequently [the Tribunal] made a substantive assessment of the claim. In light of the aforesaid, there is no reason to call into question the existence of an underlying real legal relationship between the parties …
>
> C. In the arbitration [the Claimants] invoked evidence in the form of witness testimony, witness affidavits and expert reports to prove that the investment costs in the LPG [P]lant had amounted to the alleged sum. However, [the Award] states that [the Tribunal] based its assessment of the damages with respect to the LPG [P]lant on the so-called indicative bid which had been submitted by KMG, see paragraphs 1746-1748 in [the Award].

D. As the Court of Appeal has described above, the scope of application of the public policy provision is very narrow and the legislature has also clearly decided not to introduce into the [Swedish] Arbitration Act any provision corresponding to the concept of new trial. Accordingly, in the Court of Appeal's opinion there can be no question of declaring an arbitral award invalid solely on the ground that false evidence or untrue testimony has occurred, when it is not clear that such have been directly decisive for the outcome …. However, situations are conceivable in which the invocation of false evidence may have an indirect impact on the arbitral tribunal in its assessment of the dispute. In light of the narrow scope of application and the restrictive approach that should pertain as regards opening up a new substantive assessment of the arbitrated dispute within the scope of challenge proceedings, in the Court of Appeal's opinion there should be no question of allowing such an indirect impact on the arbitral tribunal to result in the arbitral award being deemed invalid, except when it appears to be obvious that such indirect influence has been of decisive significance for the outcome in the case.

E. Since [the Tribunal] based its assessment on the indicative bid, the evidence invoked by [the Claimants] in the form of witness testimony, witness affidavits and expert reports regarding the size of the investment cost – which evidence [the State] has claimed was false – has not been of immediate importance for the outcome. In the Court of Appeal's opinion, already in these circumstances, such evidence *per se*, even if it were proven to be false – does not constitute sufficient reason to consider [the Award] invalid. In the Court of Appeal's opinion, it is also not obvious that this evidence, through indirect influence of [the Tribunal], was decisive for the outcome of the case.

F. Moving on to the question of whether the indicative bid *per se* constituted false evidence, it is undisputed that, prior to the initiation of the arbitration, [KMG] had submitted the relevant offer of USD 199 million for the LPG Plant. Thus, the indicative bid *per se* is not to be regarded as false evidence, even if - through the annual reports for Tristan Oil, KPM and TNG – possibly incorrect information regarding the amount invested in the LPG [P]lant was among the factors that KMG took into account when calculating the size of the offer. Accordingly, the allegedly false information in the annual reports did not directly constitute any basis for [the Tribunal's] assessment of the value of the LPG [P]lant. Against this background, the invocation of the indicative bid by [the Claimants] did not constitute an invocation of false evidence.

G. Finally, with respect to [the State's] allegation that, in the arbitration proceedings, [the Claimants] withheld from [the Tribunal] and [the State] certain information which might have influenced the outcome in the case, the Court of Appeal notes that, in a procedure amenable to out-of-court settlement such as arbitration, it cannot be demanded that a party provide the opposing party with information which speaks against the party's own case. There is no room to regard [the Award] as invalid on this ground, particularly not in light of the very narrow scope of application of the public policy rule.

H. To summarise, the Court of Appeal finds that none of the circumstances argued by [the State] in this respect - neither separately nor together - are such

that [the Award], or the manner in which it arose are manifestly incompatible with fundamental principles of Swedish law."

60.    Paragraph D makes clear that, in Swedish Law, to declare an arbitral award invalid on the ground that there has been false evidence it must be clear either (a) that the false evidence has been directly decisive for the outcome or (b) that the false evidence has had an indirect impact on the arbitral tribunal in its assessment of the dispute such that it "appears to be obvious that such indirect influence has been of decisive significance for the outcome in the case".

61.    The Swedish Court's reasoning at paragraphs E and F is that it was the KMG Indicative Bid that was directly decisive, and it was not false. The reasoning identifies the possibility that information that was false would affect the size of the KMG Indicative Bid, but it raises this possibility only to show that the KMG Indicative Bid was not false and that the false information was not directly decisive.

62.    This leaves still open the question of the false information being of indirect decisive impact. The final sentence of paragraph E reads that "it is not obvious that [the false information], through indirect influence of [the Tribunal] was decisive for the outcome of the case". The only reason given by the Swedish Court for what is stated in that final sentence of paragraph E is found in the first sentence of that paragraph, i.e. the fact that the Tribunal based its assessment on the KMG Indicative Bid (i.e. that the KMG Indicative Bid was directly decisive). That, with respect, does not deal with the question of the false information being of indirect decisive impact.

63.    Paragraph F does not say that that is the question it is dealing with. At one point there is the phrase "the allegedly false information in the annual reports did not directly constitute any basis for [the Tribunal's] assessment of the value of the [L]PG Plant". The use of the word "directly" either implies that if there was false information it indirectly constituted a basis for the Tribunal's assessment of value, or at least that question is left open.

64.    In these circumstances I do not, with respect, believe that the Swedish Court has dealt with the issue of indirect impact (i.e ground (b) under Swedish Law). I wish to add two further points.

65.    First, at paragraph G the Swedish Court expresses the view (as expressed in translation) that "in a procedure amenable to out-of-court settlement such as arbitration, it cannot be demanded that a party provide the opposing party with information which speaks against the party's own case". The view is stated very broadly, and I respectfully admit it troubles me. But for present purposes the view cannot be an answer if the State is correct that the present case is one where the Claimants encouraged the Tribunal to rely on an indicative offer that the Claimants knew was misleading because it was based on false information that they had provided. And further, in the present case the Tribunal expressly required the disclosure of certain documents. Neither party has suggested that the requirement would not include disclosure of adverse documents of the type described in the Tribunal's requirement (i.e. including the Perkwood Contract).

66.    Second, as mentioned, the Swedish Court also reasoned that the KMG Indicative Bid was not (itself) false evidence. That assessment holds at the time the KMG Indicative

MR JUSTICE KNOWLES
Approved Judgment

Bid was made, but I respectfully question whether it still holds when the KMG Indicative Bid is later deployed by a party who knows (but continues to conceal) that it is the product of that party's fraud.

## Availability of evidence of the alleged fraud

67.    Referring to the period before the Award, Mr Sprange QC argues that the State had access to "all relevant evidence, including Perkwood's involvement in the LPG Plant construction".

68.    Yet on Ms Nacimiento's evidence, even at the time of the hearing before the Swedish Court the Claimants did not submit any evidence in support of the alleged transportation cost said by them to justify in part the price charged by Perkwood, did not submit any evidence to support their (new) case that the Perkwood Contract came to include new equipment that would be used to increase the capacity of the LPG Plant, did not submit any corroborating evidence to support the proposition that management services were actually performed by or on behalf of Perkwood, and did not offer any explanation for what equipment had been purchased for US$72 million, where it was stored or how it related to the state of completion of the LPG Plant. If this evidence is correct then Mr Sprange QC's argument cannot be accepted without more.

69.    But more generally, what did the State know about Perkwood? Could the evidence of the alleged fraud have been discovered before the Award had the State used reasonable diligence?

70.    A large part of the argument focussed on whether the State knew at the time of the Award that Perkwood was related to the Claimants. A draft Vendor Due Diligence report dated 29 August 2008 was disclosed by the Claimants in the arbitration. The report was on the combined group of businesses of TNG, KPM and a third company, Tristan Oil. In showing a summary financial position for the group it included in an entry under "Net Working Capital" the sentence "Accounts payable and accounts receivable mainly relate to settlements with related parties including General Affinity and Statoil (crude oil customers), Kasco (performs construction work for the LPG plant) and Perkwood (a supplier of equipment for the LPG plant)." In apparent contrast, in a separate section presenting a "Business overview", the report showed General Affinity, Statoil and Kasco as "related parties" but Perkwood as one of a number of "main third parties".

71.    This discrepancy is eclipsed by the evidence from the State to the effect that there is no reference in the financial statements of TNG to Perkwood being a related party. This gives rise to the strongest suggestion that even the auditors of TNG did not know, with one consequence being that audit or review scrutiny of related-party dealings was avoided.

72.    Should the State have undertaken company searches on Perkwood at the time of the arbitration? It did not trust the Claimants. It did not agree that the Claimants had spent the costs they alleged. Mr Sprange QC goes further. He submits:

"Reasonable diligence would have plainly led to [the State] instructing its quantum expert to investigate and assess the costs of the LPG Plant .... [The State] made a series of allegations in the arbitration that the Claimants had perpetrated a fraud or something akin to it. As noted above, [the State] alleged that the Claimants had siphoned moneys from [the State] including via Perkwood, that the Claimants had sought to mislead potential investors in the LPG Plant as to its true value, and more generally to the effect that the Claimants' witnesses had lied in their testimony. ... It naturally follows from these allegations that anything relating to the true costs of the LPG [P]lant would be tainted. ... [The State] left no stone unturned in all other respects."

73. These submissions involve a number of paraphrases that do not always capture the precise position in the Arbitration. But putting that point to one side, the submissions engage, in my view, the point observed by Burton J in HJ Heinz Co Ltd v EFL Inc [2010] EWHC 1203 (Comm); [2010] 2 Lloyd's Rep 727 at [33]: "in a case of concealed fraud (concealed forgery) it may be, particularly where the source of the evidence is contained in the opposite camp, that, upon analysis of the facts an approach more favourable to the party defrauded in respect of what is due, or reasonable diligence, may be adopted." In the present case the Claimants, if dishonest, are not to escape if the right stone was not turned over by the State.

74. The State says it obtained the documents which have allowed it to make the allegations of fraud as a result of the US Discovery Proceedings in 2015. One of those is the Perkwood Contract. The Claimants refer to the fact that the State had seized many of its documents in the years before the Award (including contracts with third parties, according to the Award at paragraph 358), but that is, for me, an over broad response. Nor do I think it conclusive against the State that, according to the Claimants, the Perkwood Contract was mentioned in a due diligence report (in one extensive index of documents but not in another list of "material contracts") submitted by the State to the Tribunal on 14 March 2013, or in two spreadsheets disclosed by the Claimants.

75. The Perkwood Contract was not produced in the Arbitration, and I am not satisfied the Claimants have properly explained why. It fell within the description of documents that the Tribunal required to be produced by the Claimants where in their possession custody or control. It was a very significant document, as the Claimants will have known. It transpired that a copy was later available in the United States, and the Claimants there resisted access to it. Later still, before the Swedish Court the Claimants gave changing explanations about what it showed.

76. The Claimants say that imported equipment for the LPG Plant was declared by Perkwood and VAT and customs duties paid, and inspections by the State's Ministry of Energy and Natural Resources found substantial investment and employment by the Claimants. Again these facts do not explain the failure to produce the Perkwood Contract in the Arbitration, or why it should take until the hearing before the Swedish Court to concede that Perkwood was a related company.

77. In written submissions Mr Sprange QC says (at para 51.11) that "inspections also found the costs of the uninstalled equipment and materials in relation to the LPG Plant" to be about US$60 million. But this is not, with respect, a helpful reference on its own, for (on Ms Nacimiento's evidence, at paragraph 27(3)(b) of her Fifth Witness

**MR JUSTICE KNOWLES**
**Approved Judgment**

Statement): "While the Claimants initially asserted in the Swedish Proceedings that the MEMR Report had been based on an actual inspection of the equipment (said to be worth USD 72,000,345), they subsequently withdrew this assertion following [the State's] objections, and confirmed that the MEMR Report had not in fact been based on a site visit after all."

78.   What of the fact, referenced by the Claimants, that the State's oil and gas expert, in a report dated 17 November 2011, considered that the estimated costs of constructing the LPG Plant were reasonable "for the plant as designed"? In my view this takes one little further forward. The Tribunal did not found its decision on this opinion. The experts would no doubt have revised their opinion if the true figures are those shorn of the effect of the fraud alleged by the Claimants.

79.   I am satisfied that the State did not have access before the Award to the evidence of the alleged fraud on which it now seeks to rely, and that the evidence of the alleged fraud could not with reasonable diligence have been discovered before the Award had the State used reasonable diligence.

**Estoppel**

80.   No Court has decided the question whether there has been the fraud alleged. Neither the Swedish Court nor the US Court nor English Court has, although material has been put before those Courts that would allow them to decide that question.

81.   But the Claimants say the US Court has decided "that the Tribunal had not relied upon any of the allegedly fraudulent evidence in entering [the Award]". And the Claimants say that the decision of the Swedish Court has determined "whether the alleged fraud would have made a significant difference to the outcome of the proceedings".

82.   The short answer to the argument on estoppel on the basis of the decision of the US Court is that, as I have said above, that decision of the US Court must in my view be read narrowly and, read narrowly, is not to the effect for which the Claimants contend.

83.   The answer to the argument on estoppel on the basis of the decision of the Swedish Court is also short. The Swedish Court did not decide the factual question of indirect decisive impact on the Tribunal in its assessment of the dispute.

84.   The New York Convention is addressed, at Article V(2)(b), to the public policy of the country of enforcement. Relevant public policy can and does differ from country to country. It is correct to say that the Swedish Court did not decide whether under English law public policy required the application to enforce the Award in this jurisdiction to be refused.

85.   In oral submissions Mr Sprange QC focussed his estoppel argument on the facts. However in written submissions it was submitted for the Claimants that there was adduced "unchallenged evidence" that "the concepts of Swedish public policy and

English public policy are not materially different in the context of setting aside and enforcement of arbitral awards".

86.    I limit myself to the present context alone, and do not believe this is ultimately a matter of evidence in this case. If, as I should, I take the decision of the Swedish Court as showing Swedish public policy in the context of this case then I find, as a matter of law, that English public policy is not the same. Mr Ali Malek QC (appearing with Mr Christopher Harris and Mr Paul Choon Kiat Wee for the State) puts it this way, and I agree: "It is apparent from the outcome in Sweden alone that the content of Swedish public policy must be different from that of its English counterpart".

87.    In these circumstances, albeit briefly expressed, I rule that no issue estoppel has arisen. But even had the basis of an issue estoppel been made out, the English Court would still have to decide whether enforcement of the Award should be permitted because English public order must ultimately be a matter for the English Court: see Yukos Capital Sarl v OJSC Rosneft Oil Co (No 2) [2012] EWCA Civ 855; [2014] QB 458 at [147] per Rix LJ. Mr Sprange QC submitted that the decision cited should be confined to judgments and not applied to New York Convention arbitral awards. I cannot accept that submission; there is no warrant for the suggested limitation where the Convention is concerned expressly to respect the public policy of the enforcement court.

88.    Mr Sprange QC places reliance on the following passage from the decision of Colman J in Minmetals Germany GmbH v Ferco Steel Ltd [1999] 1 All ER (Comm) 315 at 331:

       "[i]n a case where a remedy for an alleged defect is applied for from the supervisory court, but is refused, leaving a final award undisturbed , it will therefore normally be a very strong policy consideration before the English courts that it has been conclusively determined by the courts of the agreed supervisory jurisdiction that the award should stand. Just as great weight must be attached to the policy of sustaining the finality of international awards so also must great weight be attached to the policy of sustaining the finality of the determination of properly referred procedural issues by the courts of the supervisory jurisdiction. I use the word 'normally' because there may be exceptional cases where the powers of the supervisory court are so limited that they cannot intervene even where there has been an obvious and serious disregard for basic principles of justice by the arbitrators or where for unjust reasons, such as corruption, they decline to do so. However, outside such exceptional cases, any suggestion that under the guise of allegations of substantial injustice procedural defects in the conduct of an arbitration which have already been considered by the supervisory court should be reinvestigated by the English courts on an enforcement application is to be most strongly deprecated."

89.    The emphasis given by Colman J to the importance of the policy of sustaining the finality of international awards and of the determination of properly referred procedural issues by the courts of the supervisory jurisdiction is plainly appropriate. But as Colman J recognised there may be exceptional cases. The present case is one where the issue is not just a procedural issue. Where the Swedish Court as the supervisory court has held that its powers are limited so that it cannot intervene even if the arbitrators were deliberately misled by the Claimants' use of the KMG

**MR JUSTICE KNOWLES**
Approved Judgment

Indicative Bid it is important to record that the powers of the English Court, and the requirements of English public policy, are not so limited.

## Abuse of process

90.   The Claimants rely on broadly the same arguments to support a contention that the State's resistance to the application to enforce the Award in this jurisdiction is an abuse of process. This contention must fail for the same reasons.

## Conclusion

91.   I have gone into some matters further than might normally be the case at this stage. This is because of the history of this dispute and the involvement of other courts.

92.   I hold that the decision of the Swedish Court and the decision of the US Court do not create an estoppel, that the State is entitled to rely on the evidence obtained since the Award, and that there is a sufficient prima facie case that the Award was obtained by fraud.

93.   It will do nothing for the integrity of arbitration as a process or its supervision by the Courts, or the New York Convention, or for the enforcement of arbitration awards in various countries, if the fraud allegations in the present case are not examined at a trial and decided on their merits, including the question of the effect of the fraud where found. The interests of justice require that examination.

94.   It is relevant to recognise that, on behalf of the Claimants, Mr Sprange QC asks ultimately that the Award should be recognised "as a judgment of this Court". Sir John Donaldson MR, in Deutsche Schachtbau-und Tiefbor-Gesellschaft m.b.h.v Shell International Petroleum Co Ltd [1990] 1 AC 295 at 316; [1987] 2 Lloyd's Rep 246, at 254, highlighted that enforcement is one of "the powers of the state" and that these powers are exercised on behalf of the public. These points reinforce the seriousness of what is involved.

95.   The State should have the permission it seeks to amend the English Application. Subject to any development in the proceedings before the Swedish Court or the US Court of which I am not aware, I propose to give directions for trial when handing down this judgment.

96.   Recognising the potential for further developments before the Swedish Court or the US Court, there will also be a general liberty to apply. In this particular case the parties should proceed on the basis that the liberty to apply is available, where appropriate, as one means by which the parties may pass any communication concerning the Arbitration, the Award and its enforcement between the Swedish Court or the US Court and this Court.