# EXHIBIT 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ANATOLIE STATI; GABRIEL STATI; ASCOM GROUP S.A.; TERRA RAF TRANS TRAIDING LTD., | ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:14-cv-1638-ABJ |
| REPUBLIC OF KAZAKHSTAN, | ) ) | |
| Respondent. | ) ) | |

## RESPONDENT REPUBLIC OF KAZAKHSTAN'S
## OPPOSITION TO PETITION TO CONFIRM ARBITRAL AWARD

Matthew H. Kirtland (D.C. Bar No. 456006)
matthew.kirtland@nortonrosefulbright.com
Kara Petteway (D.C. Bar No. 975541)
kara.petteway@nortonrosefulbright.com
Benjamin Hayes (D.C. Bar application pending)
benjamin.hayes@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
801 Pennsylvania Avenue, NW
Washington, D.C. 20004-2623
Tel: 202-662-0200
Fax: 202-662-4643

*Attorneys for Respondent Republic of Kazakhstan*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ........................................................................................................ 1

PARTIES ..................................................................................................................... 3

APPLICABLE TREATIES AND ARBITRATION RULES ......................................... 3

I.      NEW YORK CONVENTION ............................................................................ 3

II.     ENERGY CHARTER TREATY ........................................................................ 5

III.    STOCKHOLM CHAMBER OF COMMERCE RULES OF ARBITRATION ................. 6

FACTUAL BACKGROUND ...................................................................................... 12

I.      BACKGROUND TO THE ARBITRATION ..................................................... 12

II.     COMMENCEMENT OF THE ARBITRATION; COMPOSITION OF THE
ARBITRAL TRIBUNAL ................................................................................ 14

III.    TIMELINE OF THE ARBITRATION PROCEEDINGS .................................. 23

IV.   CHALLENGE PROCEEDINGS IN SWEDEN ............................................... 24

V.    PRESENT PROCEEDING ............................................................................... 26

ARGUMENT ............................................................................................................. 26

I.      THE AWARD IS UNENFORCEABLE UNDER ARTICLE V, SECTION 1(A)
OF THE NEW YORK CONVENTION ............................................................ 27

     A.     The Three Month Cooling-Off Period Is a Jurisdictional Prerequisite To
An Agreement To Arbitrate Between Kazakhstan and Petitioners ..................... 28

     B.     The Tribunal Lacked Jurisdiction Under Either A De Novo Or A Highly
Deferential Standard of Review .......................................................................... 30

II.     THE AWARD IS UNENFORCEABLE UNDER ARTICLE V, SECTION 1(B)
OF THE NEW YORK CONVENTION ............................................................ 36

     A.     The Right of A Party To Appoint An Arbitrator is a Fundamental To
International Arbitration ...................................................................................... 36

     B.     Due Process Standards ......................................................................................... 37

     C.     Kazakhstan Was Deprived of Its Fundamental Right to Appoint Its
Arbitrator Without Proper Notice ....................................................................... 39

     D.     Expert Opinion Supports The Conclusion That Kazakhstan Was Not
Given Proper Notice of Appointment of the Arbitrator ...................................... 44

     E.     Even if the SCC Had Requested that Kazakhstan Appoint an Arbitrator,
Which It Did Not, The Time Limits Imposed by the SCC Violated Due
Process ................................................................................................................ 46

III.   THE AWARD IS UNENFORCEABLE UNDER ARTICLE V, SECTION 1(D)
OF THE NEW YORK CONVENTION ........................................................................... 48

    A.   The Composition Of The Arbitral Authority Did Not Comply With The
Alleged Agreement Of The Parties Because The SCC Appointed An
Arbitrator For Respondent Contrary To The SCC Rules...................................... 49

    B.   The Arbitral Procedure Did Not Comply With The Alleged Agreement Of
The Parties Because The Three Month Cooling-Off Period Did Not Occur
Prior To Commencement Of Arbitration As Required By The ECT ................... 53

    C.   The Arbitral Procedure Did Not Comply with the Alleged Agreement of
the Parties Because the Tribunal Committed Multiple Procedural Errors............ 53

IV.   THE AWARD IS UNENFORCEABLE UNDER ARTICLE V, SECTION 2(B)
OF THE NEW YORK CONVENTION ........................................................................... 57

V.   KAZAKHSTAN DID NOT ENTER INTO AN ARBITRATION AGREEMENT
WITH PETITIONER TERRA RAF ................................................................................ 58

CONCLUSION ............................................................................................................................ 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Howard*,
  182 Mich. App. 243 (Mich. Ct. App. 1990) ..........................................................38

*Am. Postal Workers Union, AFL-CIO v. United States Postal Serv.*,
  789 F.2d 1 (D.C. Cir. 1986) ...............................................................................57

*Application of Gault*, 387 U.S. 1 (1967) .............................................................38, 41

*Matter of Arbitration Between Chromalloy Aeroservices*,
  939 F. Supp. 907 (D.D.C. 1996) .....................................................................30, 57

*BG Group, PLC v. Republic of Argentina*,
  134 S. Ct. 1198 (2014) ................................................................................ passim

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998) ........................................................................................42, 44

*Compagnie des Bauxites de Guinee v. Hammermills, Inc.*,
  No. CIV.A. 90-0169, 1992 WL 122712 (D.D.C. May 29, 1992) .....................48, 53

*Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*,
  403 F.3d 85 (2d Cir. 2005) ...............................................................................33-34

*Fed. Ins. Co. v. Commerce Ins. Co.*,
  597 F.3d 68 (1st Cir. 2010) ....................................................................................51

*Greene v. Lindsey*,
  456 U.S. 444 (1982) ........................................................................................38, 41

*Gulf Coast Indus. Workers Union v. Exxon Co., USA*,
  70 F.3d 847 (5th Cir. 1995) ...................................................................................57

*Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*,
  763 F.2d 34 (1st Cir. 1985) ....................................................................................56

*Howard Univ. v. Metro. Campus Police Officer's Union*,
  512 F.3d 716 (D.C. Cir. 2008) ...............................................................................27

*Hurtado v. California*,
  110 U.S. 516 (1884) ................................................................................................42

*Iran Aircraft Industries v. Avco Corp.*,
   980 F.2d 141 (2d Cir. 1992) ................................................................................ 43

*Jones v. Flowers*,
   547 U.S. 220 (2006) ................................................................................ 42, 43

*Kaplan v. Alfred Dunhill of London, Inc.*,
   No. 96 CIV. 0258, 1996 WL 640901 (S.D.N.Y. Nov. 4, 1996) ............................. 42

*LaChance v. Erickson*,
   522 U.S. 262 (1998) ................................................................................ 57

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ................................................................................ 38, 41

*Millers Mut. Fire Ins. Co. v. Pinnacle Underwriters Mgmt. Assocs., Ltd.*,
   No. CIV. 3: 98-cv-0593, 2002 WL 424579 (N.D. Tex. Mar. 15, 2002) ................. 36

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ................................................................................ 38-39, 57

*N.Y. Life Ins. Co. v. Brown*,
   84 F.3d 137 (5th Cir. 1996) ................................................................................ 38

*Parsons & Whittemore Overseas Co., Inc. v. Societe Generale De L'Industrie Du
   Papier*,
   508 F.2d 969 (2d Cir. 1974) ................................................................................ 36

*Polimaster Ltd. v. RAE Sys., Inc.*,
   623 F.3d 832 (9th Cir. 2010) ................................................................................ 34, 48

*Rann v. Chao*,
   209 F. Supp. 2d 75 (D.D.C. 2002) ................................................................................ 51

*Robinson v. Hanrahan*,
   409 U.S. 38 (1972) ................................................................................ 38

*Rosenberg v. Merrill Lynch*,
   995 F. Supp. 190 (D. Mass. 1998) ................................................................................ 36

*Sesostris, S.A.E. v. Transportes Navales, S.A.*,
   727 F. Supp. 737 (D. Mass. 1989) ................................................................................ 36

*Simon v. Craft*,
   182 U.S. 427 (1901). Notice ................................................................................ 37

*Stef Shipping Corp. v. Norris Grain*,
   209 F. Supp. 249 (S.D.N.Y. 1962) ................................................................................ 36-37, 53

*Tang v. I.N.S.*,
   No. 94-70444, 1996 WL 155138 (9th Cir. Apr. 2, 1996) ................................................... 43-44

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*,
   363 U.S. 574 (1960) ........................................................................................................... 27

**Other Authorities**

Maxi Scherer, *The New York Convention on Recognition and Enforcement of
   Foreign Arbitral Awards Commentary* 292 (C. H. Beck München & Hart
   Publishing, Oxford, 2012) ................................................................................................. 38

Robert F. Cushman et al., *Construction Disputes Representing the Contractor* §
   14.02 (3d ed. 2001) ........................................................................................................... 37

Alan Redfern & Martin Hunter, *Law and Practice of International Commercial
   Arbitration* (5th ed. 2009) ....................................................................................... 27, 36-37

## **INTRODUCTION**

This case arises out of an international arbitration award dated December 19, 2013 (the "Award"), that decided claims brought by Petitioners Anatolie Stati ("Stati"), Gabriel Stati, Ascom Group. S.A. and Terra Raf Trans Traiding Ltd. (collectively, "Petitioners") against Respondent Republic of Kazakhstan ("Respondent" or "Kazakhstan").[1]  The Award was issued in an arbitration (the "Arbitration") purportedly instituted under the terms of the Energy Charter Treaty, I.E.L. III-0068, Dec. 17, 1994 (the "ECT"), to which Kazakhstan is a member, and concerned various oil and gas assets operated by Petitioners within Kazakhstan.  The arbitral tribunal (the "Tribunal") that issued the Award consisted of three members, none of which Kazakhstan appointed.  In the Award, Petitioners obtained a ruling against Kazakhstan in the amount of $497,685.101.00, plus costs.

The facts and circumstances giving rise to the Award, as set forth below, constitute blatant violations of the provisions of the ECT, the arbitration rules of the Stockholm Chamber of Commerce ("SCC") under which the Arbitration was conducted, and Kazakhstan's due process rights.  First, Petitioners violated the ECT by failing to comply with the jurisdictional conditions necessary to create an arbitration agreement with Kazakhstan.  Specifically, Petitioners were required to first request "amicable settlement" of their dispute with Kazakhstan, and then wait three months after the date of this request ***before*** commencing arbitration proceedings.  Instead, Petitioners commenced the arbitration just five days after the contracts at issue had been terminated, and with no request for amicable resolution under the ECT. Compliance with the ECT's three month "cooling-off period" was a necessary precondition to

---

[1] A copy of the Award is attached as Exhibit A to the Declaration of Charlene C. Sun in Support of the Petition to Confirm (ECF 2-1 to 2-4).

Kazakhstan's offer to arbitrate, and Petitioners' failure to satisfy this condition invalidated any agreement to arbitrate by Kazakhstan under the ECT.

Second, after Petitioners wrongfully commenced the arbitration, the SCC violated its own arbitration rules by depriving Kazakhstan of its right to appoint its own arbitrator, and by not giving Kazakhstan proper notice of the appointment of the arbitral tribunal. This was done at Petitioners' bidding on an ex parte basis. Indeed, Kazakhstan only received notice of a request to appoint its arbitrator *after* the SCC had already appointed an arbitrator for Kazakhstan. A party's right to appoint its own arbitrator is paramount in international arbitration. Kazakhstan being deprived of this right constituted a critical violation of both the SCC Rules and fundamental due process.

As a result of the foregoing, the Award is unenforceable under Sections (1)(a), (b) and (d) and (2)(b) of Article V of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (June 10, 1958), 21 U.S.T. 2517 ("New York Convention"), for at least the following four reasons: (1) no valid arbitration agreement existed between the parties; (2) Kazakhstan was not given proper notice of the appointment of the arbitrator; (3) the composition of the arbitral authority and the arbitration procedure were not in accordance with the purported agreement of the parties to arbitrate; and (4) the recognition and enforcement of the Award would be contrary to the public policy of the United States. Each of these reasons independently prevents the Award from being confirmed by this Court pursuant to 9 U.S.C. § 207.

Kazakhstan's position is supported by the undisputed facts, legal authority and the opinion of recognized international arbitration experts Professor Horacio Grigera Naón and Professor Bengt Lindell, both of whom which have submitted statements on behalf of

Kazakhstan.  Accordingly, and as more fully set out below, the Petition should be denied with prejudice.  A proposed order is attached.

**PARTIES**

Kazakhstan has been an independent state since 1991.  On December 17, 1994, Kazakhstan signed the Energy Charter Treaty.  On October 18, 1995, the ECT was ratified by Kazakhstan, and it entered into force on April 16, 1998.

Anatolie Stati and Gabriel Stati both hold passports of Moldova and Romania.  Anatolie Stati is the father of Gabriel Stati.

Ascom Group S.A. ("Ascom") is a joint stock company incorporated under the laws of Moldova, with headquarters in Moldova.  Anatolie Stati claims to own 100% of Ascom.

Terra Raf Trans Traiding Ltd. ("Terra Raf") is a limited liability company incorporated under the laws of Gibraltar, with a registered address in Gibraltar.  Anatolie Stati and Gabriel Stati claim to each own 50% of Terra Raf.

**APPLICABLE TREATIES AND ARBITRATION RULES**

This proceeding concerns the provisions of two treaties and one set of arbitration rules: (1) the New York Convention, as implemented in the United States through the provisions of the Federal Arbitration Act, 9 U.S.C. § 207, *et seq.*; (2) the Energy Charter Treaty; and (3) the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce.  For the convenience of the Court, the relevant provisions of each are set out below.[2]

## I.  NEW YORK CONVENTION

The United States is a signatory of the New York Convention.  Section 207 of the Federal Arbitration Act provides that arbitral awards falling under the New York Convention shall be

---

[2] A true and correct copy of the SCC Rules is attached hereto as Exhibit 1.  A copy of the ECT is attached as Exhibit B to the Declaration of Charlene C. Sun in Support of the Petition to Confirm (ECF 2-5).

confirmed unless the district court "finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." *See* 9 U.S.C. § 207. Article V of the New York Convention lists seven grounds for refusal or deferral of recognition of an arbitral award. The first five come under Section 1 of Article V, and the last two come under Section 2. The full text of Article V is as follows:

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

 (a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

 (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

 (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decision on matters submitted to arbitration may be recognized and enforced; or

 (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

 (e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

> (a)    The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or
>
> (b)    The recognition or enforcement of the award would be contrary to the public policy of that country.

## II.    **ENERGY CHARTER TREATY**

The Arbitration was purportedly brought by Petitioners under the terms of the Energy Charter Treaty. Part V, Article 26 of the ECT addresses the settlement of disputes between signatory states ("Contracting Parties") — which include the Republic of Kazakhstan — and "Investor Parties" — which potentially could include private persons such as Petitioners in the event they satisfy various requirements of the ECT.

Article 26(1) requires that, if possible, all disputes between a Contracting Party and an Investor shall be "settled amicably":

> (1)  Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

To enforce this requirement, Article 26(2) provides that disputes may only be submitted for resolution, whether to arbitration or one of other prescribed venues, *after* a request for amicable settlement is made by either party to the dispute *and* a period of three months elapses from the date of that request. These three months are known as a "cooling-off" period. The text of Article 26(2) reads as follows:

> (2)    If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:
>
>> (a)    to the courts or administrative tribunals of the Contracting Party to the dispute;
>>
>> (b)    in accordance with any applicable, previously agreed dispute settlement procedure; or

(c)      in accordance with the following paragraphs of this Article.[3]

In turn, Article 26(3)(a) establishes that a Contracting Party such as Kazakhstan is deemed to have given "its unconditional consent to the submission of a dispute to international arbitration" when that dispute is submitted to arbitration "***in accordance with***" the provisions of Article 26:

(a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.[4]

## III.      **STOCKHOLM CHAMBER OF COMMERCE RULES OF ARBITRATION**

Petitioners submitted their dispute with Kazakhstan to an arbitral proceeding under the Arbitration Institution of the Stockholm Chamber of Commerce.  Such proceedings are required to be conducted under the Arbitration Rules of the Stockholm Chamber of Commerce (the "SCC Rules").  Assuming that Petitioners had complied with the ECT's three month cooling-off period before commencing the Arbitration, which they did not, the SCC Rules adopted by the Stockholm Chamber of Commerce as of January 1, 2010 properly would have governed the Arbitration.[5]  Set forth below are excerpts of the SCC Rules relevant to the present proceeding:

1.      Article 1 – titled "About the SCC" – explains the general functions of the SCC, including the distinction between the SCC Board and the SCC Secretariat.  It provides as follows in pertinent part:

---

[3] Per Article 26(4)(c), one of the specified methods of dispute resolution is arbitration before the SCC.

[4] Subparagraphs (b) and (c) of Article 26 are irrelevant to the present proceeding.

[5] Petitioners commenced the arbitration on July 26, 2010.  The preface to the SCC Rules provides that: "Under any arbitration agreement referring to the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce (the "Arbitration Rules") the parties shall be deemed to have agreed that the following rules, or such amended rules, in force on the date of the commencement of the arbitration, or the filing of an application of an Emergency Arbitrator, shall be applied unless otherwise agreed by the parties."  Ex. 1, at 6.

The Arbitration Institute of the Stockholm Chamber of Commerce (the "SCC") is the body responsible for the administration of disputes in accordance with the "SCC Rules";….The SCC is composed of a board of directors (the "Board") and a secretariat (the "Secretariat"). Detailed provisions regarding the organisation of the SCC are set out in Appendix I.

2.      Article 2 – titled "Request for Arbitration" – specifies the contents of a Request for Arbitration, and provides that it shall include:

(i)      a statement of the names, addresses, telephone and facsimile numbers and e-mail addresses of the parties and their counsel;

(ii)     a summary of the dispute;

(iii)    a preliminary statement of the relief sought by the Claimant;

(iv)     a copy or description of the arbitration agreement or clause under which the dispute is to be settled;

(v)      comments on the number of arbitrators and the seat of arbitration; and

(vi)     if applicable, the name, address, telephone number, facsimile number and e-mail address of the arbitrator appointed by the Claimant.

3.      Article 4 provides that: "Arbitration is commenced on the date when the SCC receives the Request for Arbitration."

4.      Article 5(1) specifies the contents of an Answer to a Request for Arbitration, and provides as follows:

(1)      The Secretariat shall send a copy of the Request for Arbitration and the documents attached thereto to the Respondent. The Secretariat shall set a time period within which the Respondent shall submit an Answer to the SCC. The Answer shall include:

(i)      any objections concerning the existence, validity or applicability of the arbitration agreement; however, failure to raise any objections shall not preclude the Respondent from subsequently raising such objections at any time up to and including the submission of the Statement of Defence;

      (ii)     an admission or denial of the relief sought in the Request for Arbitration;

      (iii)    a preliminary statement of any counterclaims or set-offs;

      (iv)    comments on the number of arbitrators and the seat of arbitration; and

      (v)     if applicable, the name, address, telephone number, facsimile number and e-mail address of the arbitrator appointed by the Respondent.

5.      Article 5(3) provides that:  "Failure by the Respondent to submit an Answer shall not prevent the arbitration from proceeding."

6.      Article 7 – titled "Time Periods" – provides that:  "The Board may, on application by either party or on its own motion, extend any time period which has been set for a party to comply with a particular direction."

7.      Article 8 – titled "Notices" – provides:

      (1)     Any notice or other communication from the Secretariat or the Board shall be delivered to the last known address of the addressee.

      (2)     Any notice or other communication shall be delivered by courier or registered mail, facsimile transmission, e-mail or any other means of communication that provides a record of the sending thereof.

      (3)     A notice or communication sent in accordance with paragraph (2) shall be deemed to have been received by the addressee on the date it would normally have been received given the chosen means of communication.

8.      Article 9 – titled "Decisions by the Board" – provides that:  "When necessary the Board shall:"

      (i)     decide whether the SCC manifestly lacks jurisdiction over the dispute pursuant to Article 10(i);

      (ii)    decide whether to consolidate cases pursuant to Article 11;

      (iii)    decide the number of arbitrators pursuant to Article 12;

(iv)    make any appointment of arbitrators pursuant to Article 13;

(v)    decide the seat of arbitration pursuant to Article 20; and

(vi)    determine the Advance on Costs pursuant to Article 45.

9.    Article 12 – titled "Number of Arbitrators" – provides:

The parties may agree on the number of arbitrators. Where the parties
have not agreed on the number of arbitrators, the Arbitral Tribunal shall
consist of three arbitrators, unless the Board, taking into account the
complexity of the case, the amount in dispute or other circumstances,
decides that the dispute is to be decided by a sole arbitrator.

10.    Article 13 – titled "Appointment of Arbitrators" – provides:

(1)    The parties may agree on a different procedure for appointment of
the Arbitral Tribunal than as provided under this Article.  In such
cases, if the Arbitral Tribunal has not been appointed within the
time period agreed by the parties or, where the parties have not
agreed on a time period, within the time period set by the Board,
the appointment shall be made pursuant to paragraphs (2)–(6).

(2)    Where the Arbitral Tribunal is to consist of a sole arbitrator, the
parties shall be given 10 days within which to jointly appoint the
arbitrator.  If the parties fail to make the appointment within this
time period, the arbitrator shall be appointed by the Board.

(3)    Where the Arbitral Tribunal is to consist of more than one
arbitrator, each party shall appoint an equal number of arbitrators
and the Chairperson shall be appointed by the Board.  Where a
party fails to appoint arbitrator(s) within the stipulated time period,
the Board shall make the appointment.

(4)    Where there are multiple Claimants or Respondents and the
Arbitral Tribunal is to consist of more than one arbitrator, the
multiple Claimants, jointly, and the multiple Respondents, jointly,
shall appoint an equal number of arbitrators.  If either side fails to
make such joint appointment, the Board shall appoint the entire
Arbitral Tribunal.

(5)    If the parties are of different nationalities, the sole arbitrator or the
Chairperson of the Arbitral Tribunal shall be of a different
nationality than the parties, unless the parties have agreed
otherwise or unless otherwise deemed appropriate by the Board.

(6)     When appointing arbitrators, the Board shall consider the nature and circumstances of the dispute, the applicable law, the seat and language of the arbitration and the nationality of the parties.

11.     Once composed, the arbitral tribunal has nearly complete authority under the SCC Rules, including the authority to:  (a) "conduct the arbitration in such manner as it considers appropriate" (Article 19(1)); (b) determine the location of any hearings (Article 20(2)); (c) determine the language of the arbitration (Article 21); (d) determine the applicable law (Article 22(1)); (e) determine the timetable for the arbitration, including the timetable for all written submissions of the parties (Articles 23 and 24); (f) determine whether to allow amendments to any claims, counterclaims, defenses or set-off (Article 25); (g) determine the admissibility, relevance and materiality of all evidence, as well as what evidence must be designated and disclosed by any party (Article 26); (h) appoint one or more experts to report directly to the Tribunal (Article 29); (i) determine whether to hold any party in default (Article 30); (j) determine whether to grant any interim measures, and whether and in what amount security should be provided for any interim measures granted (Article 32); (k) determine when to close the proceedings (Article 34); (l) determine whether to correct any award (Article 41); (m) determine whether to make any additional award after a final award is rendered (Article 42); and (n) determine whether and in what amount costs of the arbitration, legal fees and expenses may be shifted between the parties (Articles 43 and 44).

12.     Article 35 – titled "Awards and Decisions" – provides that when the arbitral tribunal consists of more than one arbitrator any award or decision of the tribunal shall be made by a majority of the arbitrators, with the exception that the tribunal "may decide that the Chairperson alone may make procedural rulings."

13.     Article 40 – titled "Effect of an Award – provides that an arbitral award "shall be final and binding on the parties when rendered."

14.     Article 47 – titled "Enforcement" – provides that the arbitral tribunal and the SCC, in all matters not expressly provided for in the SCC rules, are required to act in the spirit of the Rules and "shall make every reasonable effort to ensure that all awards are legally enforceable."

15.     Appendix 1 of the SCC Rules also contains provisions relevant to the present proceeding. These are excerpted below.

16.     Appendix 1, Article 2(i) – titled "Function of the SCC" – provides that the function of the SCC is to: "administer domestic and international disputes in accordance with the SCC Rules and other procedures or rules agreed upon by the parties."

17.     Appendix 1, Article 3 – titled "The Board" – provides that: "The Board shall be composed of one chairperson, a maximum of three vice-chairpersons and a maximum of 12 additional members. The Board shall include both Swedish and non-Swedish nationals."

18.     Appendix 1, Article 6 – titled "Function of the Board" – provides:

> The function of the Board is to take the decisions required of the SCC in administering disputes under the SCC Rules and any other rules or procedures agreed upon by the parties. Such decisions include decisions on the jurisdiction of the SCC, determination of advances on costs, appointment of arbitrators, decisions upon challenges to arbitrators, removal of arbitrators and the fixing of arbitration costs.

19.     Appendix 1, Article 7 – titled "Decisions of the Board" – provides:

> Two members of the Board form a quorum. If a majority is not attained, the Chairperson has the casting vote. The Chairperson or a Vice Chairperson may [] take decisions on behalf of the Board in urgent matters. A committee of the Board may be appointed to take certain decisions on behalf of the Board. The Board may delegate decisions to the Secretariat, including decisions on advances on costs, extension of time for rendering an award, dismissal for non-payment of registration fee, release of arbitrators and fixing of arbitration costs. Decisions by the Board are final.

20.     Appendix 1, Article 8 – titled "The Secretariat" – provides:

- 11 -

> The Secretariat acts under the direction of a Secretary General. The Secretariat carries out the functions assigned to it under the SCC Rules. The Secretariat may also take decisions delegated to it by the Board.

21.     In accordance with Appendix 1, Article 9 – titled "Procedures" – the SCC is under a general obligation to deal with the arbitration in an "impartial, practical and expeditious manner."

## FACTUAL BACKGROUND

## I.     BACKGROUND TO THE ARBITRATION

Hydrocarbon in the form of oil and gas is Kazakhstan's main natural resource. Since Kazakhstan became an independent state in 1991, it has attracted foreign technical and financial investment to help it recover these natural resources. The Government of Kazakhstan is the highest authority responsible for managing investments and exploration of the country's natural resources. Kazakhstan has an extensive legislative framework covering subsoil exploration contracts and the companies that operate in this sector.

In 1999, Stati investigated possibilities for investing in the extraction of oil and gas resources in Kazakhstan. To that end, Stati purportedly acquired in several steps 100% of the shares in two companies – Kazpolmunai ("KPM") and Tolkynneftegas ("TNG"). Award ¶¶ 221, *et seq.* Specifically, during the period from December 1999 to May 2000, Ascom purportedly became the owner of 100% of KPM, *id.* ¶ 221-28, and, in 2003, Terra Raf became the owner of 100% of TNG.[6] *Id.* ¶ 239. Thereafter, KPM and TNG obtained state approval from Kazakhstan to explore and develop various oil and gas fields in Kazakhstan. *Id.* ¶ 249, *et seq.* In 2006, TNG initiated activities to construct a liquefied petroleum gas plant (the "LPG Plant"), *id.* ¶ 250, the

---

[6] The validity of the transfer of TNG to Terra Raf is disputed by Kazakhstan. *See*, *e.g.*, Ex. 21 ¶ 3.3(19).

purpose of which was to filter hydrocarbons such as propane and butane out of a stream of so-called "wet" or "rich" gas.

On October 6, 2008, the President of Moldova sent a letter to the President of Kazakhstan accusing Stati of illegally concealing profits in offshore territories, and using proceeds from Stati's operations in Kazakhstan to illegally invest in states subject to United Nations sanctions. *Id.* ¶ 291. In response, Kazakhstan initiated a government inspection of Stati and his companies. *Id.* ¶¶ 296, *et seq.* Thereafter, taxes and duties were assessed by the Kazakh Tax and Customs Committee. A criminal investigation by the Kazakh authorities followed, during which searches of KPM's and TNG's premises were conducted and, ultimately, KPM's General Director was criminally charged, convicted and sentenced to a four-year prison term. *Id.* ¶¶ 345, *et seq.*; ¶ 492. In February 2009, the Kazakh Tax Committee ordered KPM and TNG to pay back taxes in the amount of $62 million. *Id.* ¶ 394. On appeal, this decision was upheld by the Kazakh Supreme Court. *Id.* ¶ 1018.

In 2008 and 2009, as a result of the worldwide financial crisis, KPM and TNG curtailed the expenses necessary for the continued development of their oil and gas projects in Kazakhstan, and suspended work on the LPG Plant. *Id.* ¶¶ 251, 1436. The LPG Plant was never completed. *Id.* ¶ 1693.

Kazakhstan initiated new investigations against Stati during the period from June to July 2010. *Id.* ¶¶ 577-610. Thereafter, the Kazakh Ministry of Oil and Gas terminated KPM's and TNG's subsoil use contracts on July 21, 2010. *Id.* ¶ 611.[7]

---

[7] In the following months, the oil and gas fields were - on a temporary basis - placed into trust management by the Kazakh state oil company and its subsidiary. Award ¶ 611.

## II.    COMMENCEMENT OF THE ARBITRATION; COMPOSITION OF THE ARBITRAL TRIBUNAL

On July 26, 2010, Petitioners filed their Request for Arbitration with the Stockholm Chamber of Commerce, claiming that Kazakhstan's actions violated its obligations under the Energy Charter Treaty.  Award ¶ 6.  Petitioners thus commenced the arbitration five days after termination of the KPM and TNG contracts at issue in the Arbitration.  Award ¶¶ 6, 611.  This did not comply with Article 26 of the ECT, which requires that a party to a dispute:  (1) request amicable resolution of the dispute; and (2) wait three months after such request before initiating arbitration.  *See* ECT, Article 26(1)-(2).  The Request for Arbitration consisted of 40 pages and was accompanied by 42 exhibits.[8]

The ECT does not state how many arbitrators are to be appointed to an arbitral tribunal composed under the SCC Rules.  Likewise, the SCC Rules do not specify the number of arbitrators for a particular arbitral tribunal.  Accordingly, as of the date of the commencement of the Arbitration, no agreement existed between Petitioners and Kazakhstan as to the number of arbitrators, the procedure for the appointment of any arbitrators or the time period in which any arbitrators should be appointed or any arbitral tribunal composed.  This stands in contrast to the common situation in international arbitration between private parties, which often is conducted pursuant to an existing contractual arbitration clause that specifies in advance the number of arbitrators that the parties have agreed to decide their dispute, the seat of arbitration, the language of the arbitration and the governing law.[9]

---

[8] A copy of the Request for Arbitration is attached as Exhibit C to the Declaration of Charlene C. Sun in Support of the Petition to Confirm (ECF 2-6).

[9] For example, the SCC Model Arbitration Clause provides as follows:

MODEL ARBITRATION CLAUSE

Given the absence of any agreement as to the number of arbitrators, the manner or time period of their appointment, or how an arbitral tribunal was to be composed, Petitioners in their Request for Arbitration (a) proposed that the arbitral tribunal "should consist of three arbitrators," Request for Arbitration ¶ 111, (b) nominated their arbitrator for their proposed three-person tribunal (David Haigh QC), *see id.* ¶112, and (c) proposed for Kazakhstan's agreement, pursuant to Article 13(1) of the SCC Rules, that the chairman of the tribunal be jointly appointed by the two arbitrators appointed by each party. *See id.* ¶ 113. Petitioners further proposed that:

> If Kazakhstan fails to appoint an arbitrator or if the two party-appointed arbitrators are unable to agree on a Chairman, the SCC Board should make the necessary appointment(s) as provided in Article 13(3) of the SCC Arbitration Rules.

*Id.* Article 13(3) of the SCC Rules, as set forth above, provides that when a party fails to appoint its arbitrator within the "stipulated time period" "set by the Board" pursuant to Article 13(1), the Board will appoint an arbitrator for the party.

On August 5, 2010, the SCC Secretariat forwarded the Request for Arbitration to Kazakhstan by courier along with a brief cover letter, the text of which reads as follows in full:

> Anatolie Stati, Gabriel Stati, Ascom Group S.A. and Terra Raf Trans Traiding Ltd. have commenced arbitration in accordance with the Arbitration Rules of the

---

Any dispute, controversy or claim arising out of or in connection with this contract, or the breach, termination or invalidity thereof, shall be finally settled by arbitration in accordance with the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce."

Recommended additions:

The arbitral tribunal shall be composed of three arbitrators/a sole arbitrator.

The seat of arbitration shall be [...].

The language to be used in the arbitral proceedings shall be [...].

This contract shall be governed by the substantive law of [...].

> Arbitration Institute of the Stockholm Chamber of Commerce (the Arbitration Rules).
>
> In accordance with Article 5 of the SCC Rules, you are requested to submit an answer to the SCC, by 26 August 2010 at the latest.
>
> Your Answer shall contain comment on the seat of arbitration and on the proposition of the Claimants that the Chairperson be selected by the party-appointed arbitrators.
>
> The Answer may be brief.
>
> Where appropriate, you shall also submit to the SCC a Power of Attorney for your counsel.

*See* Exhibit 2 hereto. The SCC cover letter did not state that the SCC Board had made any decision with respect to Petitioners' proposal that the arbitral tribunal consist of three arbitrators and that the chairman be appointed by the two party-appointed arbitrators. The cover letter did not request that Kazakhstan appoint an arbitrator. It also did not state that the SCC Board, pursuant to Article 13(1) of the SCC Rules, had set a deadline for Kazakhstan to appoint an arbitrator.

The SCC August 5, 2010 letter was addressed to the "Ministry of Justice of the Republic of Kazakhstan," the authority referred to in the Request for Arbitration as the "*governmental authority likely to represent Kazakhstan in this proceeding.*" Request for Arbitration at 6. The SCC did not take any further measures to ensure that the Request for Arbitration was sent to the correct addressee. The Request for Arbitration and the SCC Secretariat's letter were drafted in English. The official languages in Kazakhstan are Kazakh and Russian. None of the previous communications between Petitioners and Kazakhstan had been in English.

On August 9, 2010, the Kazakh Ministry of Justice received the SCC's August 5, 2010 letter attaching the Request for Arbitration. *See* Receipt for August 5, 2010 Letter (August 9,

2010), attached hereto as Exhibit 3.[10]  The three week deadline for Kazakhstan to respond to the Request for Arbitration thus amounted to only seventeen (17) days after receipt.

On August 27, 2010, the SCC Secretariat sent another letter by courier to Kazakhstan reminding it to submit an answer to the Request for Arbitration and setting a new deadline of September 10, 2010.  *See* Exhibit 4 hereto.  This letter was received by the Kazakh Ministry of Justice on August 31, 2010.  *See* Receipt for August 27, 2010 Letter (Aug. 31, 2010) attached hereto as Exhibit 5. [11]  The text of the SCC's August 27, 2010 letter reads as follows in full:

> We refer to our letter, dated 5 August 2010.
>
> You are hereby reminded to submit an Answer in accordance with Article 5 of the SCC Rules and, where appropriate, a Power of Attorney. The Answer shall be submitted by 10 September 2010, at the latest.
>
> Please be informed that failure to submit an Answer does not prevent the arbitration from proceeding.

*See* Ex. 4.  Again, this letter did not state that the SCC Board had made any decision on Petitioners' proposals regarding the composition of the arbitral tribunal, request that Kazakhstan appoint an arbitrator, or state that the SCC Board had set a deadline for Kazakhstan to appoint an arbitrator pursuant to Article 13(1) of the SCC Rules.

On September 13, 2010, Petitioners submitted an ex parte request to the SCC via courier and email asking that, pursuant to Article 13(3) of the SCC Rules, the SCC Board appoint an arbitrator on behalf of Kazakhstan.  *See* Exhibit 6 hereto, at 2.  The SCC Secretariat forwarded this request to Kazakhstan the same day but, unlike all prior and later communications, sent it by registered mail rather than by courier.  *Id.* at 1.  As a result, it was not delivered to the Kazakh

---

[10] This letter then was received by the competent department of the Ministry of Justice on August 11, 2010.

[11] This letter then was received by the competent department of the Ministry of Justice on September 1, 2010.

Ministry of Justice until September 23, 2010. *See* Receipt for September 13, 2010 Letter (Sept. 23, 2010) attached hereto as Exhibit 7.

On September 20, 2010, before notice of Petitioners' request that the SCC Board appoint an arbitrator for Kazakhstan was delivered to Kazakhstan, the SCC Board unilaterally appointed an arbitrator (Professor Lebedev) on behalf of Kazakhstan. Award ¶ 7. On September 20, 2010, the SCC Secretariat emailed Professor Lebedev to inform him of this appointment. *See* Exhibit 8 hereto, at 1. One day later, on September 21, 2010, Professor Lebedev accepted this appointment by return facsimile. *Id.* at 1-4.

On September 23, 2010, the same day that Kazakhstan received notice of Petitioners' request that the SCC appoint an arbitrator for Kazakhstan, the SCC Secretariat issued a letter to the parties providing notice that the SCC Board had (a) appointed Professor Lebedev for Kazakhstan, (b) set the seat of arbitration as Stockholm, Sweden and (c) determined that each party owed an advance on costs by October 7, 2010, in the amount of EUR 612,000 ($408,678.30 in US dollars at published exchange rates for that date). *See* Exhibit 9 hereto. This letter further stated that a "Chairperson will be appointed shortly" but did not comment on the manner of such appointment. *Id.* at 2. This letter was sent by email to counsel for Petitioners and copied by e-mail to Mr. Haigh (Petitioners' nominated arbitrator) and Professor Lebedev. *Id.* It was sent by courier to Kazakhstan, *id.*, and delivered to Kazakhstan on September 27, 2010. *See* Receipt for September 23, 2010 Letter (Sept. 27, 2010), attached hereto as Exhibit 10.

On September 27, 2010, without further communication with the parties, the SCC Board unilaterally appointed the Chairman of the arbitral tribunal (Professor Karl-Heinz Böckstiegel). *See* Letter from SCC to Parties (Sept. 28, 2010), attached hereto as Exhibit 11, at 3-4. That same day, Professor Böckstiegel accepted his appointment. *Id*. at 3. On the following day, the SCC

Secretariat sent a letter to the parties informing them that the SCC Board had appointed the

Chairman and that he had accepted this appointment. *Id*. at 1-2. This letter was sent by e-mail to

counsel for Petitioners and Messrs. Böckstiegel, Haigh and Lebedev, and by courier to

Kazakhstan. *Id.* at 1-2. On October 1, 2010, this letter was delivered to Kazakhstan. *See*

Receipt for September 28, 2010 Letter (Oct. 1, 2010), attached hereto as Exhibit 12.

On November 5, 2010, the Ministry of Justice of Kazakhstan executed a Power of

Attorney authorizing the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet")

to represent Kazakhstan in the Arbitration. *See* Exhibit 13 hereto.

On November 8, 2010, Curtis Mallet provided notice to the SCC that it had been

appointed to represent Kazakhstan in a letter sent by courier and email to the Secretary-General

of the SCC. *See* Exhibit 14 hereto. The letter stated as follows in pertinent part:

> This is to inform you that, in accordance with a Power of Attorney granted by the Ministry of Justice of the Republic of Kazakhstan (the "Republic") dated November 5, 2010, a copy of which is enclosed, Curtis, Mallet-Prevost, Colt & Mosle LLP will represent the Republic in the above-referenced proceeding (the "Proceeding").
>
> We are in the process of consulting with our client regarding this matter. We would greatly appreciate if you would forward to us a copy of the complete file regarding the Proceeding, including the Request for Arbitration together with all exhibits filed therewith, and the copies of all communications to date relating to the Proceeding.
>
> …
>
> The foregoing is subject to, and without prejudice to, the right of the Republic to raise any and all defenses and objections it may have in regard to the Proceeding, including objections to jurisdiction, all of which are hereby expressly reserved.

*Id.*

On December 2, 2010, Kazakhstan, through its counsel, formally objected to the SCC's

appointment of Professor Lebedev as its arbitrator, arguing that it was done without

Kazakhstan's consent and prior consultation, without providing prior notice of Petitioners'

request that the SCC do this, and without giving Kazakhstan adequate opportunity to select its

own arbitrator. *See* Letter from Kazakhstan to SCC (Dec. 2, 2010) attached hereto as Exhibit 15;

Award ¶ 12. Kazakhstan also requested an opportunity to appoint its own arbitrator. *Id*.

Kazakhstan's objection was submitted by email and courier, and stated as follows in pertinent

part:

> With all due respect to Professor Lebedev, the Republic feels constrained to
> object to his appointment by the SCC, without its consent or prior consultation,
> and without having had an adequate opportunity to select its own arbitrator. A
> party's right to appoint its own arbitrator is an important right that is fundamental
> to the fairness of the proceedings. We observe as well that this is not merely a
> commercial dispute between private parties, but an arbitration against a State as
> Respondent. The necessities of governmental procedure require due
> consideration and militate against the setting of aggressive time limits. The
> Republic's laws on allocation of state funds for procurement of legal services and
> selection of advisers entail a complicated and lengthy process, which require time
> and led to delays. It should also be noted that the Request for Arbitration was
> written in English, although two of the three contracts at issue in the case require
> communications in Russian and Kazakh and the third requires both Russian and
> English. The SCC Rules do not prescribe a specific time period for filing an
> Answer and appointing arbitrators. Even in ordinary cases involving commercial
> parties – and putting aside language issues and the complexity of the allegations
> and claims in the Request – a 21-day or even 35-day time limit to file an Answer
> and appoint an arbitrator is extremely short. It is even more difficult to
> understand and justify the SCC's action, within days after that short deadline,
> granting Claimant's request to take away Respondent's right to appoint its own
> arbitrator. Although the Board may have acted in the perceived interests of
> expeditiousness, speed cannot be the paramount criterion in a case such as this.
> We must further note that a member of the SCC Board is a Consultant in the King
> & Spalding firm, Claimant's counsel in this case. While we assume that she did
> not take part in the decisions of the SCC Board in this matter, this fact leads to
> additional concerns about the perceptions of undue haste.
>
> Respondent believes that it has been prejudiced and that procedural fairness has
> been impaired. The precipitous action of the SCC Board is regrettable and leaves
> Respondent with no alternative but to challenge the appointment of Professor
> Lebedev and to insist that it be permitted to exercised its right to appoint its own
> arbitrator.

As the Arbitration is still in its early stages, we raise this issue at this time to avoid a future disruption of the proceedings.  The first Procedural Meeting with the parties is scheduled for December 15 in Stockholm, and we have already indicated our intention to attend.  In view of the importance of this matter, we request a prompt response from the SCC.  We trust that Professor Lebedev will understand the circumstances that led to this request, and that he will respect the concerns expressed by the Republic.

*Id.*

Four days later, on December 6, 2010, the SCC Secretariat issued a letter to Petitioners and Messrs. Böckstiegel, Haigh and Lebedev requesting comments on Kazakhstan's objection.  *See* Letter from SCC (Dec. 6, 2010) attached hereto as Exhibit 16.  This letter was sent by email by the SCC and requested comments within seven days, by December 13, 2010.  *Id.*

On December 7, 2010, Petitioners responded by email letter to Kazakhstan's objection, wrongly characterized it as a request for disqualification, and requested that it be dismissed.  *See* Letter from Petitioners to SCC (Dec. 7, 2010) attached hereto as Exhibit 17.  Messrs. Böckstiegel, Haigh and Lebedev did not comment on Kazakhstan's objection.

On December 15, 2010, the SCC Board denied Kazakhstan's objection in a one sentence ruling that stated as follows:

(1) No ground for disqualification of Professor Sergei N. Lebedev has been found. The challenge has been dismissed.

*See* Letter from SCC to Parties (Dec. 15, 2010) attached hereto as Exhibit 18; Award ¶ 13.

On December 27, 2010, Kazakhstan sent a letter to the SCC maintaining its objection to Professor Lebedev, reserving all of its rights, defenses and objections, and noting that the SCC had not responded to its question of whether Margrete Stevens of the law firm of King & Spalding, Petitioners' counsel, had participated in any decision made by the SCC Board concerning the case.  *See* Letter from Kazakhstan to SCC (Dec. 27, 2010) attached hereto as

Exhibit 19.  The SCC replied by letter dated December 29, 2010, and stated that Ms. Stevens had

not so participated.  *See* SCC Letter to Kazakhstan (Dec. 29, 2010) attached hereto as Exhibit 20.

The sequence of dates by which the arbitration proceedings were commenced, the SCC

appointed Professor Lebedev for Kazakhstan and composed the Tribunal, thus is as follows:

- July 26, 2010 – Petitioners file Request for Arbitration five days after termination of contracts at issue on July 21, 2010.

- August 5, 2010 – SCC forwards Request for Arbitration to Kazakhstan by courier, sets deadline of August 26, 2010 for response, and does not provide notice of any SCC Board decision regarding number of arbitrators, that Kazakhstan should appoint an arbitrator or that SCC Board has set deadline for Kazakhstan to appoint an arbitrator.

- August 9, 2010 – Kazakh Ministry of Justice receives SCC August 5, 2010 letter and Request for Arbitration.

- August 27, 2010 – SCC sends reminder letter to Kazakhstan by courier requesting response to Request for Arbitration by September 10, 2010, and again does not provide notice of any SCC Board decision regarding number of arbitrators, that Kazakhstan should appoint an arbitrator or that SCC Board has set deadline for Kazakhstan to appoint an arbitrator.

- August 31, 2010 – Kazakh Ministry of Justice receives SCC August 27, 2010 letter.

- September 13, 2010 – Petitioners submit ex parte request to SCC requesting that SCC Board appoint an arbitrator for Kazakhstan.

- September 13, 2010 – SCC forwards Petitioners' request to Kazakhstan by registered mail instead of courier, resulting in letter not being delivered to Kazakhstan until September 23, 2010.

- September 20, 2010 – SCC unilaterally appoints Professor Lebedev for Kazakhstan, and provides email notice of same to Professor Lebedev.

- September 21, 2010 – Professor Lebedev accepts appointment by facsimile.

- September 23, 2010 – SCC sends letter, by email to Petitioners and courier to Kazakhstan, providing notice of Professor Lebedev's appointment and acceptance.

- September 23, 2010 – Kazakh Ministry of Justice receives Petitioners' September 13, 2010 request that SCC appoint an arbitrator for Kazakhstan.

- September 27, 2010 – Kazakh Ministry of Justice receives SCC's September 23, 2010 letter providing notice that Professor's Lebedev has been appointed for Kazakhstan.

- September 27, 2010 – Without further communication with parties, SCC appoints Professor Böckstiegel as Chairman of Tribunal, and he accepts appointment.

- September 28, 2010 – SCC sends letter, by email to Petitioners and courier to Kazakhstan, providing notice of Professor Böckstiegel's appointment and acceptance.

- October 1, 2010 – Kazakhstan Ministry of Justice receives SCC notice of Professor Böckstiegel's appointment and acceptance.

- November 5, 2010 – Kazakhstan executes Power of Attorney appointing counsel in the Arbitration.

- November 8, 2010 – Kazakhstan provides notice to SCC of appointment of counsel.

- December 2, 2010 – Kazakhstan formally objects to appointment of Professor Lebedev, and requests opportunity to exercise right to appoint its own arbitrator.

- December 6, 2010 – SCC solicits comments from Petitioners and Messrs. Böckstiegel, Haigh and Lebedev on Kazakhstan's objection.

- December 7, 2010 – Petitioners comment on objection; request that it be dismissed.

- December 15, 2010 – SCC dismisses Kazakhstan's objection.

- December 27, 2010 – Kazakhstan provides notice to SCC, Petitioners and Messrs. Böckstiegel, Haigh and Lebedev that it only is participating in the Arbitration under a full reservation of its rights, defenses and objections.

## III.   TIMELINE OF THE ARBITRATION PROCEEDINGS

After the SCC composed the Tribunal, the arbitration proceedings followed on the below timeline. These dates are a summary of the major events in the arbitration, and do not record each and every event during the proceedings.

- July 26, 2010 – Petitioners' Request for Arbitration

- December 15, 2010 – Initial Status Conference

- May 18, 2011 – Petitioners' Statement of Claim

- November 21, 2011 – Kazakhstan's Statement of Defense

- May to December 2012 – Further Briefing by the Parties

- October 2012 – Hearing on Jurisdiction and Liability

- January 2013 – Hearing on Damages

- May 2013 – Final Hearing

- December 19, 2013 – Award

In the Award, in substance, the Tribunal found Kazakhstan in breach of its obligations under the standard of fair and equitable treatment contained in Article 10(1) of the ECT. Award ¶¶ 1085-95. For damages, the Tribunal ordered Kazakhstan to pay $497,685,101, comprised of $277.8 million for two oil and gas fields, $31.3 million for another contract area and $199 million for the unfinished LPG Plant. The Tribunal also ordered Kazakhstan to pay $8,975,496.40 towards Petitioners' legal costs. Award ¶¶ 1856-61.

## IV. CHALLENGE PROCEEDINGS IN SWEDEN

On March 19, 2014, Kazakhstan filed an Application in the courts of Sweden (the seat of the Arbitration) to invalidate the Award under the provisions of the Swedish Arbitration Act. An English translation of the Application is attached hereto as Exhibit 21. The basis for Kazakhstan's request that the Award be invalidated is summarized as follows on pages 4-5 of the Application:

> In this invalidity and challenge pleading the errors will be set forth and can be summarized as the following.

> (i)     The fact that RoK has been deprived of its right to appoint its own arbitrator is clearly incompatible with the basic principles of the Swedish legal system, alternatively a deficiency in the appointment, or otherwise an irregularity in the course of the proceedings which probably influenced the outcome of the case. This will be set forth in section 5.1 below.

(ii)     The Award is not covered by a valid arbitration agreement between the Parties because STATI failed to abide by the three Month "Cooling Off" Period in article 26 ect and which constitutes a condition in RoK's offer. This is set out in section 5.2 below.

(iii)    The Award is not covered by a valid arbitration agreement between RoK and Terra Raf. This is set out in section 5.3 below.

(iv)     The Tribunal failed to consider pivotal witness evidence regarding the Quantum of the LPG Plant. This is set out in section 5.4 below.

(v)      The Tribunal has exceeded its mandate and has committed several procedural mistakes and by ignoring the submission of expert evidence and other evidence regarding almost every major disputed issue of the case. This is set out in section 5.5 below.

(vi)     The Tribunal failed to consider the RoK's objections that certain deductions would need to be made from an eventual award. This is set out in section 5.6 below.

(vi)     The Tribunal has exceeded its mandate and has committed procedural irregularities by going beyond the submissions of the Parties and by ignoring the parties' submissions and the applicable law on multiple occasions. This is set out in section 5.7 below.

The Swedish proceedings are ongoing, and have included *inter alia* Kazakhstan submitting a reply pleading on November 29, 2014. *See* Kazakhstan's Reply to Petitioners' Statement of Defence, an English translation of which is attached hereto as Exhibit 22. Also supporting Kazakhstan's application to invalidate the Award is the expert opinion of Professor Bengt Lindell. In summary, Professor Lindell's opinion is that the Award should be set aside for the same reasons set forth in Kazakhstan's present filing, i.e., that Kazakhstan was deprived of its right to appoint its own arbitrator and that Petitioners' failure to comply with the cooling-off provisions of the ECT prevented any arbitration agreement from forming and deprived the Tribunal of jurisdiction. In addition, Professor Lindell's opinion (pp. 15-32) is that the seriousness of the deprivation of Kazakhstan's right to appoint its arbitrator makes the Award

invalid, which is a public policy criterion under Article V, Section 2(b) of the New York Convention. An English translation of Professor Lindell's Opinion is attached hereto as Exhibit 23, and is relied upon by Kazakhstan in the present proceeding.

## V.    PRESENT PROCEEDING

On February 2, 2014, Petitioners apparently tried to confirm the award in this jurisdiction by filing a petition to confirm in this Court. *See* No. 1:14-cv-00175-ABJ. That petition was never served, and the ECF docket shows that Petitioners voluntarily dismissed it on May 7, 2014. *See id.* ECF 11. Nearly five months later, on September 30, 2014, Petitioners commenced the present proceeding by re-filing a substantially identical petition to confirm.

## ARGUMENT

Article V of the New York Convention provides seven bases on which a United States court may refuse enforcement or recognition of an Award. *See* NY Convention, Art. V. In this case, the Award is invalid under at least the following four bases:

(1) under Section 1(a) because no valid arbitration agreement existed between the parties;

(2) under Section 1(b) because Kazakhstan was not given proper notice of the appointment of the arbitrator;

(3) under Section 1(d) because the composition of the arbitral authority and the arbitral procedure were not in accordance with the parties' purported agreement to arbitrate; and

(4) under Section 2(b) because the Award was the result of procedures contrary to the public policy of the United States.

Each of these provides an independent reason for this Court to refuse confirmation of the Award.

# I.     THE AWARD IS UNENFORCEABLE UNDER ARTICLE V, SECTION 1(A) OF THE NEW YORK CONVENTION

Section 1(a) of Article V of the New York Convention empowers a court to decline confirmation of an arbitral award where the purported agreement to arbitrate "is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made[.]"  Under general principles of international law and under Swedish law (the country where the award was made), a valid agreement to arbitrate requires the consent of both parties to submit the dispute to arbitration.  *See* Swedish Arbitration Act (SFS 1999:116) § 1, *available at* http://swedisharbitration.se/wp-content/uploads/2011/09/The-Swedish-Arbitration-Act.pdf (accessed Feb. 23, 2015); Alan Redfern & Martin Hunter, *Law and Practice of International Commercial Arbitration* 85 (5th ed. 2009).

This also is the position under U.S. law.  S*ee United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."); *Howard Univ. v. Metro. Campus Police Officer's Union*, 512 F.3d 716, 720 (D.C. Cir. 2008) ("[A]rbitration is a matter of consent[.]").  Thus, if both parties have not consented to arbitration, no valid agreement to arbitrate is formed.

Here, no valid agreement to arbitrate was formed between Petitioners and Kazakhstan. This is because Petitioners commenced the Arbitration in violation of the ECT Article 26 amicable settlement/cooling-off requirements.  These requirements are jurisdictional, and in the absence of compliance therewith, Kazakhstan made no valid offer to Petitioners to arbitrate and certainly did not consent to arbitrate.  Without a valid offer or consent to arbitrate from

Kazakhstan, no agreement to arbitrate could have been formed between Kazakhstan and Petitioners.

A.  **The Three Month Cooling-Off Period Is a Jurisdictional Prerequisite To An Agreement To Arbitrate Between Kazakhstan and Petitioners**

The three month cooling-off period contained in Article 26 of the ECT is a precondition to the formation of an agreement to arbitrate, and, therefore, to a tribunal's jurisdiction over a dispute initiated under the ECT.  In *BG Group, PLC v. Republic of Argentina*, 134 S. Ct. 1198 (2014), the Supreme Court addressed how a federal court is to review a condition precedent that is jurisdictional (determining *whether* an agreement to arbitrate exists), as compared to one that is procedural (merely regulating *when* one's duty to arbitrate arises under an already formed agreement).  *See id.* at 1206-07.  Where a condition precedent is jurisdictional, courts presume that the parties intended courts to decide disputes involving the condition; therefore a court will review an arbitrator's decision on such a provision *de novo*.  *See id.* at 1206, 1210.  On the other hand, where a condition precedent is procedural, courts presume that the parties intended the arbitrator to rule on the condition; consequently courts will review an arbitrator's determination as to a procedural condition precedent "with considerable deference."  *See id.* at 1207, 1210.[12]

In this case, the ECT is the only stated basis for an agreement to arbitrate between Petitioners and Kazakhstan.  As noted by Professor Lindell:

> The ECT is a significant and carefully considered regulatory regime whose purpose is to ensure that investment disputes are decided in accordance with due process and in an equitable manner.  The ECT relates to an area in which there must be a balance between governmental interests and the interests of individual investors.  With respect to conflicts which may arise between investors and a State, the purpose is that such conflicts not evolve into a dispute and that disputes,

---

[12] In deciding that the particular provision at issue in *BG Group* was procedural, the Supreme Court declined to decide whether language in an agreement expressly referring to "conditions of consent" is sufficient to demonstrate that a particular condition precedent was a prerequisite to the parties' consent to arbitrate.  *Id.* at 1209.

if they do occur, should be resolved in a way that promotes the continuation of good relations, which can be best achieved through settlements.

Lindell Opinion (Ex. 23) at 3-4.

To implement this "purpose," Article 26(1) of the ECT requires that disputes "shall" be settled amicably "if possible." To enforce this requirement, Article 26(2) requires that one of the parties to the dispute must "request[] amicable settlement" *and* wait "three months from the date" of this request before commencing arbitral proceedings. Thus, only if (1) a request for amicable settlement has been made, and (2) three months have transpired thereafter without amicable settlement may "the Investor party to the dispute . . . choose to submit it" to arbitration. *See* ECT, Art. 26(2)(c), (4)(c)[13]; *see also* Lindell Opinion (Ex. 23) at 5 ("It is clearly evident from Article 26(2) that a party may not request arbitration unless the three-month period has been adhered to.") (collecting authority).

While an Investor must provide its consent to arbitrate in writing upon electing to submit a dispute to arbitration, *see* ECT, Art. 26(4), a state Contracting Party such as Kazakhstan gives conditional consent upon becoming a signatory to the ECT. Article 26(3) of the ECT provides:

> (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

Under the plain language of this provision, a signatory country's "unconditional consent" to the submission of a dispute to arbitration is *not* given automatically with respect to all disputes. Rather, it is given only to disputes that are submitted "*in accordance with the provisions of this Article* [26]." ECT, Art. 26(3) (emphasis added).

Therefore, where the required cooling-off period contained in Article 26(2) has not been triggered by a request for amicable settlement — and therefore has not elapsed — "submission

---

[13] The ECT allows arbitration under the ICSID, UNCITRAL SCC Rules. *See* ECT, Art. 26(4)(a)-(c).

of a dispute to international arbitration" has **not** taken place "in accordance with the provisions of [Article 26]." ECT, Art. 26(3)(a). In such a case, the "unconditional consent" of a signatory state to arbitrate does not exist and no agreement to arbitrate can be formed. *See also* Lindell Opinion (Ex. 23) at 6 ("Thus, it is clear from Articles 26(1), (2) and (3) ECT that a valid agreement to arbitrate cannot be deemed to have been entered into unless the requirement to seek to reach a settlement within a period of three months has been satisfied.").[14]

### B. The Tribunal Lacked Jurisdiction Under Either A De Novo Or A Highly Deferential Standard of Review

The three month cooling-off period mandated by Article 26(2) of the ECT is a condition precedent to Respondent's consent to arbitrate the dispute, and therefore to the Tribunal's jurisdiction. As a consequence, this Court should interpret and apply the cooling-off period in Article 26(2) *de novo*. *See BG Grp.*, 134 S. Ct. at 1206-07, 1210. Under a *de novo* review, the Tribunal lacked jurisdiction because Petitioners initiated the arbitration without complying with the ECT's notice and cooling-off provisions. However, even if the three month cooling-off period is treated as a non-jurisdictional, procedural rule — left primarily for the arbitrators — the Tribunal still lacked jurisdiction even under a deferential standard of review. *See id.*

Under the explicit terms of Article 26, the three month cooling-off period must precede the submission of the dispute for arbitration. *See* ECT, Art. 26(2). The three month cooling-off period is measured "from the date on which either party to the dispute requested amicable settlement[.]" ECT, Art. 26(2). Thus, in order for the necessary three month period to begin to run, one party must seek to amicably settle the dispute. Neither of these requirements was met in this case.

---

[14] While the Court in *BG Group* suggested that the presence of the term "consent" is not dispositive as to whether a condition precedent is jurisdictional or procedural, it ultimately withheld judgment on this question. *See BG Grp.*, 134 S. Ct. at 1209.

First, neither Petitioners nor Respondent "requested amicable settlement" of the dispute prior to submission of the dispute to arbitration.  In the arbitral proceedings, Petitioners attempted to rely on two letters sent on March 18 and May 7, 2009, to have triggered the three month cooling-off period.  *See* Award ¶¶ 818, 823.  The Tribunal, however, did not find that either of these letters "requested amicable settlement" nor did the Tribunal rule that Petitioners had otherwise satisfied the three month cooling-off period.  Indeed, even according to Petitioners, these letters merely made Respondent "aware of the dispute," and indicated that Petitioners would "submit [the] dispute to international arbitration."  *See* Award ¶ 818; Petitioners' Letter (Jan. 24, 2011) attached hereto as Exhibit 24; Petitioners' Letter (Feb. 2, 2011) attached hereto as Exhibit 25.

There is a significant difference between, on the one hand, making a party "aware of [a] dispute," and threatening adversarial proceedings and, on the other, "request[ing] amicable settlement" of that dispute — the latter does not follow necessarily or even intuitively from the former.  Indeed, in ruling on this issue, the Tribunal ***did not*** find that either of these letters constituted a "request[] [for] amicable settlement" under Article 26.  *See* Award ¶¶ 828-30.  Rather, the Tribunal relied solely on a determination that compliance with the pre-arbitration cooling-off period could be ***excused*** by a mid-arbitration stay of proceedings.  *See id*.  This, of course, is a non-starter, as further explained below.

The timing and content of the two letters belie any claim that they were requests for amicable settlement under Article 26(2).  First, both letters ***predate*** the majority of events which gave rise to the dispute.  *See* Award ¶ 823; Letter from Kazakhstan to Tribunal (Jan. 18, 2011) attached hereto as Exhibit 26; Letter from Kazakhstan to Petitioners (Feb. 6, 2011) attached hereto as Exhibit 27.  Second, even if a "request for amicable settlement" could theoretically be

inferred or implied by providing a notice of dispute and threatening arbitration, that inference is untenable where, as here, neither of the letters makes reference to the ECT (the instrument containing the requirement to seek amicable settlement) and, as here, the underlying contracts between the parties provided an independent right to submit a dispute to international arbitration. *See* Ex. 27, at 1.  Thus, threatening international arbitration does not necessarily implicate the ECT — and the cooling-off requirement — at all.

The three month cooling-off period was not satisfied or excused by the Tribunal providing a three month "stay" *after* the arbitral proceedings had commenced.  *See* Award ¶¶ 29, 830.  The language of Article 26(2) is clear, both *that* a three month cooling-off period must occur, and *when* it must occur.  "[T]he Investor party to the dispute may choose to submit it for resolution," but submission of the dispute may only occur "within a period of three months *from the date on which* either party to the dispute requested amicable settlement[.]"  Article 26 thus mandates, on its plain terms, that the three month cooling-off period *precede* the submission of the dispute to arbitration.[15]

Measured against this requirement, the Tribunal's stay of the arbitral proceedings for three months *after* submission of the dispute for arbitration did not, and could not have, satisfied the Petitioners' obligation to request amicable settlement and wait three months thereafter *before* commencing arbitration.  Indeed, to the contrary, as noted by Professor Lindell, the fact that Petitioners "agreed to a stay for a period of three months after the arbitration proceedings commenced and that the arbitral tribunal did not question this" is evidence that the amicable settlement/cooling-off requirement *had not* been satisfied.  *See* Lindell Opinion (Ex. 23) at 12.

---

[15] Nowhere in the Award does the Tribunal make any finding that the three month cooling-off period was actually fulfilled.  *See* Award ¶¶ 828-30.  Thus, there is no finding on this point to which this Court could grant deference, even if the cooling-off period were non-jurisdictional.

Further, a mid-arbitration stay does not give back to the parties what a *pre-arbitration* cooling-off period is meant to provide: an opportunity to settle the dispute *before* having expended funds and resources in preparation for an adversarial proceeding. *See also* Lindell Opinion (Ex. 23) at 6-8 (generally describing the purpose of a cooling-off period). Here, Petitioners submitted a request for arbitration on July 26, 2010. Award ¶ 6. The Tribunal ordered its stay on February 22, 2011 — nearly seven months later. *Id.* ¶ 830. During this time, the parties battled over Petitioners' non-compliance with the cooling-off period, *id.* ¶¶ 21-28, and the wrongful appointment of Professor Lebedev. At the same time, the SCC had already set a deadline for the Tribunal to render the final award in the dispute. *Id.* ¶ 28. And the three month "stay" was not a free-standing order to halt all proceedings, but rather came in the form of a timeline for *how the dispute would proceed*. *See* ¶¶ 29, 830. Simply put, these are not circumstances conducive to the "cooling-off" and "amicable settlement" of a dispute. It is untenable to assert that either party was remotely as inclined to amicable settlement under these circumstances as they would have been had Petitioners "requested amicable settlement" *before* requesting arbitration as required by Article 26. Even if they were, however, one of the purposes of a cooling-off period is to afford a respondent the right to advance notice of the dispute, adequate time to retain experienced counsel, and prepare for the proceedings *before* they are initiated, including identifying potential arbitrators. Kazakhstan was deprived of this right, permanently.[16]

The timing element of Petitioners' violation of ECT Article 26 is similar to *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85 (2d Cir. 2005). There, the agreement between the parties provided for the settlement of disputes by two

---

[16] *See also* Lindell Opinion (Ex. 23) at 13 ("It should be noted that the stay of proceedings could not cure the legal consequences *with respect to RoK's right to appoint an arbitrator.*").

arbitrators. *Id*. at 90. If there was a deadlock, the two arbitrators were required to appoint a third. *Id*. Only if the two arbitrators attempted, and failed, to agree on the third arbitrator was the president of the Tribunal of the Commerce of Luxembourg empowered to make the appointment. *Id*. However, contrary to the explicit requirement that the arbitrators "attempt[] to agree upon a third arbitrator," *id*. at 91, one of the two arbitrators asked the Tribunal of Commerce to appoint the third arbitrator without such an attempt, and it complied. *Id*. The Second Circuit found this violation fatal: because the agreement required the two arbitrators to attempt to agree **before** requesting an appointment from the tribunal, failing to do so was contrary to the agreement — despite an effort to manufacture an "attempt to agree" after-the-fact. *Id*. Importantly, the Second Circuit rejected the tribunal's efforts to cure the violation of the terms of the agreement by "stay[ing]" its appointment of the third arbitrator. *Id*. ("[W]e are left with the fact that the parties explicitly settled on a form and the New York Convention requires that their commitment be respected.").

The same principles apply here. Article 26 of the ECT mandates that a three month cooling-off period precede the submission of a dispute to arbitration. Petitioners failed to comply with this requirement. The Tribunal's after-the-fact stay of proceedings cannot, and did not, cure this defect. *See Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 843 (9th Cir. 2010) (vacating arbitral award under New York Convention when arbitration did not occur in location specified in the agreement).

This case thus is unlike the scenario that was at issue in *BG Group v. Argentina*. There, the applicable investment treaty included a requirement that a party first submit a dispute to the local courts for an eighteen month period (the "local litigation requirement"). *Id*. at 1203. The claimant failed to comply with this provision, but the tribunal expressly excused this non-

compliance, *id.* at 1204-05, after making a factual finding that actions taken by the respondent, Argentina, had "hindered recourse to the domestic judiciary to the point where the Treaty implicitly excused compliance with the local litigation requirement." *Id.* at 1205 (internal quotation marks omitted). The Court concluded that the tribunal had acted within its discretion in excusing the local-litigation requirement, based on its evaluation that the actions by respondents had rendered recourse to the local courts sufficiently untenable. *See id.* at 1212-13.

There are no comparable circumstances in this case. First and foremost, the Tribunal here ***did not*** find that any actions by Respondents hindered Petitioners' ability to comply with the cooling-off period. To the contrary, Petitioners were always fully capable of requesting amicable settlement of the dispute according to the terms of Article 26(2) and waiting the requisite three months thereafter before filing for arbitration; they simply chose not to.[17] Respondent thus in no way "hindered" Petitioners' ability to utilize the "cooling-off period," much less to the point where "recourse to [the cooling-off period was] . . . implicitly excused" by the ECT. *Cf. BG Grp.*, 134 S. Ct. at 1205.

The clear language of Article 26(2), the entire purpose behind its pre-arbitration cooling-off provisions, and the absence of any ruling by the Tribunal that Petitioners were excused from compliance with Article 26, confirm that no agreement to arbitrate was formed and that the Tribunal therefore lacked jurisdiction. The mid-arbitration negotiation period did not satisfy Article 26(2)'s requirement even if reviewed with "considerable deference" or, *a fortiori*, if reviewed *de novo*. *See BG Grp.* 134 S. Ct. at 1210. This Court should therefore decline confirmation of the award under the Section 1(a) of Article V of the New York Convention.

---

[17] Petitioners' disregard for the applicable rules was further exhibited in collateral London proceedings, when they requested an order in violation of the two month time response period afforded foreign sovereigns. *See* Letter from Kazakhstan to Petitioner (Jan. 22, 2015) attached hereto as Exhibit 28.

## II.   THE AWARD IS UNENFORCEABLE UNDER ARTICLE V, SECTION 1(B) OF THE NEW YORK CONVENTION

Section 1(b) of Article V of the New York Convention allows a federal court to refuse confirmation of an arbitral award where "[t]he party against whom the award is invoked was not given proper notice of the appointment of the arbitrator[.]"  Where inadequate notice has been found, courts have not hesitated to set-aside an arbitral award.  *See, e.g.*, *Sesostris, S.A.E. v. Transportes Navales, S.A.*, 727 F. Supp. 737, 742-43 (D. Mass. 1989) (refusing to enforce an award where the party was not given sufficient notice of the appointment of the arbitrator).  This ground for non-enforcement has been held to "essentially sanction[] the application of the forum state's standards of due process."  *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale De L'Industrie Du Papier*, 508 F.2d 969, 975 (2d Cir. 1974).

### A.   The Right of A Party To Appoint An Arbitrator is a Fundamental To International Arbitration

In the context of international arbitration, the significance of notice is at its apex when a party's right to select its own arbitrator is at stake.  "The right to appoint one's own arbitrator . . . is [] the essence of tripartite arbitration[.]"  *Stef Shipping*, 209 F. Supp. at 253; *see also Millers Mut. Fire Ins. Co. v. Pinnacle Underwriters Mgmt. Assocs., Ltd.*, No. CIV. 3: 98-cv-0593, 2002 WL 424579, at *2 (N.D. Tex. Mar. 15, 2002) ("[T]he right to select an arbitrator is valuable and is the essence of tripartite arbitration.") (internal quotation marks omitted); Redfern & Hunter, *supra*, at 246 ("[C]hoosing the right arbitral tribunal is critical to the success of the arbitral process…..").  The right of a party to select its own arbitrator is the "chief guarantor of [the] arbitrators' fairness and competence," *Rosenberg v. Merrill Lynch*, 995 F. Supp. 190, 208 (D. Mass. 1998), and "[e]ach party will have at least one 'judge of its choice' to listen to its case. " Redfern & Hunter, *supra*, at 250.  Indeed, one commentator has noted that, "[t]he selection of

arbitrators is as critical to an arbitration as the selection of jurors is to a jury trial."  Robert F. Cushman et al., *Construction Disputes Representing the Contractor* § 14.02 (3d ed. 2001).

There are a number of reasons for this but, in particular, a party's appointed arbitrator ensures "that the case of the appointing party is properly understood by the arbitral tribunal." Redfern & Hunter, *supra*, at 250.  Further, it is the appointed arbitrator's responsibility to "ensure that any misunderstandings that may arise during the deliberations of the arbitral tribunal . . . are resolved before they lead to injustice."  *Id.*; *Stef Shipping*, 209 F. Supp. at 253 (noting that the right to appoint one's arbitrator is valuable "only if it involves a choice of one believed to be sympathetic to his position or favorably disposed to him") (internal quotation marks omitted).

Professor Lindell and Professor Naón both confirm in their opinions that the right to appoint an arbitrator is fundamental to international arbitration.  *See* Lindell Opinion (Ex. 23) at 15-17; Naón Opinion (filed herewith) at 7-9.  This has further been confirmed by counsel for the SCC itself:

> Arbitration is about choice.  Parties choose the law governing the contract, the rules to conduct the arbitral proceedings, the seat of arbitration, counsel which represents their interests and, most importantly, parties choose the decision makers:  the arbitrators.  The parties' right to appoint their arbitrators is one of the clearest expressions of party autonomy, an essential principle of arbitration, which has made arbitration such an attractive means of dispute resolution.[18]

### B.      Due Process Standards

"The essential elements of due process of law are notice and opportunity to defend." *Simon v. Craft*, 182 U.S. 427, 436 (1901).  Notice sufficient to satisfy the "elementary and fundamental requirement of due process," is that which is "reasonably calculated, under all the

---

[18] C. Salinas Quero, Appointment of arbitrators under the SCC Rules, 1 American Bar Association Section of International Law, International Arbitration Committee, 53 (2013).  Also available at www.sccinstitute.com/articles.

circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). In other words, to satisfy the requirements of due process, notice must be given "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted). Importantly, Section 1(b)'s requirement that a party be given "proper notice of the appointment of the arbitrator" also requires that a party be notified "of any ***request*** for the appointment of an arbitrator[.]" Maxi Scherer, *The New York Convention on Recognition and Enforcement of Foreign Arbitral Awards Commentary* 292 (C. H. Beck München & Hart Publishing, Oxford, 2012) (emphasis added).

"[W]hen notice is a person's due, process which is a mere gesture is not due process." *Mullane*, 339 U.S. at 315. Rather, the "means employed [to provide notice] must be such as one desirous of actually informing the [party] might reasonably adopt to accomplish it." *Id*. When the chosen method is not a "reliable means of acquainting interested parties of the fact that their rights" are at risk, the requirements of due process are not satisfied. *Greene v. Lindsey*, 456 U.S. 444, 453-54 (1982) (internal quotation marks omitted); *see also Robinson v. Hanrahan*, 409 U.S. 38, 38-40 (1972) (holding that notice of forfeiture proceedings sent to the home of a known-to-be-incarcerated individual did not satisfy due process). Likewise, when a party possesses a right, due process requires that sufficient time be given to defend against the deprivation of that right. *See*, *e.g.*, *Application of Gault*, 387 U.S. 1, 33 (1967) (concluding that "[n]otice, to comply with due process requirements, must be given sufficiently in advance . . . so that reasonable opportunity to prepare will be afforded"); *N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 143 (5th Cir. 1996) (finding insufficient notice where a party did not have the opportunity to respond to a summary judgment motion because it was mailed to the wrong address); *Abbott v. Howard*, 182

Mich. App. 243, 250-51 (Mich. Ct. App. 1990) (refusing to enforce a judgment because failure to provide notice of a hearing as required by the applicable rules deprived a party of due process of law).

### C. Kazakhstan Was Deprived of Its Fundamental Right to Appoint Its Arbitrator Without Proper Notice

Applying these fundamental principles to the present case, the SCC's actions were not remotely "reasonably calculated, under all the circumstances," to inform Kazakhstan of an obligation to appoint its own arbitrator much less of Petitioners' request that the SCC appoint an arbitrator for Kazakhstan, or to "afford [Respondent] an opportunity to present [its] objections" to this request. *See Mullane*, 339 U.S. at 314.

The ECT does not provide the number of arbitrators for an arbitration conducted under its terms. Accordingly, the Arbitration falls under Article 2(v) of the SCC Rules, which applies if the parties have not agreed on the number of arbitrators. Under Article 2(v), the claimant should comment in its Request for Arbitration on the number of arbitrators it prefers. However, the SCC is not bound by a party's request in this regard, but must, if the counterparty does not accept the requested number of arbitrators, make a decision on the matter pursuant to Articles 9(iii) and 12 of the SCC Rules. If no agreement is reached by the parties, the SCC Board can thereby decide that the arbitration shall be decided by three arbitrators or by a sole arbitrator. *See* Ex. 1, Art. 12.

Here, Petitioners complied with Article 2(v) of the SCC Rules by commenting in the Request for Arbitration on the numbers of arbitrators the tribunal "should consist of"—three—and further proposing that the Chair of the Tribunal be appointed by the two party-appointed arbitrators. Request for Arbitration ¶¶ 111, 113. Upon receipt of the Request for Arbitration, the SCC Secretariat was required, pursuant to Article 5 of the SCC Rules, to "set a time period

within which [] Respondent [was to] submit an Answer[.]"  *See* Ex. 1, Art. 5(1).  However, neither the SCC Board nor the SCC Secretariat ***ever*** established a time period in which Respondent was required to appoint its arbitrator.

The SCC's authority to appoint an arbitrator for a party follows from Article 13 in conjunction with Article 9(iii) of the SCC Rules.  Article 13 of the SCC Rules provides for a time limit for the respondent to appoint its arbitrator. Ex. 1, Art. 13(1).  In the event any of the parties fails to appoint an arbitrator within the set time limit, the SCC Board has a right pursuant to Article 13(3) of the SCC Rules to appoint the arbitrator.  The time limit set for a party to appoint an arbitrator is decided ***by the Board***, and its length may vary.  Ex. 1, Art. 13(1).  Before the SCC Board has decided a time limit pursuant to Article 13(1), the SCC may not appoint an arbitrator.

Here, on September 13, 2010, Petitioners ex parte requested that the SCC appoint an arbitrator on Respondent's behalf.  Ex. 6, at 2. (attached letter from Petitioners).  The SCC forwarded Petitioners' request to Respondent by regular mail, resulting in an unconscionable delay.  *See id.*[19]  Compounding this error, on September 20, 2010, while Petitioners' request ***was still en route to Respondent***, and before Respondent even had notice of Petitioners' request, the SCC unilaterally appointed Professor Lebedev as Kazakhstan's arbitrator.  Award ¶ 7.  Not only were the SCC's actions contrary to the SCC Rules, since the SCC never decided on the number of arbitrators ***or*** established a deadline for Kazakhstan to appoint its arbitrator, they were also contrary to the SCC's stated policy to only appoint an arbitrator on a party's behalf when the party "explicitly" failed to exercise its right.  *See infra* at 43-44.

---

[19] The SCC Board routinely found it appropriate to send communications to Respondent by courier.  *See* Ex. 2; Ex. 4. Indeed, the Board sent the communication notifying Respondent of Professor Lebedev's appointment by courier, rather than registered mail.  *See* Ex. 11.  There is, therefore, no argument that a more expedient method of communication was somehow unavailable or impracticable.

These actions were wholly insufficient to provide adequate notice to Kazakhstan either that it was required to appoint its arbitrator within a specified period *or*, as importantly, that the SCC would deprive Kazakhstan of this right if it did not act within this (un)specified period. Indeed, as set forth above, the SCC deprived Kazakhstan of its right to appoint an arbitrator before even providing notice to Kazakhstan that such deprivation had been requested by Petitioners. A party cannot have been afforded notice "at a meaningful time and in a meaningful manner," *Mathews*, 424 U.S. at 333, when that "notice" does not even reach the party to be notified *before* the relevant action or event occurs. In addition, by failing to allow sufficient time for Petitioners' request to reach Respondent, in violation of Article 7(3) of the SCC Rules, the SCC necessarily deprived Respondent of that which adequate notice is meant to protect: a party's ability to defend its rights. *See Gault*, 387 U.S. at 33 ("Notice, to comply with due process requirements, must be given sufficiently in advance . . . so that reasonable opportunity to prepare will be afforded[.]"). By appointing Professor Lebedev before notice of Petitioners' request even reached Respondent, the SCC necessarily deprived Respondent of *literally any* opportunity to prepare (much less deliver) an objection to Petitioners' request or appoint its own arbitrator. Thus, the SCC's actions in this case represent the epitome of the "[notice] that is a mere gesture" forbidden by fundamental principles of due process. Whatever length of time might have sufficed, an utter *lack* of notice cannot possibly fulfill the requirement of due process that the chosen method of conveying notice be a "reliable means of acquainting interested parties of the fact that their rights" are at stake. *See Greene*, 456 U.S. at 453-54 (internal quotation marks omitted).

The SCC's refusal to reverse its wrongful appointment of Professor Lebedev further violated the requirements of due process. *See* Award ¶ 13; Ex. 18. The Supreme Court has

recognized that "the notice required [by due process] will vary with [the] circumstances and conditions." *Jones v. Flowers*, 547 U.S. 220, 227 (2006) (internal quotation marks omitted). As a consequence, if a party or a tribunal misjudges the adequacy of its method of providing notice, it is incumbent on that entity to rectify its error. *See id.* at 234. For example, in *Flowers*, the Court held that the government had a responsibility to take further steps to supply notice to the owner of a government-auctioned home after both attempts to supply notice were returned "unclaimed" by the post office. *Id.* at 223-24, 234. Consistent with *Flowers*, courts have vacated arbitral awards in circumstances where, as here, an arbitrator refused to re-open proceedings after becoming aware that notice had been ineffective. *See, e.g.*, *Kaplan v. Alfred Dunhill of London, Inc.*, No. 96 CIV. 0258, 1996 WL 640901, at *5-7 (S.D.N.Y. Nov. 4, 1996) (vacating arbitral award where, after discovering that a party did not receive notice of the arbitral hearing, the arbitrator failed to reopen the arbitral proceeding).

The same principles hold true here. On December 2, 2010, Respondent challenged the SCC's appointment of Professor Lebedev. *See* Award ¶ 12. Assuming *arguendo* that the SCC was not (and should not have been) aware of the inadequacy of the notice that it mailed on September 13, 2010, Respondent's objections to Professor Lebedev's appointment amply informed the SCC of its deficiencies. *See id.*; Ex. 15. Nonetheless, the SCC refused to reverse Professor Lebedev's appointment. *See* Award ¶ 13; Ex. 18. In failing to so do, the SCC perpetuated a fundamental unfairness on Kazakhstan.

The conclusion that the SCC's actions in this case violate due process is confirmed by the SCC's own representations to Respondent in a prior proceeding. The "touchstone of due process is protection . . . against arbitrary action[.]" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (citing *Hurtado v. California*, 110 U.S. 516, 527 (1884)). Thus, due process requires that

rules and procedures be applied in a consistent, non-arbitrary manner. *See Tang v. I.N.S.*, No. 94-70444, 1996 WL 155138, at *1 (9th Cir. Apr. 2, 1996) ("Due process may nonetheless be violated by administrative appeal procedures that create uncertainty or arbitrary results.").

In a prior SCC proceeding involving Kazakhstan—*Sudima Time Ltd. & Kazakhstan Development Corp. v. Republic of Kazakhstan*, Arbitration V (069/2005)—the SCC represented to Respondent that it would only find that a party waived its right to appoint an arbitrator, *see* Ex. 1, Art. 13(3), if the waiver was "explicit." In that case, the SCC Board sent a letter to Respondent, requesting it to appoint its arbitrator. *See* Letter from SCC to Kazakhstan (Oct. 5, 2005) attached hereto as Exhibit 29. The letter was inadvertently mailed to the wrong government ministry. Letter from Kazakhstan to SCC, attached hereto as Exhibit 30. In subsequently reversing its appointment of an arbitrator on Respondent's behalf, the SCC stated its policy was to only make an appointment on a party's behalf "where [the] party ***explicitly*** fails to make an appointment." Letter from SCC to Sudima Time Ltd et al. (Mar. 30, 2006) attached hereto as Exhibit 31, at 1. (emphasis added). The SCC acknowledged that to do so under other circumstances "may constitute ground for a future challenge to the award." *See id.* Yet the SCC's actions in this case were entirely contrary to its prior representation: the SCC appointed Professor Lebedev on Respondent's behalf ***without any*** waiver, express or implied, by Respondent of its rights under Article 13(3) of the SCC Rules.

Where a party justifiably relies on the representations of an adjudicative body—including an arbitral tribunal—that adjudicative body is barred by principles of due process from reversing course to that party's detriment. In *Iran Aircraft Industries v. Avco Corp.*, 980 F.2d 141 (2d Cir. 1992), the Second Circuit affirmed a district court's refusal to confirm an arbitral award under the New York Convention. *Id.* at 142, 146. In that case, a party relied on representations by

members of the arbitral tribunal regarding the appropriate form in which to submit evidence. *Id.* at 143-44. However, in its award, the tribunal disallowed the claims that were supported by this evidence, concluding that the form was insufficient to support the claims. *Id.* at 144. The party challenged enforcement of the award in the United States under New York Convention Art. V, 2(b). *Id.* at 145-46. In affirming the district court's refusal to confirm the award, the Second Circuit concluded that the tribunal's reversal of position "denied [the party] the opportunity to present its claim in a meaningful manner" in violation of fundamental due process by "[h]aving led [the party] to believe it had used a proper method to substantiate its claim[.]" *Id.* at 146.

So too here. The SCC expressly represented to Kazakhstan in a prior proceeding that it would find a party to have waived its right to appoint an arbitrator *only if* the waiver is explicit. The SCC's arbitrary action in this case is wholly inconsistent with the requirements of due process. *See Lewis*, 523 U.S. at 845; *Tang*, 1996 WL 155138, at *1.

**D.  Expert Opinion Supports The Conclusion That Kazakhstan Was Not Given Proper Notice of Appointment of the Arbitrator**

That the Award is unenforceable under Article V, Section 1(b) of the New York Convention is supported not only by the undisputed facts and applicable law but also by expert opinion.

Filed herewith is the expert opinion of Horacio Grigera Naón. As set forth in his statement of qualifications, Professor Naón is one of the world's leading practitioners in the field of international arbitration. *See* Naón Opinion at 5 . He is the Director of the Center on International Commercial Arbitration at American University, Washington College of Law, as well as a Distinguished Practitioner in Residence at the Washington College of Law, where he teaches a general course on international commercial arbitration. He has been in the practice of international business law and international arbitration for the last thirty-five years. From 1996

to 2001, he was the Secretary General of the International Court of Arbitration of the

International Chamber of Commerce ("ICC"), and in that capacity he supervised and

administered thousands of international arbitrations.  He has sat or is sitting in over seventy (70)

international arbitrations, including arbitrations arising out of bilateral investment protection

treaties, under, among others, the ICC, International Centre for Dispute Resolution (ICDR),

American Arbitration Association, ICSID and UNCITRAL arbitration rules, often as president of

the arbitral tribunal.  He holds law degrees from the University of Buenos Aires (Abogado 1972;

Doctor of Law 1983) and Harvard Law School (LLM 1984; S.J.D., 1985).  He is a member of

the District of Columbia bar, along with the Argentina Federal Courts Bar, the New York Bar,

and the U.S. Supreme Court Bar.  He has published extensively in the field of international

arbitration.  *Id.*

Professor Naón was retained in this case "to analyze and give an expert opinion on the

procedure carried out by the [SCC] … leading to the appointment by the SCC of Professor

Sergei Lebedev as arbitrator on behalf of the RoK[.]"  *Id.* at 3.  After reviewing the operative

facts, Professor Naón concluded as follows:

> The circumstances set forth above — which show that the SCC failed to properly
> apply or even infringed the SCC Rules — deprived the RoK of its ability to
> exercise its autonomy to appoint its co-arbitrator or the constitution of  the arbitral
> tribunal, to which the RoK was entitled under the SCC Rules Article 13(3),
> because:
>
> a)      The SCC did not describe in its correspondence addressed to the Ministry
>         the obligation of the RoK to designate its co-arbitrator, the time limit to do
>         so and the consequences ensuing from the failure to appoint the co-
>         arbitrator, taking particularly into account that the RoK is a State party;
>
> b)      Given the fact that the RoK is a State party, the SCC did not use the
>         flexibility  afforded to it under Articles 5  and 7 of the SCC Rules to allow
>         the RoK to have reasonable time to appoint its co-arbitrator with adequate
>         counsel assistance, for example by aligning the setting or administration of
>         time limits for the appointment of the co-arbitrator with  more flexible
>         approaches in those respects evidenced by the rules and practices of other

international arbitral institutions, particularly when such approaches concern State parties;

c) The SCC failed to fairly administer the time limits granted to the RoK to appoint its co-arbitrator, either by not computing them from the date the communications imparting such time limits were actually received by the RoK, or by precipitating the appointment by the SCC of an arbitrator on behalf of the RoK apparently without caring to consider whether or when the RoK had received sufficient advance notice of the request from its opposing party to have the SCC make such appointment and without involving the RoK in a consultation process (as it would have been the case under ICSID or PCA practices) and, therefore, without appropriate time to adequately react to such request;

d) The SCC did not consider, in the application of its rules, the fact that the RoK, being a State party, was entitled to benefit from the presence and assistance of specialized counsel for the proper exercise of its party autonomy, not only in the selection and appointment of a co-arbitrator of its choice for an arbitral case involving important public and State interests, but also in the constitution of the arbitral tribunal, including the process leading to the appointment of an arbitrator on behalf and without the consent of the RoK and of the arbitral tribunal's president; and

e) As indicated in paragraph 31 g) above, by its conduct, the SCC has seriously compromised the international enforcement of the arbitral award rendered in the Arbitration pursuant to, inter alia, Article V of the New York Convention.

*Id.* at 27-28. Respondent respectfully directs the Court to the entirety of Professor

Naón's opinion.

That Kazakhstan was not given proper notice of the appointment of the arbitrator,

and its due process rights were violated is equally confirmed by the opinion of Professor

Lindell. *See* Lindell Opinion (Ex. 23) at 20-32.

> **E. Even if the SCC Had Requested that Kazakhstan Appoint an Arbitrator, Which It Did Not, The Time Limits Imposed by the SCC Violated Due Process**

Even if the SCC had directed Respondent to appoint an arbitrator in its Response, which

it did not, the conduct of the SCC constituted a substantial deviation from norms of international

arbitration.  In total, the SCC allowed Kazakhstan at most thirty-two (32) days to file its

Response (from August 9 to September 10, 2010).  Had the SCC provided notice to Kazakhstan

that the SCC Board had determined that Kazakhstan should appoint its arbitrator within the same

time period for filing its Response, which it did not, such a cramped timeline stands in stark

contrast to those provided by numerous other arbitration institutes.  As confirmed by Professor

Naón:

> Even if in these letter the SCC put the RoK on notice of an obligation to appoint
> its arbitrator, which it did not, this would have contrasted with the rules and
> practices of ICSID, which provide for 90 days for the appointment of arbitrators
> by the parties, or with those of the ICC, which provide for 30 days likely to be
> followed by an extension to do so if requested by a State party, or with the PCA
> Rules, also granting the Respondent thirty days to appoint its arbitrator.  Further,
> the SCC practice revealed by the SCC correspondence in the Arbitration is in
> stark contrast with the ICSID or PCA practice for selecting an arbitrator on behalf
> of a defaulting party which, as shown above, is not done in haste and is based on a
> consultation process with participation of the defaulting party.

Naón Opinion, at 20.

The SCC's actions in appointing an arbitrator on Respondent's behalf—while

incompatible with principles of due process—thus is all the more deficient when measured

against the well-established norms in international arbitration that place special emphasis on the

right to appoint an arbitrator when a foreign state is a party.  *See id.* at 8-9, 20.  "[T]he process of

choosing an arbitrator is a delicate one and takes time."  *Id.* at 24.  Rather than afford

Respondent that time, however, the SCC acted in a manner that "rendered impossible any

reaction from [Respondent]" and conflicted with established practices of international

arbitration.  *Id.* at 24-25.

Professor Naón's opinion is shared by Professor Lindell.  *See* Lindell Opinion (Ex. 23) at

§ 3.1 ("The SCC's time limits") and § 3.2 ("The time limits are obviously too short").

## III.    THE AWARD IS UNENFORCEABLE UNDER ARTICLE V, SECTION 1(D) OF THE NEW YORK CONVENTION

Section 1(d) of Article V of the New York Convention empowers a federal court to refuse enforcement of an arbitral award where "[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the alleged agreement of the parties[.]" *See also Polimaster*, 623 F.3d at 843 (vacating an arbitral award under Article V, 1(d)). In prior cases, this Court has noted that a court should not set-aside an arbitral award unless the asserted procedural violation "worked substantial prejudice to the complaining party." *Compagnie des Bauxites de Guinee v. Hammermills, Inc.*, No. CIV.A. 90-0169, 1992 WL 122712, at *5 (D.D.C. May 29, 1992).

The Award in this case fails under both of the criteria identified in Section 1(d). First, through the alleged arbitration agreement, Petitioners and Kazakhstan consented to have the arbitral authority composed according to the provisions of the SCC Rules. These rules give each party the right to appoint its own arbitrator when the tribunal is to be composed of more than one arbitrator. *See* Ex. 1, Art. 13(3). However, by appointing an arbitrator on Respondent's behalf contrary to the SCC Rules, the Tribunal's final composition did not comply with the parties' alleged agreement to arbitrate. This conclusion is further supported by the expert opinion of Professor Naón, and specifically his conclusion that "the SCC failed to properly apply or even infringed the SCC Rules" and thus "deprived the RoK of its ability to exercise its autonomy to appoint its co-arbitrator or the constitution of the arbitral tribunal, to which the RoK was entitled under the SCC Rules Article 13(3)." Naón Opinion, at 27; *see also* Lindell Opinion (Ex. 23) at 29-32 (explaining at length why Professor Lebedev was not "lawfully appointed" given that he was appointed "in contravention of the parties' agreement").

Second, the parties' alleged agreement explicitly required a three month cooling-off period to precede the submission of the dispute to arbitration. As set forth above, Petitioners did not comply with this requirement, and the Tribunal did not enforce it. For both of these reasons, neither the composition of the arbitral authority nor the arbitral procedure were in accordance with the alleged agreement of the parties.

> **A.    The Composition Of The Arbitral Authority Did Not Comply With The Alleged Agreement Of The Parties Because The SCC Appointed An Arbitrator For Respondent Contrary To The SCC Rules**

> **1.    Non-Compliance With The Alleged Agreement Of The Parties**

Article 26 of the ECT provides that an Investor may submit a dispute for resolution by "an arbitral proceeding under the [SCC]." ECT, Art. 26(4)(c). The Arbitration Rules promulgated by the SCC govern disputes submitted to the SCC for arbitration. *See* Ex. 1, Preface, Art. 1. Thus, by including arbitration by the SCC as an option for resolving a dispute, a party to the ECT implicitly agrees to have the dispute governed by the then-applicable SCC Rules (when a dispute is submitted to the SCC in accordance with the provisions of ECT Article 26). *See* Ex. 1, Preface.

The number of arbitrators and method of selecting arbitrators in an SCC arbitration is governed by the SCC Rules. *See* Ex. 1, Art. 12, 13. Unless the parties agree on the number of arbitrators, the SCC Rules provide that the SCC Board shall "decide the number of arbitrators." Ex. 1, Art. 9(iii), 12. The SCC Board is allowed to choose between three arbitrators or one arbitrator based on whether the Board determines that the complexity of the case warrants decision by a sole arbitrator. *See* Ex. 1, Art. 12. The SCC Rules further direct that, where the number of arbitrators is to be greater than one, each party to the dispute has a right to appoint an equal number of arbitrators, leaving the Chairperson to be designated by the SCC. *See* Ex. 1, Art. 13(3). A party may lose its right to appoint an arbitrator if the party "fails to appoint" its

arbitrator within "the stipulated time period[.]" *See id.* In such a case, the appointment will be made by the SCC Board. *See id.* Moreover, in the absence of an agreed-upon timeline for appointing the arbitrators, the "stipulated time period" consists of a "time period set by the Board[.]" *See* Ex. 1, Art. 13(1). Thus, a party loses its right to appoint its arbitrator ***only*** when (1) the time period for appointing the arbitrator has been designated, and (2) the party fails to comply with that time period.

The SCC did not comply with these rules in this case. On July 26, 2010, Petitioners filed their request for arbitration. Award ¶ 6. Pursuant to Article 5 of the SCC Rules, the Secretariat is to "set a time period within which Respondent [was to] submit an Answer[.]" *See* Ex. 1, Art. 5(1). However, the SCC ***never*** established a time period within which Kazakhstan was required to appoint its arbitrator. And no party contends that it did.

The only time period ever established by the SCC was that under Article 5 of the SCC Rules for Kazakhstan to provide its Answer to the Request for Arbitration. *See* Ex. 2; Ex. 4; *see also* Ex. 1, Art. 5 ("The Secretariat shall set a time period within which the Respondent shall submit an Answer to the SCC."). This Article 5 deadline, however, is distinct from the deadline found in Article 13, governing when a party must appoint its arbitrator. Article 13 provides that the ***Board*** is to designate a deadline for appointing arbitrators if the parties have not agreed on such timing. *See* Ex. 1, Art. 13(1), (3). In contrast, Article 5 provides that the "time period within which the Respondent shall submit an Answer to the SCC" is to be designated by the ***Secretariat***. *See* Ex. 1, Art. 5(1). Thus, the SCC rules themselves bar any interpretation that conflates these time periods, requiring instead that each time period be ***independently*** designated.

This interpretation is in accord with the remainder of Article 5 of the SCC Rules. Article 5(1)(v) directs that the Answer should include the contact information for "the arbitrator appointed by a respondent," but only "*if applicable*" to that particular party. *See* Ex. 1, Art. 5(1)(v). This requirement would be *in*applicable if, for example, as here, the parties had not yet agreed on the number of arbitrators and the SCC Board had not yet exercised its authority under Article 9(iii) to determine the number of arbitrators or set a deadline for appointment of an arbitrator. This requirement also would be inapplicable if the parties had pre-designated their arbitrators in the arbitration agreement, or if the SCC had determined, pursuant to Article 12, that the dispute would be decided by a sole arbitrator. *See* Ex. 1, Art. 12.

The same is true when the SCC has not established a time period for the appointment of arbitrators, as required by Article 13 of the SCC Rules, at the time when the Answer is requested. *See* Ex. 1, Art. 13(1), (3). As noted, Article 13 explicitly gives to the Board, not the Secretariat, the authority to designate the deadline for appointing arbitrators.[20] Reading Article 5(1)(v) to require Kazakhstan to appoint its arbitrator *before* the Board has exercised its Article 13 authority renders this grant of authority to the Board meaningless. Article 5(1)(v) thus does not impose an independent timeline for appointing arbitrators. *See Fed. Ins. Co. v. Commerce Ins. Co.*, 597 F.3d 68, 71 (1st Cir. 2010) ("[W]e must avoid constructions that render contract terms meaningless." (internal quotation marks omitted)); *Rann v. Chao*, 209 F. Supp. 2d 75, 81 (D.D.C. 2002) ("[A] court should . . . read the statute so that no word, clause, sentence, or phrase

---

[20] Appendix 1, Article 7 of the SCC Rules lists certain decisions the SCC Board can delegate to the SCC Secretariat. This list *does not* include the decision to set a deadline for a party to appoint its arbitrator. *See* Ex. 1, at 22 ("The Board may delegate decisions to the Secretariat, including decisions on advances on costs, extension of time for rendering an award, dismissal for non-payment of registration fee, release of arbitrators and fixing of arbitration costs."). Even if the list did include this decision, it would be a moot point as it is undisputed that the SCC Secretariat never requested that Kazakhstan appoint an arbitrator or set a deadline for the same.

is rendered surplusage, superfluous, meaningless or nugatory." (internal quotation marks omitted)).

In any event, even if the time period for supplying a response under Article 5 *can* simultaneously supply the deadline for appointing an arbitrator, the conduct of the Secretariat forecloses that option here.  In its August 5, 2010 cover letter to Kazakhstan, the Secretariat listed the content that Kazakhstan was required to include in the Answer.  *See* Ex. 2 ("Your Answer shall contain comment on the seat of arbitration and on the proposition of the Claimants that the Chairperson be selected by the party-appointed arbitrators.").  Notably ***absent*** from this list was ***any*** language directing Kazakhstan to appoint its arbitrator in the response.  The Secretariat's action is, however, perfectly consistent with Article 5:  because the Board had not determined the number of arbitrators or established a deadline for the appointment of arbitrators, Article 5(1)(v)'s requirement that the response contain this information was not "applicable." *See* Ex. 1, Art. 5(1)(v).  As a consequence, the Secretariat did not ever request that Kazakhstan appoint an arbitrator, either expressly or implicitly, in its Answer or otherwise.

Moreover, the SCC's representations to Kazakhstan in *Sudima Time Ltd.* case, confirm that the deadline for submitting an Answer does not also set the timeline for appointing an arbitrator and that an arbitrator may only be appointed by the institution of a party "explicitly fails to make the appointment."  *See supra* at 43-44.  Here, Kazakhstan did not appoint an arbitrator because it was never notified by the SCC that it was required to make such an appointment, and the SCC Board never set a deadline for the same.  Failing to appoint an arbitrator under these circumstances cannot be characterized as having been done "explicitly."

## 2. Non-Compliance With The Parties' Alleged Agreement Substantially Prejudiced Respondent

Kazakhstan has been "substantial[ly] prejudice[d]" as a result of the Tribunal's procedural violation. *See Compagnie*, 1992 WL 122712, at *5. It was because of the SCC's failure to request that Kazakhstan appoint an arbitrator, to designate a time period for such appointment, and to provide meaningful notice that Petitioners had requested that Kazakhstan be deprived of this right, that Kazakhstan t did not appoint an arbitrator. And it was because of this perceived "failure" that the SCC believed itself empowered to appoint an arbitrator on Respondent's behalf. Thus, because of the SCC's procedural error, Respondent was deprived of that right which is "the essence of tripartite arbitration[.]" *Stef Shipping Corp.*, 209 F. Supp. at 253 (S.D.N.Y. 1962). Respondent being deprived of its right to appoint its own arbitrator, thus prejudiced it *per se*.

## B. The Arbitral Procedure Did Not Comply With The Alleged Agreement Of The Parties Because The Three Month Cooling-Off Period Did Not Occur Prior To Commencement Of Arbitration As Required By The ECT

For the reasons set out above, Petitioners; failure to comply with the three month cooling-off period required by Article 26(1), (2) of the ECT resulted in the arbitral procedure not complying with the alleged arbitration agreement between the parties. These arguments are equally applicable to a defense under Article V, 1(d).

## C. The Arbitral Procedure Did Not Comply with the Alleged Agreement of the Parties Because the Tribunal Committed Multiple Procedural Errors

The Award also is unenforceable under Section 1(d) of Article V because the Tribunal committed a number of procedural errors and irregularities during the arbitration that prejudiced Respondent. These errors and irregularities are set forth in detail in Kazakhstan's pending challenge proceedings in Sweden. In principle, these errors consist of the Tribunal (1) ignoring the submission of expert evidence and other evidence regarding almost every major disputed

issues of the case; (2) failing to consider Kazakhstan's objections that certain deductions would need to be made from any eventual award to Petitioners; and (3) going beyond the submissions of the Parties and ignoring the Parties' submissions and the applicable law on multiple occasions. *See generally* Ex. 21; Ex. 22.

A prime example of these procedural errors was the Tribunal's complete disregard of crucial testimony that resulted in $199 million being improperly awarded to Petitioners. This concerned the valuation given by the Tribunal to an unfinished LPG Plant. *See* Award ¶¶ 1693-1748. Petitioners had started constructing the LPG Plant in 2006, *id.* ¶ 250, but halted construction sometime in the first half of 2009. *Id.* ¶ 441. According to Petitioners' own statements, the construction was approximately 90% finished at this time. *See* Transcript of Arbitration Proceeding (Jan. 29, 2013) attached hereto as Exhibit 32, at 31.

Kazakhstan argued that only scrap value should be attributed to the unfinished LPG plant. This was because there were no sufficient sources of gas to be processed at this plant, Petitioners had not proven the existence of any such sources, and, accordingly, it would have been uneconomical to finish the construction. *See* Award ¶¶ 1712-42. Nonetheless, Petitioners argued that the LPG Plant would be completed and operated as a going concern. On the basis of this argument, Petitioners ultimately demanded compensation for the alleged investment costs in the Plant of $245 million and a portion of its so-called prospective value of $329 million. *See id.* ¶ 1649.

Petitioners attempted to support their position that the LPG Plant was not scrap by alleging that "publicly available" information indicated that Kazakhstan was "gearing up" to open the LPG Plant in 2012. *Id.* ¶ 1696. The only such information was provided by

Petitioners' experts in a footnote reference to two hyperlinks to internet pages.  These hyperlinks were not provided as exhibits or even translated.  *See id.* ¶ 1745.

Kazakhstan rebutted this allegation with a witness statement by Mr. Taras Khalelov, the general director of the company in charge of the trust management of the fields who had personal knowledge of the relevant issues.  *See id.* ¶ 1737.  Both in his written witness statement and during oral testimony (in January 2013), Mr. Khalelov confirmed that no attempts to finish the construction had been undertaken.  In his witness statement, Professor Khalelov testified as follows:

> The LPG Plant is not part of the trust management.  However, as it has been abandoned by the owners, we protect the premises and the equipment by employing guards.  Ever since the unfinished LPG Plant was abandoned, no further work has been conducted on the Plant.
>
> I have been informed that Claimants allege that Kazakhstan is training specialists for the operation of the LPG plant.  However, no such training has taken place and I have never heard about any programme [sic] to this objective either.  In addition, I do not know of any intention to finish the construction of the plant.

*See* Exhibit 33 ¶¶ 4.1-4.2.  In his oral testimony, Mr. Khalelov reemphasized this point:

> [Question]:  You state in your witness statement . . ., that: "Ever since Claiments abandoned the unfinished LPG Plant, no further construction on the Plant has been conducted."  Is that correct?
>
> [Professor Khalelov]:  Absolutely correct.
>
> [Question]:  And has any construction been commenced since you submitted your witness statement?
>
> * * * *
>
> [Professor Khalelov]: No.  The answer to your question is no.
>
> * * * *
>
> [Question]:  Thank you.  And are you aware of any plans to finish the construction?
>
> [Professor Khalelov]:  No, officially I am not informed of any.  I do not know.

Ex. 32, at 143-44.  This evidence was unchallenged.

Petitioners did not repeat their argument until July 2013 (i.e. at least 6 months after Kazakhstan had allegedly intended to start operating the LPG Plant), when the proceedings were formally closed, did not submit any evidence to show that the plant had indeed been opened or even that *any* construction work had taken place.  *See* Ex. 22 ¶ 275.

The Tribunal, however, either overlooked or ignored Mr. Khalelov's evidence.  Specifically, in arriving at its $199 million valuation, the Tribunal, in a first step considered whether to attribute value to the LPG Plant at all.  *See* Award ¶¶ 1743-48.  In answering this question in the affirmative, the only "evidence" cited by the Tribunal were the two hyperlinked internet pages.  *See id.* ¶ 1745.  Indeed, the wording of the Award demonstrates that the Tribunal completely overlooked or ignored Mr. Khalelov's evidence.  This can be seen in Paragraph 157 of the Award where the Tribunal, when describing the witnesses who testified on Day 2 of the hearing on damages, mentioned ***every single*** witness who testified except for one, Mr. Khalelov.  *See id.* ¶¶ 157-59

The Tribunal thus ignored critical evidence showing that Petitioners were wrong to ascribe anything other than scrap value to the LPG Plant.  *Id.* ¶¶ 1712-48.  As a consequence of this error, $199 million was added to Respondent's liability.  *Id.* ¶ 1747.  This deprived Respondent of its due process right to present its case and be heard.  *See LaChance v. Erickson*, 522 U.S. 262, 266 (1998).  Courts have vacated arbitral awards in similar situations.  For example, the First Circuit affirmed a district court's decision to vacate an arbitral award where the arbitrator allowed evidence to be admitted, but "refused to give any weight to [the] evidence."  *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 40 (1st Cir. 1985).  There, as here, the non-considered evidence was

"unquestionably relevant to [the] determination" and was "central and decisive" to the party's position.  *Id*.  Failure to consider evidence of this kind was "so destructive of the [party's] right to present [its] case" that it warranted setting aside the award.  *Id*. (last alteration in original) (internal quotation marks omitted); *see also Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir. 1995) (affirming vacatur of an arbitral award where arbitrator refused to consider evidence).  The same result should follow here.

## IV.    THE AWARD IS UNENFORCEABLE UNDER ARTICLE V, SECTION 2(B) OF THE NEW YORK CONVENTION

Section 2(b) of Article V authorizes a federal court to decline enforcement of an award where it "would be contrary to the public policy of that country."  The arbitration proceedings and the Award in this case falls within this provision.

Public policy derives from "laws and legal precedents and not from general considerations of supposed public interests."  *Am. Postal Workers Union, AFL-CIO v. United States Postal Serv.*, 789 F.2d 1, 8 (D.C. Cir. 1986); *Matter of Arbitration Between Chromalloy Aeroservices*, 939 F. Supp. 907, 913 (D.D.C. 1996).

The protections of due process are deeply rooted in the law and legal precedents of the United States.  *See* Const. amend V & XIV § 1.  As noted above, the right to receive meaningful notice is an "elementary and fundamental requirement of due process in any proceeding which is to be accorded finality[.]"  *Mullane*, 339 U.S. at 314; *see also* SCC Rules (Ex. 1), Art. 40 ("An award shall be final and binding on the parties when rendered.").  Likewise, "[t]he core of due process" encompasses the right to "a meaningful opportunity to be heard."  *LaChance*, 522 U.S.at 266; *Mullane*, 339 U.S. at 314 (due process requires that a party be "afford[ed] [] an opportunity to present [its] objections").

As set forth above, the Tribunal appointed an arbitrator on Respondent's behalf without providing **any notice** to Respondent.  Depriving Respondent of this fundamental right, without justification, is irreconcilable with the most basic notions of fairness and due process that form the fabric of United States law and public policy.

## V.    KAZAKHSTAN DID NOT ENTER INTO AN ARBITRATION AGREEMENT WITH PETITIONER TERRA RAF

Even if the Tribunal did possess jurisdiction over the dispute between Respondent in principle, that jurisdiction does not extend to Petitioner Terra Raf, who is not an "investor" within the meaning of Article 1(7) of the ECT because it is a company incorporated in Gibraltar. This deprived the Tribunal of jurisdiction over Terra Raf and thus renders the Award unenforceable by Terra Raf in the present proceeding under Article V, Section 1(a) of the New York Convention.

Article 26 of the ECT governs disputes between a "contracting party" and an "investor." *See* ECT, Art. 26(1).  A "contracting party" is defined in the ECT as a "state" or "Regional Economic Integration Organization which has consented to be bound" by the ECT.  *See* ECT, Art. 1(2).  An "investor" is defined, in relevant part, as "a company or other organization organized in accordance with the law applicable in [a] Contracting Party[.]"  ECT, Art. 26(7)(a)(ii).  Therefore, for Terra Raf to be an "investor", Gibraltar would have to be a "contracting party", *i.e.*, it would have needed to "consent to be bound" by the ECT, *see* ECT Art. 1(2), which it did not.  While both the United Kingdom and the European Union ("EU") are signatories of the ECT, *see* http://www.encharter.org/index.php?id=61 (accessed Dec. 29, 2014), none of these signatures entail that Gibraltar is also a contracting party.

The Tribunal determined that it could exercise jurisdiction over a dispute involving Petitioner Terra Raf because, in its view, "the ECT applies to Gibraltar on the basis that Gibraltar

is part of the European Community, which is itself party to the ECT." *See* Award ¶ 746. Gibraltar is a territory under the control of the United Kingdom. The United Kingdom, in turn, is a member of the European Union, and a signatory of the Treaty on the European Union ("TEU") and the Treaty on the Functioning of the European Union ("TFEU"). *See* http://europa.eu/about-eu/countries/member-countries/ (accessed Dec. 29, 2014). From this, the Tribunal relied on two separate provisions to conclude that Gibraltar was subject to the ECT. First, the Tribunal pointed to Article 52 of the TEU, which states: "The Treaties shall apply to . . . the United Kingdom of Great Britain and Ireland." Award ¶ 746. Second, the Tribunal relied on Article 355 of the TFEU, which states: "The provisions of the Treaties shall apply to the European territories for whose external relations a Member State is responsible." *See* TREU, Art. 355(3), *available at http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:12012E/TXT&from=EN.* Thus, the Tribunal reasoned that the EU effectively acted on Gibraltar's behalf in consenting to the ECT. *See* Award ¶ 746.

The Tribunal's reasoning is incorrect. Article 28 of the Act of Accession of the Kingdom of Denmark, Ireland, the Kingdom of Norway and the United Kingdom of Great Britain and Northern Ireland ("Act of Accession"), which forms part of the Treaty between the then old EEC and new EEC member states, rules that Gibraltar does not participate in the so-called Common Commercial Policy (CCP) of the European Union.[21] Therefore, the EU has no power to enter into treaties with effect for the territory of Gibraltar, in so far as the treaty is part of the CCP.

The ECT, however, *was* concluded within the framework of the CCP. By virtue of Article 207(1) of the TFEU, the CCP applies to trade and foreign direct investments. And, the

---

[21] *See* Act of Accession, *available at* http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=OJ:L:1972:073:TOC

ECT primarily deals with trade and protection of investments in the energy sector.[22]  Lacking competence in the area of CCP as regards Gibraltar, there was no possibility for the EC to include Gibraltar—and thereby Terra Raf—in the territorial scope of the ECT.[23]  Consequently, the Award, for this independent reason, cannot be enforced by Petitioner Terra Raf.

## CONCLUSION

WHEREFORE, Respondent requests that the Petition be denied, that this action be dismissed with prejudice, and that Respondent be awarded the costs of this proceeding, including attorneys' fees and expenses, in a total amount to be quantified subsequently.

---

[22] The Council of the European Union and the Commission of the European Communities in their 23 September 1997 Decision to conclude the ECT also explicitly referred to Article 113 of the EC Treaty, which establishes the common commercial policy, Official Journal L 069, 09/03/1998 p. 1,  http://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:31998D0181&from=DE.

[23] Even if, *arguendo*, it was assumed that the ECT in principle applied to Gibraltar due to the EU's ratification, the ECT could not have been applied to Terra Raf.  The area of the EU has to be that of its member states.  The specific EU law is applicable to the member states either directly or through incorporation into the national law.  Therefore, in this context, Terra Raf could only be protected by the ECT by virtue of the EU ratification, if it were incorporated under specific EU law, such as a *Societas Europaea (SE)*, which it is not.  Otherwise, there would be no difference whether the ECT applied via the EU or Gibraltar ratification.

Dated:  February 26, 2015

Respectfully submitted,


  /s/ Matthew H. Kirtland
Matthew H. Kirtland (D.C. Bar No. 456006)
matthew.kirtland@nortonrosefulbright.com
Kara Petteway (D.C. Bar No. 975541)
kara.petteway@nortonrosefulbright.com
Benjamin Hayes (D.C. Bar application pending)
benjamin.hayes@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
801 Pennsylvania Avenue, NW
Washington, D.C. 20004-2623
Tel:  202-662-0200
Fax:  202-662-4643

*Attorneys for Respondent Republic of Kazakhstan*